IN THE UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA

ABDUR-RAHIM MAHDI,                    :
        Movant,

                                      :

v.                                    :        CRIMINAL NO. 01-396-01 (ESH)

                                      :

UNITED STATES OF AMERICA,
        Respondent.                   :

                                      :

oooOooo

MOVANT'S REPLY IN ANSWER TO
THE GOVERNMENT'S OPPOSITION TO MOVANT'S MOTION TO
VACATE PURSUANT TO 28 U.S.C. § 2255

COMES NOW, The Movant, Abdur-Rahim Mahdi, and lays forth his instant Reply in answer to the Government's Oppositional pleading in its entirety. Herein, the Movant addresses each of the Government's opposing arguments in the order in which they appear in the Government's Oppositional pleading.

## A. THE OPPOSITION TO MOVANT'S DOUBLE JEOPARDY AND 18 U.S.C. § 13 VIOLATIONS

To begin with, the Government either by mistake or design recasts the Movant's double jeopardy claim under the "Multiplicitous Indictment" claim Movant's appellate attorney previously presented on direct appeal. Obviously the Government is attempting to hoodwink the Court into summarily denying Movant's valid--and totally seperate from that of appellate counsel--claim on the first glance presumption that the argument is the exact one raised by appeal counsel, which is factually not so.

To be sure, Movant's double jeopardy claim mentions nothing to the tune of a multiplicitous indictment and/or counts of the indictment, a claim of error the Movant understands must be raised before trial lest the claimant suffers procedural hurdles and/or other detrimental circumstances as a result of postrial objections. To the contrary here, the Movant is clear and procedurally correct in pointing out to the Court that his conviction(s) for the lesser included §846 narcotics conspiracy is in conflict with the holdings of the United States Supreme Court and other United States Circuit Courts on the issue, and violates his constitutional right under the Fifth Amendment's Double Jeopardy Clause, a claim the § 2255 remedy recognizes for redress. In short, in accordance with Rutledge v. United States, 517 U.S. 292, 301-303 (1996)(holding that concurrent sentences imposed for 21 U.S.C. § 846 conspiracy

RECEIVED
Mail Room

APR - 1 2013

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

offense and 21 U.S.C. § 848 continuing criminal enterprise offense is a cummulative punishment not authorized by Congress); Brown v. Ohio, 432 U.S. 161, 169 (1977) ("[w]hatever the sequence may be, the Fifth Amendment forbids successive prosecution and cummulative punishment for a greater and lesser offense."); see also United States v. Solano, 605 F.2d 1141, 1145 (9th Cir. 1979)(holding that, where defendant was previously convicted on drug charges and then faced trial on RICO conspiracy, although defendant was not entitled to a pre-trial evidentiary hearing [on double jeopardy claim], if it becomes clear from the trial that [defendant] is being pro-secuted twice for the same conspiracy, he is free to raise such argument after trial if he is convicted on the RICO conspiracy count"); United v. Sperling, 560 F.2d 1050, 1059 (2d Cir. 1977)(noting Court's "opinion, set out above, that Congress did not intend §§ 846 and 848 to be offenses seperately and simultaneously punishable where the facts on which the violation rests are the same"); United States v. Marshall, 332 F.3d 254 (4th Cir. 2003)("A defendant convicted under 21 U.S.C. § 848 (CCE) cannot, in addition be convicted for any predicate conspiracy charges proved as an element of the 848 offense.")(citing United States v. Wilson, 135 F.3d 291, 303 (4th Cir. 1998), and with the law of uniformity between Circuit Courts, the Movant's conviction(s) for the lesser included § 846 narcotics conspiracy offense(s), in ad-dition to the RICO and VICAR substantive conspiracy offenses, is clear error in law that infringes on Movant's double jeopardy rights and requires vacation of the les-ser included § 846 conspiracy and any other lesser included (or those premised on the same conduct) conspiracy offense(s), lest the District of Columbia Circuit creates conflict with the U.S. Supreme Court and other U.S. Circuit Courts on the same issue.

Further, the Government's reliance on the Blockburger (Blockburger v. United States, 284 U.S. 299 (1932)) tinged opinion of the Court of Appeals, particularly in light of its age and developments since that decision, the details of the case itself, and that Movant's case involved a complex conspiracy, is defective. Indeed, the Court of Appeals' adverse decision on this issue is far from settled amongst the Circuits, as well as it was premised on the prehistoric Blockburger analysis.

In Blockburger, the Court concluded that the petitioner had engaged in a series of seperate offenses, each of which was punishable. See Blockburger, 284 U.S. at 302. The Court observed: "in the present case, the first transaction, resulting in a sale, had come to an end. The next sale was not the result of the original impulse, but of a fresh one-that is to say, of a new bargain." Id. at 303. The Blockburger Court de-termined that "[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine

3

whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." **Id.** at 304.

Unlike reviewing the series violations in Blockburger, application of that rule in the conspiracy context is a wholly different matter. As one court noted, "[a]lthough such a test appears easily applicable to most cases involving double jeopardy claims, it is not easily applied to complex conspiracy prosecutions." United States v. Solano, 605 F.2d 1141, 1144 (9th Cir. 1979). The Blockburger test is only a first consideration, in considering the elements of two or more overlapping offenses, particularly where conspiracy charges are involved. See Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)(explaining that the Blockburger test serves function of analyzing elements of offenses at issue, which is similar but distinguishing from situation where conspiracy offenses involves "concerted criminal activity, a plurality of criminal agents"); **see also** Brown v. Ohio, 432 U.S. at 166 n.6 ("The Blockburger test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense."). Accordingly, in the conspiracy context, double jeopardy analysis requires consideration of the precise allegations, not just the elements. **Cf.** United States v. Barton, 647 F.2d 224, 237 (2d Cir. 1981)(affirming consecutive sentences on counts for two different conspiracy charges--one to violate RICO and one to possess explosives and damage buildings--after close examination of allegations of each charge, including that RICO conspiracy would not have provided a RICO predicate); **see** Solano, 605 F.2d at 1145.

Applying these principles to allegations here, rather than just comparing the elements of § 846 and RICO and VICAR as called for by the Blockburger test, the Court of Appeals affirmed multiple conspiracy convictions based on the same exact facts and proof sustaining each offense. The § 846 conspiracy is clearly a lesser included and predicate offense of at least the RICO count.

In Ball v. United States, 470 U.S. 856, 861-865 (1987), the Court concluded that Congress did not intend to allow punishment for both illegally "receiving" and illegally "possessing" a firearm." The Court held that the only remedy consistent with the Congressional intent was to vacate one of the underlying convictions as well as the concurrent sentence based upon it, and explained that the second conviction does not evaporate simply because of the sentence's concurrence, since it has potential adverse collateral consequences--e.g., delay of parole eligibility or an increased sentence under a recidivist statute for future offenses--that make it presumptively impermissible to impose. Because the Supreme Court adheres to the presumption that Congress intended to authorize only one punishment in the circumstances

4

of an ongoing drug crime or crime of violence, one or both of the substantive RICO
and VICAR conspiracy convictions (in which the lesser included § 846 conviction
will remain or vis-a-vis), lest it is unauthorized punishment for a seperate offense
and must be vacated under Ball, 470 U.S. at 864.

Next, Movant's claim with respect to the multiple § 924(c) convictions, al-
though linear with the Blockburger circumstances set out above--in that the Block-
burger test should not be determinitive in this instance--is more based on double
jeopardy protection within the context of a conspiracy; that is, an ongoing drug
crime or crime of violence, as well as this Circuit's precedence in United States v.
Anderson, 59 F.3d 1323 (D.C. 1995) and that of its seven sister circuits on the
issue; see United States v. Lindsay, 985 F.2d 666, 673 (2d Cir. 1993); United States v.
Privette, 947 F.2d 1259, 1262-63 (5th Cir. 1991); United States v. Sims, 975 F.2d
1225, 1233 (6th Cir. 1994); United States v. Cappas, 29 F.3d 1187, 1189 (7th Cir.
1994); United States v. Fontanilla, 849 F.2d 1257, 1258-59 (9th Cir. 1988); United States v.
Moore, 958 F.2d 310, 312 (10th Cir. 1992); United States v. Hamilton, 953 F.2d 1344,
1346 (11th Cir. 1992), holding that only one § 924(c) conviction can be entered in/
on any single predicate offense; that is, ongoing drug crime or crime of violence.

Indeed, this Circuit, in Anderson, 59 F.3d at 1326-28, found that the terms
"uses" or "carries" in the statute implied continuing activity, so that a single
violation of the statute does not occur each time the defendant used or carried a
gun. The Court reasoned that Congress in drafting § 924(c) was not seeking to crim-
inalize every discrete deployment or brandishing of a gun during a period when a
drug crime or crime of violence was being committed. Id. at 1326-27. Here, Movant
should have only been convicted of one § 924(c) violation for using or carrying a
firearm during and in relation to the overall "Mahdi Brothers" drug crime con-
spiracy, which included acts of violence. Although the Government charged Movant
with several seperate predicate offenses, all of the six § 924(c)(1) charges were
linked to the overall Mahdi Brothers narcotics conspiracy, allegedly headed by the
Movant. Alternatively, at most, the statute is ambiguous as to the appropriate unit
of prosecution and therefore the rule of lenity is to be applied. Anderson, 59 F.3d
at 1334, citing Lindsay, 985 F.2d at 676 (invoking rule of lenity and concluding
defendant who uses multiple firearms in relation to a single predicate offense may
be convicted of only one § 924(c) violation).

Also, the Movant recognizes that D.C. Code § 11-502(3) allows that an indict-
ment jointly charging offenses against both U.S. Criminal Code and District of
Columbia Criminal Code offenses to be subjected to a single trial in the United

5

States District Court. Thus Movant concedes on his § 13 claims of double jeopardy
and lack of jurisdiction, that absent abrogation, repeal, or favorable amendment
to § 11-502(3) prohibiting the mixing and trial of D.C. Code offenses with that of
U.S. Code offenses, in one indictment and trial, has no support in law. However,
the Movant argues alternatively that § 11-502(3) is an unconstitutional statute
in that it unconstitutionally suspends the claim by a defendant that the United
States District Court for the District of Columbia has no jurisdiction—and/or vio-
lates double jeopardy—when District of Columbia Criminal Code offenses are
charged and tried in a federal indictment and district court along with the exact
or related U.S. Code offenses. In otherwords, no other U.S. District Court allows
for the indictment and trial of local criminal offenses together with federal code
offenses, absent compliance with the laws and rules of 18 U.S.C. § 13, lest Movant's
equal protection rights are also infringed.

Finally, in the event that the Court considers any unpresented defense of waiver
by the Government on the above issues as raised in Movant's § 2255 motion, the
Movant aks that the Court also consider the counter claim that Movant's trial and
appeal counsel were ineffective for not preserving and/or presenting these speci-
fic claims. **See** United States v. Weathers, 493 F.3d 229, 232 (D.C. 2007)(counsel
held ineffective for not raising double jeopardy claim).

**B. THE OPPOSITION TO MOVANT'S PROSECUTORIAL MISCONDUCT AND BRADY VIOLATIONS CLAIM**

At the outset, the Movant presents that the suppression of impeaching evidence—
unauthorized gifts, promises and privileges dispensed by the Government to secure
fabricated and favorable testimony of coconspirators and other cooperating witnesses
against Movant—establishing the interest, incentive, and bias of several of the
Government's key (crucial) witnesses to testify falsely/unfavorably against the
Movant is required to be no more clear than stated by Movant. Also, contrary to the
Government's assertions, this evidence was material, under Brady v. Maryland, 373
U.S. (1963), to Movant's guilt and sentence. And had this evidence not been suppressed
or discovered in time for the Movant to confront and impeach the biased witnesses,
there is a reasonable probability, Giglio v. United States, 405 U.S. 150 (1972),
that the jury may not have credited any or some of the witnesses testimony where-
by not convicting Movant of all or some of the multiple criminal counts the Government
paraded the witnesses before the jury to establish.

To be sure, the Movant's burden is not proof that the jury would have acquitted
him of all or any specific number of the charged counts, but a mere showing that there

was a 'reasonable probability,' however slight, that had the jury been aware of the
Government witnesses illegal incentive, interest and bias to testify favorably for
the Government and the Government's complicity in that conduct, the jury would have
acquitted Movant of all or, at least, some of the charged counts, all of which carried
significant penalties that could have affected the bottom line of Movant's incredibly
infinite sentence. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). As an example
of the affect a lying and biased prosecution witness may have on the outcome of an
otherwise strong case for the prosecution is the O.J. Simpson acquittal, after it was
revealed that one of the prosecution's key witnesses, Los Angeles Police Detective,
Mark Furman, testified falsely as to his previous racial misconduct and bias towards
African-Americans. Indeed, during several post trial interviews on the investigative
television programs "Hard Copy" and "Inside Edition," all twelve of the Simpson Jurors
acknowledged their belief that Mr, Simpson was guilty of the crimes charged but that
their decision to acquit Mr. Simpson was because of the lie and dishonesty of Mark
Furman, which delivered the slight reasonable doubt mandating acquittal under the law.

Here, the Government does not deny that it suppressed the evidence at issue, but
instead that "the defendant has fallen short of demonstrating either that the Gov-
ernment suppressed evidence of any special treatment for cooperating witnesses, or
that such suppression was material under Brady/Giglio." (Govt. Opp. at 13). In other-
words, the Government here is openly laughing in the Movant's and Court's face at
Movant's layman attempt at proving the Government's indiscretions; the proverbial,
"Yea, so what we did it. Can you prove it though." However, the Government is mistaken
and/or over confident in its understanding of the allegations here and what is only
required to encourage the ordering of further fact finding proceedings by the Court.
First, as detailed above, the Movant has shown that the suppressed evidence was ma-
terial and could have produced at least a de minimus affect in Movant's favor on the
verdict and sentence. Next, the Movant doesn't have to **prove** in his habeas (§ 2255)
motion that the Government committed the acts of misconduct alleged. The Movant's
requirement is to make a prima facie showing of a constitutional violation that, if
true, warrants relief (which Movant's § 2255 Motion does) since the proof of the
claim may depend on undeveloped facts which an evidentiary hearing provides a vehicle
for; the fact finding process that the habeas proceeding affords.

Infact, Movant's claim here is clear and concise on who, when and where the
illegal promises, gifts and privileges were made by, given to, and at what loca-
tion. The mere fact that Movant, as a layman without the enourmous investigative
resources of the Government, could not locate and obtain sworn affidavits from all

7

of the participants/cooperating witnesses stated in Movant's claim, but that of Antoine Tabron, does not make his claim incredible or nonqualifying for further inquiry by the Court, as there is no requirement of a specific number of affidavits before a claim may survive summary judgement. Movant thus submits that the detailed and sworn affidavit of Antoine Tabron and Movant's clear allegations are enough under the rules where the allegations of the affidavit are accepted as true, to warrant further proceedings to allow Movant a fair opportunity to develope the undiscovered facts to prove his claim.

### 1. The Sufficiency Of Antoine Tabron's Affidavit

Antoine Tabron's Affidavit is sworn, specific in detail, and unequivocal about the factual events and occurrences stated therein. On the otherhand, the Government has presented nothing in its opposition that Antoin Tabron's allegations are incredible or impossible to have occurred as sworn, such as to overcome the rule and presumption that the statements of the affidavit are true. To be certain, the Government has presented the affidavits of Assistant United States Attorneys Michael Brittin and Stephen Pfleger in an apparent attempt to discredit and deny Mr. Tabron's allegations, neither of the Government's Affiants transforms Mr. Tabron's story into an incredible or impossible one. In fact, neither Mr. Brittin or Pfleger deny that the sex, drugs, cell phones and other special privileges and promises occurred with the coconspirators/cooperating witnesses. Mr. Brittin and Pfleger could say only that they either had no (personal) "knowledge," "do not recall," is "unaware," or "not aware" of the incidents alleged my Mr. Tabron. (Brittin Affidavit at ¶¶ 15, ¶ 19; Pfleger Affidavit at ¶¶ 6-7). Thus, far from showing that Mr. Tabron's allegations are wholly incredible, which showing is required for the summary dismissal of Movant's claim here, the Government's Affiants have merely created a factual dispute, the factual dispute necessitating an evidentiary hearing and further inquiry for proper resolution of the claim. Blackledge v. Allison, 431 U.S. 63, 82 n.25 (1977); Marchibroda v. United States, 368 U.S. 497 (1962); Lonchar v. Thomas, 517 U.S. 314, 324 (1996)); **see also** Earp v. Ornoski, 431 F.3d 1158, 1170 (9th Cir. 2005)(holding that district court's summary judgement was impossible because there was no evidentiary basis to judge the habeas affiant's story since his story was completely outside the record); Frazier v. United States, 18 F.3d 778, 789 (9th Cir. 1994) ("Because all of the factual allegations were outside the record, this claim on its face should have signalled the need for an evidentiary hearing.").

Next, although Mr. Tabron did not eventually testify for the Government at

Movant's trial, Mr. Tabron is an eyewitness to the intentional salacious conduct by the Government against Movant throughout the prosecution, a violation of the Movant's due process rights in and of itself. However, and more importantly, Mr. Tabron is the only witness (Affiant) of those who were involved in the special treatement by the Government that was available to the Movant due to Movant's indigency, lack of investigative resources, and his instant imprisonment. In other-words, Mr. Tabron is the only evidence that Movant is able to present at this stage of the habeas process to establish his claim of misconduct on behalf of the Government. Thus Movant should not be punished by the summary dismissal of his claim, as suggested by the Government, because of his limited and restrictive circumstances in trying to locate and obtain sworn affidavits from the other witnesses in the Government's pay-for-play campaign. Wherefore, the Movant should be allowed further fact finding proceedings to discover and develop the undiscovered facts of his claim. **See** Gibson v. United States, 566 A.2d 473, 477 (D.C. 1989)(citing Harrison v. Nelson, 394 U.S. 286 (1969))(Although habeas proceedings do not mandate discovery, the courts should "fashion post-conviction discovery procedures as may be required to give meaning and substance to the objectives of the law."). "Where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is...entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry. Harris, 394 U.S. at 300. Citing this standard, the Supreme Court in Bracey v. Gramley, 520 U.S. 899 (1997) held that it was an abuse of discretion to deny discovery to the petitioner given the allegations in his habeas claim.[1]

Further, if these illicit special privileges were not given by the Government and executed with the coconspirators/cooperating witnesses and/or their family and friends, the the Government should have no problem with a fact finding hearing in which these witnesses would be sure to exonerate it of the allegations.

### 2. The Credibility of Movant's Claim Of Special Privileges And Other Government Misconduct With The Coconspirators/Cooperating Witness And Others

Again, the Movant submits, and stands on, the circumstances and law as presented above with respect to the Sufficiency of Antoine Tabron's Sworn Affidvit;

---

[1]   Implementing the mandate of Harris, the federal system promulgated Rule 6 of Rules Governing Section 2255 Proceedings in the District Courts, which provides that the judges should grant discovery "for good cause shown." Bracey, 520 U.S. at 904; see also Miller v. United States, 479 A.2d 862, 869 (D.C. 1984)(evidentiary hearing required unless "allegations of the motion itself...are wholly incredible, or even if tru, would merit no relief").

9

that is, that Movant is a layman, indigent, imprisoned, and thus unable to mount the investigative resources and capabilities of the Government in locating the named coconspirators/cooperating witnesses and others (some of whom were secreted away by the Government, and remain, for purported protective purposes) to obtain the additional Affidavits the Government asserts is required to survive summary dismissal of the instant claim, and thus should not be disallowed a full hearing--affording discovery procedures and facilities--and opportunity to develope further the undiscovered facts establishing his claim.

Also, the Movant now asks the Court to take judicial notice that the same Government Prosecuting Office has participated in the exact kind of misconduct, alleged here by the Movant, before in the "Newton Street Crew" case (United States v. Hoyle, et al. (Cr. 92-284)); "Card/Moore" case (United States v. Card, et al. (F-7682-91)); "Edwards" case (United States v. Edwards (F-4437-92)); and the "Jones Matter" (an Investigation, not a trial), all involving the U.S. District and Superior Court prosecutions and trials of individuals on RICO-Narcotics Conspiracy-Murder-Sexual Assault crimes. Indeed, in the Newton Crew, Card/More, and Edwards cases and the Jones Matter, all prosecuted by the U.S. Attorneys Office for the District of Columbia, the Government (led by AUSA G. Paul Howes) committed all of the same acts alleged here now by Movant, which included financial benefits to family and friends of key witnesses, access to drugs, alcohol, and sex while in custody. And when confronted with those allegations, as here in Movant's case, the Government did exactly what it is doing now, feigned innocence and lack of knowledge of the conduct. However, in those cases the Government eventually relinquished and admitted and was proved to have committed and participated in all of the alleged misconduct in those cases, resulting in the agreement by the Government to significant sentence reductions for the defendants. (See Exhibit 5 attached hereto; "Legal Times" news article reporting "Newton Street Crew" prosecutorial misconduct; also Hearing minutes of District of Columbia Court of Appeals Board On Professional Responsibility: "In The Matter of G. Paul Howes"). Thus, Movant submits that his instant misconduct claim is substantial, has credibility, and raises nonfrivolous questions concerning the integrity of Movant's entire prosecution team and the trial, which warrants further inquiry.

As further evidence establishing the credibility of Movant's claim, the Movant again asks the Court to take judicial notice of the post-trial admittance of fabricated testimony by Government witness Kevin Evans, who testified substantially in favor of the Government. The fabrication was belatedly revealed in a letter to

Movant by AUSA Mr. Pfleger shortly after the verdict in Movant's case, and which when brought to the Court attention during Movant's sentencing hearing, the Court placed the letter in the record. (See Exhibit 6 attached hereto; Excerpts of Sentencing minutes in U.S. versus Abdur Mahdi, 01-396-1; also Excerpt of Docket Entry in U.S. versus Abdur Mahdi, 01-396-1, Doc. No. 536 (12/04/03)). However, nothing was ever done about Mr. Evan's fabrication and the Government's belated revelation, no further inquiry or petition to the trial court for a new trial by Movant's trial attorney. Thus, further proceedings in the form of an evidentiary hearing and discovery process is indeed necessary.

### 3. The Credibility of Movant's Claim Of Voucher Misconduct/Fraud

The Movant submits, and stands on, the facts, laws, his laymanship and imprisonment circumstances, and the evidence (including the documentary evidence in Exhibits 5 and 6) as presented above, with respect to the Sufficiency of Antoione Tabron's Affidavit, the claim of Special Treatment Misconduct, and Voucher Misconduct/Fraud, in reply here.

Briefly, the Movant does point out that the Government, via its affiants, AUSA Brittin and Pfleger, admits to the use of the vouchers in Movant's case, see Brittin Affidavit at ¶ 12; and Pfleger Affidavit at ¶ 6, however, admits no misconduct in in their use. Again, such an initial feign of innocence and lack of knowledge is to be expected as it has been established as its M.O. (Modus Operandi) when confronted with misconduct allegations, specifically witness voucher misuse and fraud. (See Exhibits 5). Thus Movant prays that the Court allow further proceedings, in that counsel for Movant be appointed, and an evidentiary hearing and discovery process ordered in order that the undiscovered facts establishing Movant's claim be illuminated and for proper resolution of the claims. Gibson, 566 A.2d at 477; Harris, 394 U.S. at 300; Bracey, 520 U.S. at 904.

### C. THE OPPOSITION TO MOVANT'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

In response to Movant's direct claim that trial counsel. Bernard Grimm, failed to investigate and call Jacob Vonderpool, an exonorating/alibi-eye-witness to the Curtis Hattley Murder, the Government uses twenty two pages of its opposition attemting to establish and rehabilitate Mr. Grimm as the quintessential "Johnny Cochoran" during Movant's prosecutution and trial by self servingly recaping the trial conduct exhibited by Mr. Grimm on behalf of Movant. However, the government does not directly address or overcome the specific factual allegations that Mr. Grimm did not further investigate or call for the defense, Mr. Vonderpool,

regardless of any other good trial conduct Mr. Grimm may have executed, with Mr. Vonderpool, a crucial (and the only eyewitness) for Movant in the defense of the Hattley murder, he failed miserably and the Government is attempting to skirt this fact with suppositions and assumptions as to Mr. Grimm's reasoning for not calling Mr. Vonderpool, supported by Mr. Grimm's good trial conduct in other areas of the defense, but absent any statement or affidavit from Mr. Grimm himself explaining his reasoning for abandoning Mr. Vonderpool.[2] Indeed, the Government can not justify a tactical reason for Mr. Grimm in failing to use Mr. Vonderpool for the defense since Mr. Grimm failed to investigate and interview Mr. Vonderpool and and his story to assess the evidence to derive at the decision not to call Mr. Vonderpool. Thus, Mr. Grimm's wholesale failure to investigate the Vonderpool evidence made it impossible for Mr. Grimm to derive at a proper and informed decision to abandon Mr. Vonderpool's favorable account of the Hattley murder.[3] Also, contrary to the Government's suppositions and assumptions, Mr. Grimm may have very well simply forgot about or lost track of Mr. Vonderpool due to the enormity of the task of defending against the Government's vast and sprawling case against Movant. Thus further inquiry and fact finding procedures are necessary for proper resolution of the claim and to hear from Mr. Grimm himself.

Next, the Government points out (Govt. Opp. at 29) the delays with either Musa Mahdi or Mr. Vonderpool coming forward "eight years after the jury verdict," to exonerate Movant of being present and participating in the Hattley murder. Here, the Movant submits that the [intimated] defense of untimeliness is not dispositive on when the bearer of exculpatory/exonorating information comes forward, but when the moving (petitioning) party became aware of the information upon which his claim is based. In otherwords, Movant did not become aware that Mr. Grimm did not investigate and speak with Mr. Vonderpool as Mr. Vonderpool reported and attested to Movant, or that Musa Mahdi was present at the Hattley murder until both persons revealed the information to Movant when, where, and at what time as sated in Movant's submitted affidavits. And inarguably, Movant did timley bring his instant claim, based on the Musa Mahdi and Vonderpool revelations, within the one year time limitation for presenting newly discovered facts forming the basis

---

2   See Govt. Opp. at 22 and n.14, 23 and n.15 and n.16, 24, 25 and n.17, 26 and n.18–n.19, 27, 28.

3   See Godfrey v. United States, 454 A.2d 293 (D.C. 1982) (stating that a substantial defense as bearing upon whether a conviction should be set aside for incompetence of counsel is not limited to the presentation of an alternative theory of the case, but included admission of evidence that substantially will discredit the government's case in-chief, and the defense will be lost if counsel fails to impeach key government witnesses with highly credible evidence).

12

of a claim.

Also, the Government makes note of the Movant's unauthorized statement submit-
ted with his § 2255 motion. (Govt. Opp. at 29). However, the Movant points out that
the Government is either mistaken or simply doesn't know the law according to the
execution of judicially susceptible statements/affidavits. Indeed, statements or
affidavits of the attesting individual or utterer does not necessarily have to be
notarized before it is accepted as true, so long as the affiant swears under pen-
alty of the law for perjury that the statements and contents therein are in fact
his own and truthfully presented.

Fianlly, contrary to the Government's assertion that Movant was not preju-
diced by Mr. Grimm's abandonment of Mr. Vonderpool for the defense against the Hat-
tley murder (Govt, Opp. at 28), Movant **was** prejudiced because he was deprived of
an alibi defense and the opportunity ('reasonable probability'), no matter how
slight, of an acquittal and/or hung jury on that count, a count/offense that if
not affecting (via spillover) the jury's verdict on the other charged counts, then
certainy it affected and generated the statutory life sentence(s) across the board
on those statutorily qualifying counts of conviction. In otherwords, absent the
Hattley murder conviction (which would have been challengeable with the Vonder-
pool alibi-testimony), Movant's sentence would have almost certainly been less than
life imprisonment. And the suggestion that Mr. Grimm did not call Mr. Vonderpool
for the defense because it would have been inconsistent with his (Grimm's) speci-
fic defense, evidence and arguments already put before the jury (Govt. Opp. at 37),
ignores the damning fact that Mr. Vonderpool had revealed himself to Mr. Grimm well
in advance of the start of trial, in time for Mr. Grimm to have investigated the
Vonderpool evidence and determined the most effective defense to the Hattley murder,
which may have mandated the Vanderpool alibi-testimony or, at least, its inclusion
with any thing else counsel may have had in mind, as opposed to simply abandon-
ing Mr. Vonderpool without an investigation or discussing it with Movant.[4]

As well, any negative inference the jury may have drawn with respect to Mr.
Vonderpool identifying "Radar" as the Hattley killer and evidence presented by the
Government that Radar was Movant's supplier in the narcotics conspiracy (Govt.

---

4  **See** Tr. Trans. page 108 (7/7/03), Vol. 37; where defense counsel, during discussions with the
Court, acknowledging that pre-decisions had been made by counsel to exclude witnesses, but the need
to discuss and confirm counsel's actions with the Movant; **see also** Tr.Trans. 138 (6/23/03), Vol. 29.

In addition, the Government's suggestion that Mr. Grimm abandoned Mr. Vonderpool because Fifth
Amendment implications or perjury (Govt. Opp. at n.24 of page 37, cont. from page 36; and n.25 of
page 38) is simply further suppositon, assumption, and purely speculative and self serving.

Opp. at 36), did not outweigh the potential benefit of an alibi defense to the first-degree murder of Curtis Hattley since the narcotics conspiracy (or any of the other offenses charged) would not have resulted in a life sentence standing alone. In any event, counsel Grimm and Mr. Vonderpool should be called before the Court where the Court may hear first hand counsel's Grimm's reasoning for abandoning Mr. Vonderpool, and hear Mr. Vonderpool's version of the Hattley murder, his pretrial contact with counsel Grimm, and whether he would have then, or now, invoked his Fifth Amendment right to silence and representation of counsel under the Sixth.

**WHEREFORE**, based on all of the above, including Movant's submitted affidavits and other evidentiary documents, the Court should deny the Government's request for summary denial of Movant's substantive claims, order an evidentiary hearing and discovery proceedings, and the appointment of counsel for the Movant during this process, where witnesses can be heard, their deamnor gauged, and the Movant's rights protected for proper resolution of the claims.

Respectfully submitted,

Abdur-Rahim Mahdi, Movant
Reg. No. 24541-016
USP-Coleman #1
P.O. BOX 1033
Coleman, Florida 33521

## CERTIFICATE  OF  SERVICE

I HEREBY CERTIFY, that a true and correct copy of the Movant's Reply To The Government's Opposition To Movant's Motion To Vacate Pursuant To 28 U.S.C. § 2255 was served on the United States Attorney's Office, Joan Draper (AUSA), Special Proceedings Division, 555 4th Street, N.W., Room 10-445, Washington, D.C. 20530, via first-class mail, postage prepaid, this 25th day of March, 2013.

Abdur-Rahim Mahdi, Movant
Reg. No. 24541-016
USP-Coleman #1
P.O. BOX 1033
Coleman, Florida 33521

# EXHIBIT 5

MAY 01 '00

# LegalTimes

LAW AND LOBBYING IN THE NATION'S CAPITAL

MAY 1, 2000

**Multitasking** The people who *really* run firms are spinning a lot of plates at once. A Special Report on Law Firm Administration offers tips for not letting anything fall. Page 33

# Judge Gives Up Troubled Case

*Cites Seriousness of Misconduct Claims, Belief in Defendants' Guilt in Gang Prosecution*

### By CARRIE JOHNSON

A federal judge who oversaw the successful prosecution of one of the city's most violent drug gangs says he cannot be impartial in considering the gang leaders' request for a new trial.

U.S. District Judge Thomas Penfield Jackson, who also presides over the government's antitrust suit against the Microsoft Corp., has stepped down from the ongoing saga of the Newton Street Crew.

The unusual move comes five years after Jackson sentenced the defendants to multiple life prison terms, and two years after a secret Justice Department investigation

found evidence of misconduct by the team of prosecutors and police who busted the drug ring. The 86-page report by the DOJ's Office of Professional Responsibility remains under seal.

Judges rarely recuse themselves after investing so much time in a case. Post-trial challenges, such as motions seeking new trials, almost always become the province of the judge who heard the evidence at trial. Indeed, someone like Jackson, who presided over more than five months of testimony, is the ideal person to make judgments about how newly uncovered information affects a case, says Richard Flamm,

See **NEWTON**, PAGE 15

**OFF THE CASE:** Thomas Penfield Jackson recused himself.

PATRICE GILBERT



# Lewis Powell's Friend at the FBI

### By TONY MAURO

The late Justice Lewis Powell Jr. enjoyed a previously unknown long and friendly relationship with FBI Director J. Edgar Hoover, according to Powell's just-released FBI file.

# Capital Exiles

The Elian Saga Is Only the Latest Defeat For the Once Indomitable Anti-Castro Lobby

15

## CourtWatch

# New Judge for Messy Newton Street Case

**NEWTON, FROM PAGE 1**

who has written a book about judicial disqualification.

"A judge not only does form strong opinions about criminal defendants and other characters in the trial, like lawyers, but he is expected to do so," says Flamm.

But Jackson apparently has come to the opposite conclusion. In a one-page statement, the judge made no mention of the seamy details about a long-running controversy in Newton Street: claims about the treatment of witnesses before and during the 1994 trial. The allegations—namely, that the relatives and friends of key government witnesses received financial benefits, and that the witnesses themselves may have enjoyed access to drugs, alcohol, and sex while in custody—form the basis of defense attorneys' request for a new trial.

The judge called such claims "nonfrivolous" and wrote that, "if true, [they] undermine confidence in the trial verdict. They also call into question the integrity of the entire prosecution team and could expose the lead prosecutors to criminal liability."

Jackson concluded that he could not make the final call on whether the four defendants, who remain behind bars, should be able to ask questions and gather information about the misdeeds in hopes of winning a new trial.

"Having presided over the trial, I have formed strong opinions about the defendants' guilt, and I have as well developed high regard for the integrity of the prosecu-

Jackson's recusal was effective March 14, but his statement was released only last week.

U.S. Attorney Wilma Lewis declined comment through her spokesman, who cited pending litigation. But in written statements to *Legal Times* last year, Lewis defended prosecutors' actions in the case, which was tried several years before she became U.S. attorney.

"It goes without saying that this office would never condone acts of prosecutorial misconduct," she wrote. "Whenever it is determined that a matter was handled inappropriately, we will take the necessary steps to prevent its reoccurrence."

Lewis also expressed "complete confidence" in Lynn Leibovitz and Jeffrey Ragsdale, two assistant U.S. attorneys who worked on the Newton Street case and who continue to work in her office. G. Paul Howes, who led the prosecution in this and several other high-profile cases before he left the U.S. attorney's office in 1995, did not return a call. He is now a partner in a San Diego law firm.

Defense lawyers say they were taken aback when they received word that the case had been randomly reassigned to Judge Colleen Kollar-Kotelly.

Michael Lasley, a D.C. lawyer who represents John "Dirty John" McCollough, a gang enforcer convicted of participating in five murders, says that until he learned about the judge's reasons for recusing himself, he assumed Jackson stepped down because he was too busy with the Microsoft dispute.

Jensen Barber, a lawyer for Mark "Markie" Hoyle, who ran the gang, which operated on Newton Street in Northwest Washington, seized on Jackson's statement as a rallying cry for his efforts to reopen the case.

"We are encouraged that the Court has recognized there are substantial non-frivolous questions concerning the integrity of the Newton Street trial and the resulting verdict," Barber says. "The defense has labored for five years under very onerous conditions to obtain confirmation of some of these serious allegations. We have done so without the impressive resources available to the government."

At the same time, Barber bemoaned the loss of Jackson's "encyclopedic knowledge" of the unwieldy case.

John Carney, who represents Anthony "Ghost" Goldston, the gang's founder, says the new judge has yet to set a hearing date. "I expect it will be some time," he says. "This is a case that's probably as large as Microsoft in terms of the size of the transcripts."

Vincent Jankoski, lawyer for Mario "Black Mario" Harris, the fourth defendant in the case, did not return a call to press time.

A veteran defense attorney not involved in the Newton Street case says the judge's order is unusually blunt.

"The reasons, to a 'certain extent, are remarkable in their candor," says Alan Chaset, who practices in Northern Virginia. "I think we in the criminal defense bar harbor the suspicion that what's being said happens all the time."



PATRICE GILBERT

**STILL STANDING:** Defense counsel Jensen Barber cheered judge's statement about defense claims.

tors and the credibility of their witnesses," the judge wrote. "I am unable to put aside those predilections sufficiently to enable me to decide this matter impartially, unaffected by those prejudices."

FILED

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY
HEARING COMMITTEE NUMBER ONE

| | | |
|---|---|---|
| **In the Matter of:** | : | |
| | : | |
| **G. PAUL HOWES,** | : | |
| | : | **Bar Docket No. 131-02** |
| **Respondent.** | : | |
| | : | |
| **A Member of the Bar of the** | : | |
| **District of Columbia Court of Appeals** | : | |
| **(Membership No. 434709)** | : | |

## REPORT AND RECOMMENDATION
## OF HEARING COMMITTEE NUMBER ONE

### Introduction

This matter involves misconduct by a federal prosecutor (at the relevant time),
Assistant United States Attorney G. Paul Howes, Esq. (hereinafter "Respondent"), in
connection with the use of witness vouchers in the course of the investigation and prosecution
of gang- and drug-related multiple murders, and an unrelated alleged sexual assault, in the
District of Columbia. Witness vouchers are used in appropriate circumstances to provide basic
and relatively minimal compensation (typically $40 per day) for time and travel to witnesses
who appear in judicial proceedings. Respondent in this matter, *inter alia*, provided witness
vouchers, sometimes very large numbers of them, to persons who were not entitled to receive
them, and intentionally failed to disclose the use and misuse of the vouchers to the criminal
defendants he was prosecuting. When the defendants discovered abuse and nondisclosure of
the vouchers, they filed motions for new trials. The government negotiated substantially
reduced sentencing recommendations, which were adopted by the relevant courts. Respondent

has acknowledged multiple violations of the D.C. Rules of Professional Conduct, and the Committee has no doubt that the misconduct established in this record is of the utmost seriousness.

Bar Counsel's charges are divided into three counts, each pertaining to a criminal investigation and/or prosecution: (i) the investigation and prosecution of Javier Card, Fonda Moore, and others (Count I, the "*Card/Moore*" matter); (ii) the investigation and prosecution of Mark Hoyle and others (Count II, the "*Newton Street Crew*" matter); and (iii) the investigation of an alleged sexual assault (Count III, the "*Jones*" matter). Bar Counsel and Respondent agree on many of the relevant facts and violations of the Rules and have entered into a "Stipulation of Facts and Charges" executed by Bar Counsel, Respondent, and Respondent's Counsel. Bar Counsel's Exhibit ("BX") 1. Importantly, Bar Counsel and Respondent "agree that Respondent's conduct constitutes violations of the following District of Columbia Rules of Professional Conduct for each of the three Counts":

3.3(a)   false statement of material fact or law to a tribunal;

3.4(c)   disobeying an obligation under the rules of a tribunal;

3.8      failing to timely disclose evidence that tended to negate the guilt of the accused;

8.4(a)   violating or assisting in violating the Rules of Professional Conduct;

8.4(c)   engaging in conduct involving dishonesty or misrepresentation; and,

8.4(d)   engaging in conduct that seriously interfered with the administration of justice.

BX 1, ¶ 32(a)-(f). We find that each of these charges is supported by clear and convincing evidence, except for the alleged violation of Rule 3.8 in connection to the *Jones* matter because the *Jones* matter did not proceed beyond the investigative stage.

Bar Counsel has also charged Respondent with violating Rule 3.4(b) (offering a prohibited inducement to a witness) and Rule 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law). Respondent contests these charges.

A hearing took place on May 7-11, 2007 before Hearing Committee Number One composed of H. Bradford Glassman, Esq. (Ad Hoc Chair), Mr. John F. Barker and James T. Phalen, Esq.[1] Bar Counsel was represented by Senior Assistant Bar Counsel Elizabeth A. Herman, and Respondent was represented by Paul L. Knight, Esq., Plato Cacheris, Esq., and John F. Hundley, Esq. Respondent testified on his own behalf.

After hearing all of the evidence, reviewing the briefs of the parties, and conducting an independent analysis of prior cases, for the reasons stated below, the Committee concludes that all of the stipulated charges (other than the charged violation of Rule 3.8 in the *Jones* matter) are supported by clear and convincing evidence.[2] We also find that the contested Rule 8.4(b) violation is supported by clear and convincing evidence. We find that the contested Rule 3.4(b) violation is not supported by clear and convincing evidence.

---

[1]     At the time this case was assigned to Hearing Committee Number One, the Chair was serving beyond the expiration of his second term at the request of the Chair of the Board and pursuant to D.C. Bar R. XI, § 5(a), which provides that "[u]pon completion of a member's term, that member shall continue to serve until a successor is appointed." Bar Counsel nonetheless filed a motion to disqualify the Chair, on the grounds that his continued service violated § 5(a). Respondent opposed the motion. The Board, acting through its Chair, denied the motion to disqualify, but in order to remove an issue on appeal that might present the risk, however remote, of a re-trial, the Board replaced the Chair of Hearing Committee One with Mr. Glassman. *See* Order, March 28, 2007 at 4. Mr. Glassman recused himself prior to the issuance of this report.

[2]     In addition to the exhibits introduced into evidence, the Hearing Committee has considered supplemental post-hearing exhibits. Tr. 1489-90. On May 24, 2007, Bar Counsel filed the supplemental exhibits, marked as BX 119A-C, and which included a Master Voucher List and the vouchers. On May 25, 2007, Bar Counsel submitted the "full" BX 119B, which included a missing voucher for Detective Jack Szymczak. That same day, Respondent filed a motion to admit Respondent's Exhibit ("RX") 22, the missing Szymczak voucher. In addition, on May 17, 2007, Bar Counsel filed a consent motion to admit BX 120 (transcript in *United States v. Pittman*, Criminal Action No. F-5785-92 (Aug. 4, 1992)) and BX 121 (transcript in *United States v. Pearsall*, Criminal Action No. F-6355-92 (June 22, 1992)). There being no objection, the Hearing Committee grants Bar Counsel's and Respondent's motions to admit post-hearing exhibits and accepts BX 119 A-C, 120, 121 and RX 22 into evidence.

3

As to sanction, Mr. Phalen recommends the sanction proposed by Bar Counsel: a two-year suspension with a fitness requirement. But for Bar Counsel's recommendation, Mr. Phalen would have recommended disbarment. *See In re Cleaver-Bascombe,* 892 A.2d 396, 412 n.14 (D.C. 2006) (recognizing that although the Court of Appeals "is not precluded from imposing a more severe sanction than that proposed by the prosecuting authority, that is and surely should be the exception, not the norm, in a jurisdiction, like ours, in which Bar Counsel conscientiously and vigorously enforces the Rules of Professional Conduct."). Mr. Phalen defers to the Board on Professional Responsibility and the Court of Appeals as to whether this case represents the type of exception contemplated by *Cleaver-Bascombe.* Mr. Barker recommends disbarment on the grounds that the gravity of the misconduct supports the exception contemplated in *Cleaver-Bascombe* and an upward departure from Bar Counsel's recommended sanction.

Before turning to the violations, we set forth our findings of fact.

## FINDINGS OF FACT

### A.   Background

1.      Respondent is a member of the District of Columbia Bar, having been admitted on October 5, 1992, and assigned Bar Number 434709. BX 1, ¶ 1.

2.      From on or about March 26, 1984 until May 26, 1995, Respondent was an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the District of Columbia ("the USAO"). As an AUSA, he was responsible for prosecuting persons charged with federal and/or local crimes. BX 1, ¶ 2.

3.      From on or about September 8, 1993 to April 11, 1994, Respondent prosecuted Javier Card and Fonda Moore ("*Card/Moore* case") and other associated criminal defendants

4

before the Honorable Herbert B. Dixon, Jr., in the Superior Court of the District of Columbia for, *inter alia,* drug conspiracy, murder and murder conspiracy charges that emanated from an extensive, multi-year investigation. *United States v. Card, et al.* (F-7682-91). Respondent was the sole prosecutor in this complex, seven-month, multi-defendant trial, involving more than 30 government witnesses. BX 1, ¶¶ 5, 15.

4.      Three of the *Card/Moore* defendants were convicted at trial, and received the following sentences:

Antoine Rice, 40 years to life (mandatory minimum of 25 years);

Javier Card, 69 years to life;

Jerome Edwards, 61 years to life (mandatory minimum of 30 years).

BX 1, ¶ 19.

5.      The day after the conclusion of the *Card/Moore* trial, Respondent (as lead prosecutor) and two other AUSAs began a trial before the Honorable Thomas Penfield Jackson in the United States District Court for the District of Columbia against Mark Hoyle and co-defendants who were alleged to be the leadership of a violent drug gang called "the Newton Street Crew." *United States v. Hoyle, et al.* (Cr. 92-284).   We refer to this as "the *Newton Street Crew* case." The government brought continuing criminal enterprise, RICO conspiracy, drug conspiracy, murder and murder conspiracy charges against the *Newton Street Crew* defendants.    The trial concluded six months later, on October 13, 1994, and was the culmination of an extensive, multi-year investigation by Respondent and numerous detectives, agents and officers dating back to the late 1980s, as well as several prior, related prosecutions of Newton Street Crew members by Respondent. BX 1, ¶¶ 6, 21.

B.     Findings Relating to Witness Vouchers Generally

6.     As a prosecutor, Respondent had access to federal government fact witness vouchers ("federal vouchers").  By law, Respondent was authorized to provide federal vouchers to fact witnesses, associated with federal cases, to compensate them for attendance at certain judicial proceedings in federal court matters.  The term "judicial proceeding" was defined by federal regulations, and included "pre-trial conferences." BX 1, ¶ 3.

7.     Before payment is made on a federal voucher, the federal voucher must include the name of the relevant criminal case, the witness' name, dates of attendance and the prosecutor's signature authorizing payment.  Each federal voucher requires that the prosecutor sign the voucher certifying that, "the witness named above attended in the case or matter indicated and is entitled to the statutory allowance of attendance and travel." BX 1, ¶ 4.

8.     As a prosecutor, Respondent also had access to Superior Court witness vouchers for use in connection with Superior Court cases or investigations.  Federal vouchers are not authorized to be distributed to witnesses in Superior Court matters, and *vice versa*. BX 1, ¶¶ 3, 10.

9.     During the relevant time period, witnesses were paid $40 per day for each day of attendance in a federal case, no matter whether the witness' attendance was for an entire day, a half day or one hour.  Further, federal vouchers permitted payment for multiple days on one voucher.  District of Columbia Superior Court witnesses, on the other hand, were paid by the half day, through the Superior Court, by Superior Court witness vouchers.  Superior Court witness vouchers only permitted payment for a maximum of one day per voucher. BX 1, ¶ 10.

10.     During the relevant time period, AUSAs received no formal training regarding the statute and regulations authorizing the payment of witness fees.  Tr. 647-49.  In practice,

6

AUSAs learned how to use witness vouchers from more experienced colleagues, in what can fairly be described as "on the job" training. *See* Tr. 100-01, 647-49, 798-99. It seems that AUSAs were not required or expected to be aware of the content of the statute and regulations authorizing witness fees. *See* Tr. 102-03, 649-54, 798. Preparing witness fee vouchers was viewed as a trivial or *pro forma* task:

> to try to put [the preparation of witness vouchers] in some context for you, this was a very routine aspect of the job, almost a, you know, a minor aspect of the job. It wasn't anything that was ever at the forefront of any kind of office policy or office training.

Tr. 650 (testimony of former AUSA David Shertler).

11.     During the relevant time period, it was standard practice within the USAO for prosecutors to provide witness vouchers to witnesses who appeared at the USAO or the courthouse in order to provide information to a prosecutor or a police officer, even if that witness did not appear at trial, before the Grand Jury, or in any other court proceeding, and even if such appearance was not contemplated at the time the witness appeared at the USAO or courthouse. Tr. 613-21, 625-27. Although this standard practice may not have complied with applicable law and/or regulations, it appears that AUSAs who were Respondent's contemporaries believed that the standard practice was entirely appropriate. Tr. 233, 613-14, 616-27, 650-58, 800-02. Even Bar Counsel's witnesses confirmed that this was the case. Tr. 109-10, 114-15 (Robert Chapman, Esq.), 263-66 (Jeffrey Ragsdale, Esq.); *see also* Tr. 1427-29 (FBI Special Agent Denise Conrad).

12.     Incarcerated witnesses were not entitled to receive witness vouchers under any circumstances. Respondent was aware of this prohibition. BX 1, ¶ 9; Tr. 1050.

C.      **Findings Relating to *Card/Moore* Witness Vouchers**

13.      Before, during and after the *Card/Moore* prosecution, Respondent improperly provided federal vouchers to government witnesses, to their friends and relatives, and to an incarcerated government witness.  Respondent authorized payment to these individuals by providing federal vouchers to them, although these individuals were witnesses—or associated with witnesses—in the *Card/Moore* case, a Superior Court case. BX 1, ¶¶ 7, 9, 17.

14.      Respondent authorized Clarice Haywood, wife/girlfriend of government *Card/Moore* witness Irvin Pittman, to receive $2,036 in federal vouchers under the federal court captions *United States v. Hoyle* and *United States v. Perry* covering dates between September 6, 1993 and March 22, 1995.  Ms. Haywood was never called as a trial witness.  Respondent knew that Ms. Haywood was not entitled to be paid by federal vouchers in a Superior Court case.  BX 1, ¶¶ 17, 17(a).

15.      Respondent authorized Irvin Pittman to receive $3,750.65 in federal vouchers under the federal court captions *United States v. Hoyle* and *United States v. Perry.*  Mr. Pittman testified for the government in *Card/Moore.*  He testified between October 14 and October 25, 1993, but his voucher payments covered dates between September 28, 1993 and March 22, 1995.  Respondent knew that Mr. Pittman was not entitled to be paid by federal vouchers in a Superior Court case.  BX 1, ¶¶ 17, 17(b).

16.      Respondent authorized Leroy Pearsall to receive $5,095.55 in federal vouchers under the federal court captions *United States v. Hoyle* and *United States v. Perry.*  Mr. Pearsall testified for the government in *Card/Moore* between October 25 and October 28, 1993, but his voucher payments covered dates between September 28, 1993 and February 14,

8

1995. Respondent knew that Mr. Pearsall was not entitled to be paid by federal vouchers in a Superior Court case. BX 1, ¶¶ 17, 17(c).

17.     Respondent authorized Kalvin Bears to receive $504.00 in federal vouchers under the federal court captions *United States v. Perry Graham, United States v. El Toro Graham* and *United States v. Perry,* although he was a witness in *Card/Moore.* Respondent knew that Mr. Bears was not entitled to be paid by federal vouchers in a Superior Court case. BX 1, ¶¶ 17, 17(d); Joint Corrections to Stipulations, ¶ 17(d).

18.     Respondent authorized Fred Johnson to receive $452 in federal vouchers under the federal court caption *United States v. Hoyle.* Mr. Johnson testified in *Card/Moore* between November 29 and December 2, 1993, and his voucher payments covered dates between November 3, 1993 and December 2, 1993. Respondent knew that Mr. Johnson was not entitled to be paid by federal vouchers in a Superior Court case. BX 1, ¶¶ 17, 17(e).

19.     Respondent authorized Theresa Bryant Green to receive $1,472.50 in federal vouchers under the federal court captions *United States v. Hoyle* and *United States v. Perry.* Ms. Green testified for the government in *Card/Moore* between January 11 and January 31, 1994. Her voucher payments covered dates between October 15, 1993 and May 22, 1995. Respondent knew that Ms. Bryant Greene was not entitled to be paid by federal vouchers in a Superior Court case. BX 1, ¶¶ 17, 17(f).

20.     Respondent authorized Detective Jack Szymczak to receive $411 in federal vouchers under the federal court caption *United States v. Hoyle.* Detective Szymczak testified one day in *Card/Moore,* and then he returned to Philadelphia. Respondent authorized a federal voucher for Detective Szymczak that covered three days of attendance ($120) and meals and/or lodging ($173), although Detective Szymczak arrived from Philadelphia on the day of his

*Card/Moore* testimony and completed his testimony on the same day. Respondent falsely certified attendance and entitlement on the voucher provided to Detective Szymczak. Respondent knew that Detective Szymczak was not entitled to be paid by federal vouchers in a Superior Court case. BX 1, ¶¶ 17, 17(g).[3]

21.     Respondent authorized Jacqueline Hayes, fiancée of government witness Kalvin Bears, to receive $4,376.50 in federal vouchers under the federal court captions *United State v. Perry* and *United States v. Hoyle.* The vouchers cover the dates between October 4, 1992 and March 31, 1995. Ms. Hayes was not called as a trial witness. Respondent provided vouchers to Ms. Hayes before Mr. Bears testified in *Card/Moore,* during Mr. Bears' testimony in *Card/Moore,* and in March 1995 when Mr. Bears also received an improper voucher for dates when he had been incarcerated. Respondent knew that Ms. Hayes was not entitled to be paid by federal vouchers in a Superior Court case. BX 1, ¶¶ 17, 17(h).

22.     Respondent authorized retired Metropolitan Police Detective Ronald Fluck to receive approximately $4,949.50, in federal vouchers for appearances, food and/or lodging and/or mileage on 68 days between May 14, 1993 and December 15, 1993. Detective Fluck testified one day in the *Card/Moore* trial. Respondent provided federal vouchers to him for his assistance as a case agent. Neither Superior Court vouchers nor federal vouchers are authorized to pay individuals who provide assistance as a case agent. Respondent falsely certified on federal vouchers provided to Detective Fluck that Detective Fluck was entitled to federal vouchers, when he was not. BX 1, ¶ 18; Joint Corrections to Stipulations, ¶ 18.

---

[3]     Respondent had authorized a previous witness voucher payment of $118 to Detective Szymczak ($80 for two days' attendance and $38 for meals). *See* BX 1, ¶¶ 17, 17(g).; Response to Bar Counsel's Proposed Findings of Fact, Conclusions of Law and Recommendation as to Sanction, and Respondent's Proposed Findings of Fact, Conclusions of Law and Recommendation as to Sanction, ("Response") at 64.

23.     Respondent explained that federal vouchers were issued to *Card/Moore* witnesses because he understood that the *Card/Moore* witnesses were providing information useful in the *Newton Street Crew* matter:

> as we looked at it then, anything that walked through my door that had to do with the investigation that sprung, that became what was called the Newton Street, got paid under that caption.
>
> That wasn't correct. That wasn't right as I understand the regulations today, but it was our practice. That is just how we did business.

Tr. 1030.

### D.     Findings Relating to the *Newton Street Crew* Witness Vouchers

24.     Before, during and after the prosecution of the *Newton Street Crew* case, Respondent signed federal vouchers for individuals who were not entitled to such federal vouchers or who were not entitled to a federal voucher for "the matter indicated." BX 1, ¶ 7.

25.     Respondent also provided vouchers to the family and friends of government witnesses for unauthorized purposes, and to cooperating witnesses who were not entitled to such vouchers. BX 1, ¶ 9.

26.     Respondent signed and provided, or had others provide on his behalf, federal vouchers totaling approximately $9,835.00 to retired Metropolitan Police Detective David Belisle for appearances on 167 days between July 13, 1993 and September 23, 1994. Detective Belisle testified on three days in the *Newton Street Crew* trial. Respondent provided federal vouchers to Detective Belisle not only for the three days of testimony but also for his assistance as a case agent. Respondent falsely certified that Detective Belisle was entitled to federal vouchers, when he was not. Also, Respondent failed to disclose these payments to the attorneys representing the criminal defendants. BX 1, ¶ 23.

27.     Respondent signed and authorized federal vouchers for friends and relatives of incarcerated government witnesses in the *Newton Street Crew* case although these individuals were not entitled to federal vouchers. Respondent failed to disclose, or fully disclose, these payments to defense counsel who were entitled to know of these benefits to government witnesses. BX 1, ¶ 24.

28.     Respondent improperly authorized federal vouchers for the friends and relatives of incarcerated cooperating government witness Kenneth Forgy. Mr. Forgy testified between May 4 and May 17, 1994. BX 1, ¶ 25(a). Specifically,

> A.     Respondent improperly authorized $3,192 in vouchers for Tarita Forgy (Mr. Forgy's sister) covering dates of attendance between August 2, 1993 and February 24, 1995; she was never called to testify at trial. BX 1, ¶ 25(a)(i).

> B.     Respondent improperly authorized $462 in vouchers for Diane Henson (Mr. Forgy's aunt) covering dates of attendance between July 26, 1993 and September 16, 1994; she was never called to testify at trial. BX 1, ¶ 25(a)(ii).

> C.     Respondent improperly authorized $7,518 in vouchers for Lavinia Henson (Mr. Forgy's grandmother) covering dates of attendance between July 2, 1993 and May 1, 1995; she was never called to testify at trial. BX 1, ¶ 25(a)(iii).

29.     Respondent improperly authorized $166 in vouchers for Nichelle Jackson (girlfriend of another government witness, Shelton Brooks Seldon), covering dates of attendance between January 4, 1995 and January 6, 1995; she was never called to testify at trial. BX 1, ¶ 25(a)(iv).

30.     Respondent improperly authorized federal vouchers for the friends and relatives of incarcerated cooperating government witness Lazaro Santa Cruz, who testified between May 19 and June 3, 1994. BX 1, ¶ 25(b). Specifically,

> A.     Respondent improperly authorized $1,164.50 in vouchers for Nancy Santa Cruz (Mr. Santa Cruz's sister) covering dates of attendance between April 26, 1993 and August 5, 1994; she was never called to testify at trial. BX 1, ¶ 25(b)(i).

       B.     Respondent improperly authorized $4,578 in vouchers for Neko Stevenson (Mr. Santa Cruz's girlfriend and the mother of his child) covering dates of attendance between April 26, 1993 and January 25, 1995; she was never called to testify at trial.  BX 1, ¶ 25(b)(ii).

       C.     Respondent improperly authorized $442.00 in vouchers for Betty Stevenson (Lenora Cole's mother) covering dates of attendance between December 1, and December 22, 1994; she was never called to testify at trial. BX 1, ¶ 25(b)(iii), Joint Corrections to Stipulations, ¶ 25(b)(iii).

31.     Respondent improperly authorized $1,633.25 in vouchers for Cheryl English, (Andre Wilson's girlfriend and mother of his child), covering dates of attendance between April 23, 1993 and August 9, 1994; she was never called to testify at trial.  Mr. Wilson was an incarcerated cooperating government witness who testified between June 6 and June 8, 1994. BX 1, ¶¶ 25(c), 25(c)(i).

32.     Respondent improperly authorized $1,919.30 in vouchers for Maria Deolo (Don Price's girlfriend and mother of his child), covering dates of attendance between July 11, 1994 and April 7, 1995; she was never called to testify at trial.  Mr. Price was an incarcerated cooperating government witness who testified between June 22 and August 3, 1994.  BX 1, ¶¶ 25(d), 25(d)(i).

33.     Respondent improperly authorized federal vouchers for the friends of incarcerated cooperating government witness Frank Lynch, Jr., who testified between August 9, and August 16, 1994.  BX 1, ¶ 25(e).  Specifically,

       A.     Respondent improperly authorized $8,409 in vouchers for Michelle Washington (Mr. Lynch's girlfriend and the mother of his child) covering dates of attendance between June 25, 1993 and April 6, 1995; she was never called to testify at trial. BX 1, ¶ 25(e)(i).

       B.     Respondent improperly authorized $714 in vouchers for Frank Lynch Sr. (Frank Lynch, Jr.'s father) covering dates of attendance between June 29, 1994 and April 6, 1995; he was never called to testify at trial.  BX 1, ¶ 25(e)(ii).

       C.     Respondent improperly authorized $1,008 in vouchers for Karen Lynch (Frank Lynch, Jr.'s sister) covering dates of attendance between July 15, 1993 and July 5, 1994; she was never called as a witness. BX 1, ¶ 25(e)(iii).

    D.    Respondent improperly authorized $126 in vouchers for Helen Lynch (Frank Lynch, Jr.'s mother) covering dates of attendance between July 15, 1993 and July 20, 1993; she was never called to testify at trial. BX 1, ¶ 25(e)(iv).

34.    Respondent improperly authorized federal vouchers for the friends and relatives of incarcerated cooperating government witness William Woodfork, who testified between July 25 and July 26, 1994. BX 1, ¶ 25(f). Specifically,

    A.    Respondent improperly authorized $5,421.20 in vouchers for Kathleen Baldwin (William Woodfork's grandmother) for dates of attendance between July 2, 1993 and April 6, 1995; ($2,734.50 during the trial, $243.20 given one year after the trial was over, the balance pre-trial); she was never called to testify. BX 1, ¶ 25(f)(i).

    B.    Respondent improperly authorized $1,016.20 in vouchers for Jacqueline Young, (William Woodfork's mother) for dates of attendance between July 20, 1993 and September 1, 1994; she was never called to testify at trial. BX 1, ¶ 25(f)(ii).

    C.    Respondent improperly authorized $1,554 in vouchers for Michael McNeil (William Woodfork's uncle) for dates of attendance between July 26, 1993 and July 15, 1995. BX 1, ¶ 25(f)(iv).

    D.    Respondent improperly authorized $168 in vouchers for Anne Green (William Woodfork's aunt) for dates of attendance between July 20, 1993 and July 23, 1993. BX 1, ¶ 25(f)(v).

    E.    Respondent improperly authorized $178 in vouchers for Kit Beane (William Woodfork's aunt) for dates of attendance between July 26, 1993 and July 28, 1993. BX 1, ¶ 25(f)(vi).

**E.**    **Findings Relating to the *Card/Moore* and *Newton Street Crew Brady/Giglio* Violations**

35.    In both the *Card/Moore* and the *Newton Street Crew* cases, the government relied chiefly on the testimony of cooperating incarcerated witnesses who themselves had been participants and/or conspirators in the criminal conduct charged against the defendants. The veracity of their testimony was disputed and hotly contested throughout the two trials by the defense. BX 1, ¶ 8.

36.     Benefits provided directly or indirectly to cooperating government witnesses by the government could have been relevant to the jurors' duty to determine credibility and weigh bias. Prosecutors are required by law to inform defendants of all benefits, including derivative benefits, provided by the government to government witnesses at a time when use by the defense would be reasonably feasible. *See Giglio v. United States,* 405 U.S. 150 (1972); *Brady v. Maryland,* 373 U.S. 83 (1963). BX 1, ¶ 8.

37.     Respondent intentionally failed to fully disclose, or failed to disclose at all, to attorneys representing the defendants he prosecuted the fact that he provided, was providing and/or intended to provide unauthorized federal vouchers to family and friends of government witnesses, incarcerated government witnesses and former police officers associated with the *Card/Moore* and *Newton Street Crew* cases. BX 1, ¶ 9.

38.     Respondent testified that he did not believe that he was required to disclose witness fee payments under *Giglio* or *Brady,* and that he would have opposed any defense request for production of witness voucher information specifically. Tr. 1294-95.

39.     However, Respondent testified that the total dollar value of vouchers a witness received "would have made a difference" to him as to whether the information should be disclosed. Tr. 1298. Indeed, Respondent admitted that in the *Newton Street Crew* case, he considered whether he should disclose the amount of witness vouchers to the presiding judge, Judge Jackson, to get his view as to whether disclosure was necessary. Tr. 1298-1300.

40.     Rather than disclose the amounts of the witness vouchers to Judge Jackson, Respondent engaged in his own "calculus," in which he attempted to balance his disclosure obligation against his desire to protect these witnesses from harm, and his belief that defense counsel would never question these witnesses about the voucher payment because such

questioning would elicit testimony alleging that the defendants had engaged in uncharged criminal conduct. Tr. 1298-1300. Respondent admitted that his decision as to disclosure was "a decision that I took out of [Judge Jackson's] hands and I should not have." Tr. 1299.

F.     **Payments to Incarcerated Government Witnesses**

41.     After the *Newton Street Crew* prosecution was completed, Respondent signed and provided, or had others provide on his behalf, federal vouchers of approximately $160 to each of four government witnesses (Lazaro Santa Cruz, Robert Smith, William Woodfork and Frank Lynch) who were incarcerated on the dates of attendance stated on the federal vouchers. All four had been government witnesses in the *Newton Street Crew* trial Respondent had prosecuted. Respondent knew none of them were entitled to payment on the dates specified in the federal vouchers because they were incarcerated. BX 1, ¶ 22; Tr. 1140, 1144-46.

42.     Respondent knew that in order to receive the payment authorized by the vouchers, Messrs. Santa Cruz, Smith, Woodfork and Lynch would have to falsely attest that they were entitled to payment. Tr. 1146.

43.     As discussed in paragraph 17, Respondent authorized Kalvin Bears to receive $504.00 in federal vouchers under the federal court captions *United States v. Perry Graham, United States v. El Toro Graham* and *United States v. Perry,* although he was a witness in *Card/Moore.* Of the total funds paid to Mr. Bears, $160 covered dates when he was incarcerated. BX 1, ¶ 17(d); Tr. 1130-32. Respondent knew that Mr. Bears was not entitled to receive any witness fee for the days on which he was incarcerated, but he "weighed what [he] knew about incarcerated witnesses [not being entitled to witness fees] against safety concerns that were revealed to [him]." Tr. 1132.

44.     Respondent testified that he issued vouchers to all of the previously incarcerated witnesses because he feared for their safety:

> On the day the three Newton Street people were released and Mr. Bears, there was no federal funds available. None of them ever wanted to leave the city. In the case of the Newton Street people they had been promised a large sum of money, thousands of dollars to be able to start a new life. That money was not available on the day they got out and given my experience with everything I have been through, including losing an informant and knowing of the families, I gave them—I authorized what turned out to be $160 for the day they got out. I believe that the day they got out they were entitled to a witness fee because I was discussing with them a case that had not been indicted, but that is neither here nor there. What I was doing was making sure that those individuals, at least for the first day, until they got their bearings, didn't go home and walk into getting killed.

Tr. 1051-52.

### G.     Post-Conviction Proceedings

45.     On March 1, 1996, the Office of Professional Responsibility of the Department of Justice ("OPR") opened an investigation into allegations of misconduct during the *Newton Street Crew* prosecution. On or about February 9, 1998, OPR concluded its investigation and found that Respondent had committed misconduct. BX 1, ¶ 12.

46.     Although OPR found that Respondent was pursuing legitimate goals and did not personally profit from the use of vouchers, OPR concluded that Respondent significantly misused government funds by his issuance of improper federal vouchers and that he committed intentional professional misconduct. OPR concluded that Respondent "distributed the vouchers in ways that went so far beyond the limits of appropriate conduct as to constitute flagrant abuse of the system." OPR concluded that Respondent "used the government's witness fee funds as a discretionary source of money to be paid out virtually at will." BX 1, ¶ 13.

17

47.     In 1996, OPR disclosed their initiation of an investigation into allegations of misconduct in the *Newton Street Crew* case to defense counsel in that case and to the United States District Court for the District of Columbia.  Each convicted defendant filed a motion for a new trial based upon Respondent's misconduct.  BX 1, ¶ 27.

48.     On March 15, 2002, the government agreed not to oppose the defendants' motions and stipulated to dispositions.  The District Court accepted the stipulated dispositions, vacated and dismissed numerous counts of conviction.  BX 1, ¶ 27.  The defendants received significant sentence reductions, as follows:

Mark Hoyle, *United States v. Hoyle,* Crim. No. 92-284

> original sentence: 8 life terms, plus 25 years
> amended sentence: 28 years

John McCollough, *United States v. McCollough.* Crim. No. 92-284

> original sentence: 9 life terms, plus 85 years
> amended sentence: 28 years

Anthony Goldston, *United States v. Goldston,* Crim. No. 92-284

> original sentence: 4 life terms, plus 5 years
> amended sentence: 18 years, concurrent with Superior Court sentences

Mario Harris, *United States v. Harris,* Crim. No. 92-284

> original sentence: 5 life terms, plus 25 years
> amended sentence: 18 years

BX 1, ¶¶ 27(a)-(d).

49.     Defense counsel in *Card/Moore* became aware of the post-conviction litigation in the *Newton Street Crew* cases, and filed motions to vacate their clients' convictions based upon Respondent's prosecutorial misconduct.  Although the government initially resisted the defendants' motions, the government ultimately agreed to stipulate to relief in the form of

vacating and dismissing numerous counts of conviction and agreeing to significant reductions in prison sentences.   BX 1, ¶ 19.   The Superior Court agreed to accept the stipulated dispositions, vacated the convictions and re-sentenced the defendants as follows:

Antoine Rice, *United States v. Rice*, Case No. F 6601-92

> original sentence: 40 years to life with a mandatory minimum of 25 years;
> amended sentence: 5 to 15 years.

Javier Card, *United States v. Card*, Case No. F 7682-91

> original sentence: 69 years to life;
> amended sentence: 23 years to life, with the execution of all but 23 years suspended.

Jerome Edwards, *United States v. Edwards*, Case No. F 4437-92

> original sentence: 61 years to life, mandatory minimum of 30 years;
> amended sentence: 23 years to life, with the execution of all but 23 years suspended.

BX 1, ¶ 19(a)-(c).

50.      Respondent had prosecuted other criminal defendants before the *Newton Street Crew* case and at their trials presented some of the same witnesses who later testified in the *Newton Street Crew* case.   BX 1, ¶ 28.   Two of these defendants filed motions to vacate their sentence and also convinced the government to agree to stipulated dispositions and new sentences based upon Respondent's misconduct:

Donnie Strothers, *United States v. Strothers*, Crim. No. 92-285

> original sentence: 30 years
> amended judgment: 14 ½ years

William Hoyle, *United States v. William Hoyle*, Crim. No. 92-285

> original sentence: 30 years
> amended sentence: 14 ½ years

BX 1, ¶ 28(a)-(b).

H.      **Findings Relating to the Jones Family**

51.     In addition to prosecuting the cases described above, Respondent also investigated an alleged sexual assault on a young girl. Tr. 1055. The victim of the alleged assault was Ms. Marjorie Jones' granddaughter. Tr. 1055; BX 1, ¶ 29.

52.     Respondent authorized federal vouchers to be paid to Ms. Jones and her three grandchildren for 53 days of attendance between December 1, 1993 and June 13, 1995, totaling $3,603.20 for Ms. Jones (including meals and/or mileage) and $2,080.00 for each grandchild, for a total of $9,843.20 to the family. BX 1, ¶ 29. Only one of Ms. Jones' grandchildren was the alleged victim. Tr. 1055-56. Respondent authorized federal vouchers to two of the Jones grandchildren although he knew that they were not attending as fact witnesses. BX 1, ¶ 29.

53.     Respondent authorized witness vouchers for the two other grandchildren because the alleged victim would not have been able to meet with Respondent without her grandmother and brothers. Tr. 1055-60.

54.     Respondent provided and authorized the federal vouchers to Ms. Jones and her three grandchildren as witnesses for the *Newton Street Crew* case although neither Ms. Jones nor her grandchildren attended court proceedings to address *Newton Street Crew* matters. Respondent provided and authorized federal vouchers to Ms. Jones and her three grandchildren although they were not entitled to them. BX 1, ¶ 30.

55.     Respondent signed federal vouchers dated June 13, 1995, for attendance on May 31, June 2, June 8 and June 13, 1995, to Ms. Jones and her three grandchildren. Respondent had terminated his employment with the USAO and had left that office by May 26, 1995. Respondent authorized these federal vouchers for Ms. Jones and her grandchildren although he knew they were not entitled to them. BX 1, ¶ 31. Respondent acknowledges that "[t]hese vouchers are clearly improper." Response at 81.

20

## CONCLUSIONS OF LAW

Respondent has stipulated that his conduct violated the following District of Columbia Rules of Professional Conduct for each of the three Counts (*Card/Moore, Newton Street Crew* and the *Jones* matter):

a)      Rule 3.3(a), in that Respondent knowingly made a false statement of material fact or law to a tribunal (BX 1, ¶ 32(a));

b)      Rule 3.4(c), in that Respondent knowingly disobeyed an obligation under the Rules of a tribunal (BX 1, ¶ 32(b));

c)      Rule 3.8(e), in that Respondent, in a criminal case, intentionally failed to disclose to the defense, upon request and at a time when use by the defense was reasonably feasible, evidence or information that he knew or reasonably should have known tended to negate the guilt of the accused (BX 1, ¶ 32(c));

d)      Rule 8.4(a), in that Respondent violated or attempted to violate the Rules of Professional Conduct, knowingly assisted or induced another to do so, and/or did so through the acts of another (BX 1, ¶ 32(d));

e)      Rule 8.4(c), in that Respondent engaged in conduct involving dishonesty or misrepresentation (BX 1, ¶ 32(e)); and,

f)      Rule 8.4(d), in that Respondent engaged in conduct that seriously interfered with the administration of justice.  BX 1, ¶ 32(f).

Respondent has not stipulated to and has denied violating Rules 3.4(b) and 8.4(b) as charged by Bar Counsel.  We address these charges below.

Although the parties have stipulated to many facts and six Rule violations, the Stipulations do not describe how Respondent's conduct violated the Rules.  The parties

21

fundamentally differ as to what the Stipulations mean, with Respondent perceiving only technical violations in areas where Bar Counsel alleges serious, substantive, and deliberate ethical breaches. Many of the points in contention revolve around disputed factual conclusions or applications of law to facts. For example,

    (i)     was Respondent's issuance of witness vouchers to cooperating individuals who were not expected to testify (hereinafter, "non-testifying cooperators") itself a sufficiently clear abuse of the witness voucher process to constitute ethical misconduct?

    (ii)    did witness vouchers issued to government witnesses and their relatives reflect compensation for visits to the USAO to provide case-related information or indirect financial inducements or other efforts to influence the witnesses? and

    (iii)    was Respondent's authorization of witness payments in connection with the *Card/Moore* (Superior Court) case on federal vouchers under *Newton Street Crew* (U.S. District Court) case captions part of a deliberate effort to thwart evidence-gathering efforts by the *Card/Moore* defendants and their counsel or simply a (concededly improper) time-saving shortcut?

In light of these Stipulations and other evidence presented during the hearing, we find that Bar Counsel has established each of the stipulated violations for each of the three Counts in the Specification of Charges, with the exception of the charged violation of Rule 3.8 in connection with the *Jones* matter.   Even though Respondent has stipulated to this violation, we cannot conclude that in connection with the *Jones* matter, Respondent "intentionally failed to disclose to the defense, upon request and at a time when use by the defense was reasonably feasible, evidence or information that he knew or reasonably should have known tended to negate the guilt of the accused," because the *Jones* matter involved an investigation, not a trial.   There was no defendant to receive the information at issue.   It was not possible, therefore, for Respondent to violate Rule 3.8(e) in connection with the *Jones* matter.

The only questions remaining for the Hearing Committee regarding the charged violations are whether Respondent violated 1) Rule 3.4(b), by offering a prohibited inducement to a witness; or 2) Rule 8.4(b), by committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness.  As is fully set out below, we do not find by clear and convincing evidence that Respondent offered a prohibited inducement to a witness.  However, we do find by clear and convincing evidence that Respondent's conduct constituted false statements and certifications in violation of 18 U.S.C. §§ 1001 and 1018—criminal acts that reflect adversely on his honesty, trustworthiness or fitness—when he

1)      signed vouchers for incarcerated witnesses even though he knew that those witnesses were not entitled to receive vouchers;

2)      used vouchers to compensate retired police detectives Fluck and Belisle for their work as "case agents";

3)      used witness vouchers to compensate two Jones children who were not fact witnesses; and,

4)      used vouchers to compensate the Jones family for dates of supposed meetings with Respondent after he left the USAO.

I.      **Nature of Misconduct Alleged**

Bar Counsel's case focuses on seven principal types of allegedly unethical conduct:

(i)     issuing witness vouchers to non-testifying cooperators;

(ii)    issuing large quantities of witness vouchers to government witnesses for days on which the witnesses did not testify, and issuing large quantities of witness vouchers to those closely associated with government witnesses;

(iii)    "miscaptioning" witness vouchers, that is issuing District of Columbia Superior Court vouchers to witnesses in connection with a matter in the United States District Court;

(iv)    using witness vouchers to compensate two retired police detectives for serving as "case agents" assisting with his prosecutions;

(v)    using witness vouchers to make unlawful and improper payments to prisoners for days that they were incarcerated;

(vi)    using witness vouchers to make other unlawful and improper payments; and,

(vii)    failing to disclose potentially exculpatory evidence to criminal defendants.

We address each of these items in turn.

1.    <u>Payments to Non-Testifying Cooperators</u>

The parties disagree as to whether issuing witness vouchers to non-testifying cooperators (the overwhelming majority of vouchers at issue) constitutes a *per se* misuse of vouchers and is thus a disciplinary violation. Bar Counsel contends that the governing statutes and regulations clearly prohibit issuing witness vouchers to non-testifying cooperators; Respondent argues that the law does not clearly prohibit such payments, and that, in any event, he was conducting legitimate USAO business in accord with the well-established office practice. We first examine the legal position, then review the USAO's practice, and then consider whether Respondent's general practice of issuing witness vouchers to non-testifying cooperators violated the Rules.

Bar Counsel argues that 28 U.S.C. § 1821 and its implementing regulations (28 C.F.R. Part 21) prohibit issuing witness vouchers to non-testifying cooperators. *See* Bar Counsel's Proposed Findings of Fact, Conclusions of Law and Recommendation as to Sanction, ("Bar Counsel's Opening Br.") at 86-87. 28 U.S.C. § 1821 provides for payment of a specified

24

witness fee to "a witness in attendance at any court of the United States." 28 C.F.R. Part 21 clarifies that fact witnesses who attend a "judicial proceeding," including a "pre-trial conference," are entitled to a witness fee. *See* 28 C.F.R. §§ 21.1(c), 21.4. The term "pre-trial conference" is defined to include interviews to discuss the witness's expected testimony. *See* 28 C.F.R. § 21.1(c), (d). The interview must be held prior to the date of testimony but after the date is set. *See* 28 C.F.R. § 21.1(d). Importantly, as Respondent concedes, the term "judicial proceeding" *"does not* include information or investigative proceedings conducted by a prosecuting attorney for the purpose of determining whether an information or charge should be made in a particular case." 28 C.F.R. § 21.1(c) (emphasis added); *see* Response at 83.

Respondent "has readily admitted that a large percentage of the vouchers that he signed or authorized cannot be justified by 18 U.S.C. § 1821." *See* Response at 3; *see also, e.g.,* Findings of Fact ("FOF") 14-21, 24-25, 28-34. However, Respondent argues that 28 U.S.C. § 524 also allows AUSAs to issue federal vouchers, and that it "is a very broad statute authorizing the payment of compensation and expenses of witnesses and informants beyond that permitted by 28 U.S.C. § 1821." Response at 83; *see also* Response at 82. We do not agree.

Section 524(a) provides that "[a]ppropriations for the Department of Justice are available to the Attorney General for payment of— . . . compensation and expenses of witnesses and informants." It appears in a chapter of the United States Code discussing the general powers of the Attorney General, and it authorizes expenditures out of general DOJ appropriations on a variety of items pertaining to the administration of the Department, including payments for notarial fees, stenographic services, meals and lodging for marshals "when acting as bailiffs in attendance on juries," as well as payments to witnesses and

informants. 28 U.S.C. § 524(a). Section 524 does not purport to define the circumstances in

which such payments are appropriate (unlike § 1821, which, does precisely that). On the

contrary, the purpose of the provision appears to be to specify the appropriate funding sources

for various broad categories of departmental expenditures.

United States v. Johnpoll, 739 F.2d 702 (2d Cir. 1984), addressed a criminal

defendant's argument that the United States should have to pay to bring foreign witnesses to

the United States for deposition because § 524 authorized such payments. Johnpoll rejected

that argument, focusing on the differences between § 524 and § 1821:

> Johnpoll argues that the government's refusal to meet the foreign
> witnesses' demands [for certain compensation to attend a deposition] was
> nevertheless unreasonable because 28 U.S.C. § 524(a)(1) makes appropriations
> available to the Attorney General "for payment of . . . compensation and expenses
> of witnesses and informants, all at the rates authorized or approved by the
> Attorney General" and that the government in the past has pursuant to § 524(a)(1)
> expended thousands of dollars for witnesses in protective custody because of
> death threats. See, e.g., United States v. Librach, 536 F.2d 1228, 1230-31 (8th
> Cir.), cert. denied, 429 U.S. 939, 50 L. Ed. 2d 308, 97 S. Ct. 354 (1976) ($9,947);
> United States v. Partin, 493 F.2d 750, 757 (5th Cir. 1974), appeal after remand,
> 552 F.2d 621 (5th Cir.), cert. denied, 434 U.S. 903, 98 S. Ct. 298, 54 L. Ed. 2d
> 189 (1977) ($26,000 for one witness; $5,000 for another). Johnpoll, however,
> misconstrues the purpose of § 524(a)(1). In contrast to 28 U.S.C. § 1821, which
> mandates that fees and allowances be paid to witnesses appearing in "any court
> of the United States" in an amount not to exceed certain prescribed figures, §
> 524(a)(1) is designed to provide funds for security of government witnesses
> without any such specific limit on the amount that may be spent in the case of
> each witness, which would obviously turn on his or her security needs. United
> States v. Librach, supra, 536 F.2d at 1230 (§ 524(a)(1) authorizes support
> payments for witnesses in protective custody because of death threats); United
> States v. Partin, supra, 493 F.2d at 757 (§ 524(a)(1) authorizes the government
> "to pay the maintenance costs of material witnesses in protective custody").
> Indeed, the original Justice Department regulations promulgated under § 524,
> later enacted into law, 18 U.S.C. preceding § 3481 [sic], provided for the
> protective custody of witnesses in organized crime cases. Since the security of the
> witnesses was not an issue in the present case, § 524 cannot be read as
> authorizing or requiring the government to pay more than the 28 U.S.C. § 1821
> statutory witness fees.

Id. at 710 (emphases added).

As we see it, § 524 is not plausibly read as conferring a broad and unregulated power upon AUSAs to pay witness fees. On the contrary, it appears to us that AUSAs derive their authority in respect of witness vouchers from the provisions that expressly confer and regulate that authority, *i.e.*, 28 U.S.C. § 1821 and 28 C.F.R. Part 21, and we see no reason to doubt that they must follow the requirements set out in those provisions.

Respondent contends that the then-current United States Attorneys' Manual (USAM) supports his § 524 argument. The pertinent section of the 1988 USAM provides that, "[i]f the [pre-appearance] interview occurs during the time the witness is under subpoena, compensation is granted pursuant to 28 U.S.C. § 1821. . . . If the interview occurs prior to the return date of the subpoena, compensation is granted pursuant to 28 U.S.C. § 524." USAM § 1-14.111 (citing *United States v. Thomas*, 320 F. Supp. 527 (D.D.C. 1970)). *See* Response at 7. This USAM provision does not directly support Respondent's position, as it addresses pre-*appearance* interviews, not interviews with non-testifying cooperators. Moreover, the USAM is merely a statement of internal DOJ policy. It does not have the force of law. *See* USAM § 1.1-100. Thus, the USAM cannot change the requirements of a statute such as 28 U.S.C. § 1821 or a regulation such as 28 C.F.R. Part 21, and, even if it could, the USAM language cited does not endorse Respondent's conduct.

The 1970 *Thomas* decision cited in the USAM arguably addresses a non-witness' appearance at the USAO. In that case, Judge Bryant admonished the government for issuing "phony summonses" summoning "prospective" witnesses to the USAO. 320 F. Supp. at 528-29. The court was also invited to suppress the practice of paying a $20 witness fee to such persons, and it declined to do so. *Id.* at 530. The government had conceded that § 1821 did not authorize the payment in question but had relied instead on 28 U.S.C. § 524. *Id.* Judge

Bryant found the arguments and the court's own research concerning this assertion of authority to be "inconclusive." *Id.* Lacking any clear statutory prohibition, and citing the general equity and desirability of compensating citizens for their time lost in assisting the government, he declined to enjoin the payments. *Id.* Hence, although the USAM does not go so far as to sanction the practice of paying witness fees to non-testifying cooperators who visit the USAO to be interviewed, *Thomas* at least somewhat supports that position, holding that it is not clearly prohibited (at least as to a "prospective witness"). Importantly, *Thomas* did not apply 28 C.F.R. Part 21, which was not promulgated until 1986, sixteen years after *Thomas*. *Thomas* thus offers little or no support, in our view, for issuing witness vouchers to non-testifying cooperators after 1986.

Relying on the plain language of §§ 524 and 1821, as well as *Johnpoll* and the cases cited above, we conclude that § 524 does not authorize the use of witness vouchers to compensate those who are not entitled to compensation via witness voucher pursuant to 28 U.S.C. § 1821 and 28 C.F.R. Part 21.[4]

Although we reject Respondent's contention that § 524 authorized issuing witness vouchers to non-testifying cooperators who assisted his prosecutions and investigations, we accept that the Department's statements and the USAM's citation to *Thomas* may have contributed to his understanding that such payments were allowed. It is clear from the record that during the relevant time period, there was no formal training on proper witness voucher

---

[4]     The position is even more clear as regards Superior Court witness vouchers. *See* D.C. Stat. § 15-714 ("The fees . . . to be paid any witness *attending in a criminal case in the Superior Court* . . . shall be the same as those paid to witnesses who attend before the [D.C. federal district court].") (emphasis added); *see also* Super. Ct. Crim. R. 113 (providing for witness fee payable to "each witness attending court or a deposition pursuant to any rule or order of a court"). It is difficult to read these rules as supporting a broad construction of the term "witness" to include, essentially, informants. The Superior Court voucher form, moreover, requires the prosecutor to certify that the voucher recipient "attended as a witness in the above entitled case" and requires the recipient to certify that "I was *compelled to appear in this court as a witness* for the parties as indicated above." (emphasis added). BX 2.

use.  Tr. 647-49.  In practice, AUSAs learned how to use witness vouchers from more experienced colleagues, in what can fairly be described as "on the job" training.  *See* Tr. 100-01, 647-49, 798-99.  It seems that AUSAs were not required or expected to be aware of the content of the statute and regulations authorizing witness fee payments.  *See* Tr. 102-03, 649-54, 798.  Preparing witness fee vouchers was viewed as a trivial or *pro forma* task:

> to try to put [the preparation of witness vouchers] in some context for you, this was a very routine aspect of the job, almost a, you know, a minor aspect of the job.  It wasn't anything that was ever at the forefront of any kind of office policy or office training.

Tr. 650 (testimony of former AUSA David Shertler).

As discussed above, during the relevant time period, it was standard practice within the USAO for prosecutors to provide witness vouchers to witnesses who appeared at the USAO or the courthouse to provide information to a prosecutor or a police officer, even if that witness did not appear at trial, before the Grand Jury, or in any other court proceeding, and even if such appearance was not contemplated at the time the witness appeared at the USAO or courthouse.  Tr. 613-21, 625-27.  It appears that AUSAs who were Respondent's contemporaries believed that the standard practice was entirely appropriate.  Tr. 109-10, 114-15, 233, 263-66, 613-14, 616-27, 650-58, 800-02; *see also* Tr.1427-29.  Although we believe that this conduct was not in accord with the statute and regulations, we recognize that the practice of providing vouchers to non-testifying witnesses was within the norm for this office and had a colorable legal justification.  It seems that in at least some respects, Respondent relied on standard office practice concerning witness payments to non-testifying cooperators, as did at least some of his colleagues.

Comment No. 3 to the Scope section of the Rules states that the "Rules presuppose that disciplinary assessment of a lawyer's conduct will be made . . . in recognition of the fact that a

lawyer often has to act upon uncertain or incomplete evidence of the situation." It would be unrealistic to expect AUSAs to investigate the regulatory underpinnings of every practice and procedure of their offices. In ordinary circumstances, an AUSA should be able to rely on high-level, well-publicized policy pronouncements such as those contained in the USAM, as well as established office policies and practices concerning administrative and similar matters.

These same considerations also tend to negate the culpability requirements for the rules that appear to be implicated by Respondent's use of witness vouchers to pay non-testifying cooperators. To establish a Rule 8.4(b) violation, Bar Counsel must establish by clear and convincing evidence "that the conduct at issue was a criminal act" that "reflects adversely on his or her fitness as a lawyer." *In re Slaughter*, 929 A.2d 433, 445 (D.C. 2007). Here, Bar Counsel has charged violations of 18 U.S.C. §§ 1001 and 1018 (as to false certifications on the vouchers concerning eligibility for payment thereunder), both of which require knowing violations. *See* note 19, *infra*. A violation of Rule 8.4(c) (dishonesty) requires intentional or reckless conduct. *See In re Romansky*, 938 A.2d 733, 741-742 (D.C. 2007). As for the alleged violation of Rule 8.4(d), "conduct can be 'prejudicial to the administration of justice whether it was reckless or somewhat less blameworthy.'" *In re Evans*, 902 A.2d 56, 69 (D.C. 2006) (quoting *In re Hopkins*, 677 A.2d 55, 60 (D.C. 1996)). The Court has declined, however, to find a violation of Rule 8.4(d) where the conduct "did not seriously and adversely affect the administration of justice." *In re Hallmark*, 831 A.2d 366, 375 (D.C. 2003). We cannot say that Respondent's adherence to an office policy of issuing witness vouchers to non-testifying cooperators "seriously and adversely" affected the administration of justice. All concede that such payments could have been made by the Department under other funding authorities, such as those used for informants, and the USAO evidently regarded non-testifying cooperators as

eligible for witness fees for quite a number of years. In any event, absent sufficient proof of a more culpable state of mind, we conclude that Bar Counsel has not established this broad set of alleged violations.

Finally, we decline to find violations based on Bar Counsel's contention that some of the non-testifying cooperators received payments for telephone calls and not in-person conversations. *See* Bar Counsel's Opening Br. at 86-87. Bar Counsel relies on testimony based entirely on memoranda of two interviews recorded on FBI Forms 302 from the OPR investigation, in which Respondent and Detective Wagner allegedly acknowledged issuing witness vouchers based on telephone calls. The 302s were not moved into evidence by deliberate choice of both parties, *see* Tr. 1439 ("[W]e both have reasons."), and Bar Counsel's case therefore consists of past recollection recorded testimony of Special Agent Denise Conrad, the drafter of the 302s. *Cf.* Fed. R. Evid. 803(5) (hearsay exception for recorded recollection read into evidence). Respondent relies on his own testimony and that of Detective Wagner, both of whom deny having made any such statement during the OPR investigation or having issued any such witness vouchers. Detective Wagner went so far as to allege that the 302s had been deliberately falsified in this respect. Tr. 909-14. Agent Conrad testified that before the 302s were finalized, they were reviewed by DOJ attorneys who had attended the interviews. Tr. 1369-73, 1396.

We consider it highly significant that Agent Conrad's testimony was based entirely on her recent review of the 302s and that she specifically and repeatedly disclaimed any direct recollection of the relevant, alleged statements by Respondent and Detective Wagner. Tr. 1376 ("Q  Do you specifically remember putting that [statement attributed to Wagner] in this 302? A  It's been so long, not exactly."), Tr. 1404 (no independent recollection of Wagner interview,

recollection "solely based" on review of 302), Tr.1439 ("Q  So, do you remember that discussion [with Respondent re: witness vouchers for telephone calls]?  A  Not specifically."). She also conceded that the 302 had never been shown to Respondent for his comments.  Tr. 1395-96.  Particularly in view of the possibility of error or misunderstanding, the testimony of Respondent, and the corroborating testimony of Detective Wagner, we do not consider testimony based solely on the cold 302s to constitute clear and convincing evidence that Respondent issued witness vouchers for information provided telephonically.  We do not, therefore, have occasion to analyze whether this conduct would have violated the Rules.

     2.    **Payments to Witnesses and Their Relatives**

     The parties disagree as to whether the record establishes that Respondent used witness vouchers to compensate government witnesses and their family members for purposes other than providing information.  Bar Counsel contends that the pattern and sheer volume of payments—with tens of thousands of dollars provided to witnesses and their relatives, girlfriends, and other close associates—suggests that the payments were not for information and/or were for the witness' benefit, even if provided to another recipient.  Respondent contends that each of these payments was made to someone who provided information at the courthouse or the USAO, although he acknowledges that the visits sometimes also served the purpose of calming and providing familial support to anxious witnesses.  Respondent also defines the concept of "providing information" broadly to include, for example, information about threats to witnesses, or even information that there were *no* such threats since the last discussion, and that all was quiet.[5]

---

[5]     Respondent concedes "[i]f the only reason the witness voucher was given was because the relative came to boost the morale of a witness, then that might well be an improper reason for authorizing a witness voucher." Response at 9.

The evidence concerning witness voucher payments to government witnesses and their relatives potentially lends itself to three interpretations:

1)      Each of the payments was for a visit to the USAO or courthouse during which the voucher recipient provided case-related information (although the visit may have also served other purposes, such as providing moral support to a government witness).

2)      Some of the payments were made to induce relatives to visit incarcerated witnesses to maintain their morale, but the relatives did not provide real or substantial case information.

3)      Payments were, in sum and substance, unlawful financial inducements to the witnesses either directly or through their relatives and close associates.

We believe that most of the payments fall into the first category, *i.e.*, payments for case-related information, but that at least some of the vouchers issued fall into the second category, *i.e.*, payments for visits to provide moral support where no real information was provided. Bar Counsel's evidence does not, in our view, support the allegation of a *quid pro quo* or explicit financial inducement of any witness, and, although the record suggests at least recklessness in creating improper financial inducements, we do not, in the end, find clear and convincing evidence to support such a charge.

We reject Respondent's assertion that every relevant voucher was based on a visit to provide substantive information. The record is clear that *Card/Moore* and *Newton Street Crew* prosecutors wanted to shore up anxious government witnesses. Those cases were built on the testimony of a very small number of closely associated prosecution witnesses, and one witness' defection could easily have resulted in other defections, potentially undermining the government's case. The prosecutors used considerable effort to prevent this from happening

through the calming influence of "leaders" among the incarcerated witnesses themselves, and through visits from family members and other close associates.

Moreover, as discussed below, the record reveals conclusively that Respondent was willing to misuse witness vouchers when he considered it expedient to do so. He used witness vouchers to pay thousands of dollars to retired police detectives who assisted him as "case agents," hundreds of dollars to incarcerated cooperators to ease their reentry into society, and thousands of dollars to three family members of a child witness ostensibly for information about the *Newton Street Crew* case but in reality for their emotional support to her during interviews with him—all without any legal basis. We believe that the evidence is compelling that at least some received vouchers on certain occasions for bolstering witnesses' resolve, not for providing information.

The OPR Report, offered into evidence and admitted without objection from Respondent, identified instances in which a witness' relatives received vouchers for bolstering morale, not providing information. Kenneth Forgy's grandmother, Lavinia Henson, received some $7,518 in witness voucher payments from July 1993 through May 1995, even though she never testified. *See* BX 1, ¶ 25(a)(iii). Mr. Forgy, described by Judge Jackson as the "killer" for the Newton Street Crew, testified on May 4-17, 1994, and was not only a key government witness – he considered himself to be a "leader" of other government witnesses. The OPR Report states that, "[a]ccording to Forgy, he was kept on the sixth floor of the courthouse on many days not just as a witness but as a leader of the other witnesses, some of whom were afraid of the defendants and the defendants' associates." BX 3 (OPR Rept.) at 33. The Report notes that MPD Detective Barbara Lyles said that Mr. Forgy "acted as a leader to keep the morale of the other witnesses strong and to keep them loyal to the government." *Id.* The OPR

Report relates that, according to Mr. Forgy, Mrs. Henson made frequent trips to the courthouse to visit him, and, when she did, according to Respondent, she was "asked at least one question" such as "whether anything had happened with respect to threats or whether she had anything new to report." *Id.* at 33-34. The Report indicates that Respondent told OPR's investigators "perhaps one-third of the time it was the *absence* of information that was significant." *Id.* at 34. He also indicated that Mrs. Henson sometimes visited Mr. Forgy without receiving a witness voucher and that she "always was a potential witness who could provide historical background information about the Newton Street neighborhood." *Id.*

We believe that Mrs. Henson was a valuable information source. However, it is clear that many times she was not paid for providing information, but rather for bolstering Mr. Forgy's morale. We believe that whether Respondent asked her how things were in the neighborhood and received an "all clear" response, this was nothing more than a *pro forma* gesture at compliance with the witness voucher rules. Certainly the amount of information exchanged did not require an appearance at the USAO. We believe that, at least to a large degree and on many occasions, Mrs. Henson was paid for her services in bolstering Mr. Forgy's morale, not for information. *See* BX 3 at 33-34; Tr. 985-86 (Judge Jackson's testimony that payments were for visits to encourage incarcerated witnesses to testify). *But cf.* Tr. 1283-84 (Respondent's testimony that Ms. Henson provided information "every day").[6]

---

[6]      Kathleen Baldwin's case is more complex. She was *Newton Street Crew* witness William Woodfork's grandmother, and she received $5,421.20 for 91 days of attendance between July 2, 1993 and April 6, 1995. BX 3 at 44-46. Ms. Baldwin visited the courthouse on each day of Mr. Woodfork's testimony to speak with him and the prosecutors. *Id.* at 44. During these visits, Respondent spoke with Ms. Baldwin, asked her questions about her relatives who were connected to *Newton Street Crew* defendants and witnesses, and sought her opinions of the trial testimony she had observed. *Id.* The OPR considered Ms. Baldwin to be credible and indicated that she had provided some information for every voucher except one, which may have been a payment intended for Woodfork upon his release from prison. *Id.* On this record we do not find a violation on the basis of these voucher payments.

We believe that much the same can be said of Michelle Washington, incarcerated *Newton Street Crew* witness Frank Lynch, Jr.'s girlfriend and mother of his child. BX 1, ¶ 25(e)(i). Ms. Washington received $8,409 in witness voucher payments for attendance on 103 dates between June 25, 1993 and April 6, 1995. BX 1, ¶ 25(e)(i); BX 3 at 36. Ms. Washington told OPR's investigators that Respondent called her "often to his office or to the courthouse to provide information or to 'comfort' Lynch with her presence." BX 3 at 36. Although Ms. Washington "said she provided some general information about the defendants and their relatives," she said "she had no evidence about their crimes, because she had never witnessed any drug transactions or other criminal activity." *Id.* Respondent indicated to OPR that Ms. Washington "provided some information about the defendants and was important in helping the prosecutors maintain a good relationship with Lynch." *Id.* at 37. When asked at the hearing if he agreed with OPR's conclusion that Ms. Washington and others came down to the USAO not to provide information but rather to comfort their incarcerated relatives, Respondent stated that "[t]hat's one of the benefits and one of the services they did provide. But Michelle Washington was a wealth of knowledge about all the family and tensions we were dealing with. . . . So I disagree that they did not provide me with information pertinent to my case." Tr. 1284. This is not a powerful denial, and in view of the general and non-crime-specific nature of the information Ms. Washington was able to provide and the large number of vouchers issued, we conclude that these vouchers were at least in part issued for motivational rather than information-gathering purposes. On those facts, we have no difficulty finding that Respondent abused the witness voucher process; indeed, the weak gesture at compliance only underscores the *pro forma* character of the exercise.

The evidence is less compelling, in our view, in favor of the contention that the payments in question were in fact a *quid pro quo* or financial inducement to the government's witnesses. First, beyond the pattern of payments itself, discussed below, there is no evidence of any *quid pro quo* or agreement relating to payment between Respondent and any prosecution witness. Second, as discussed below, the only specific voucher recipients shown by Bar Counsel *not* to have been paid for visits to provide information (leaving aside the incarcerated individuals and "case agents" discussed below) appear to have visited to provide moral support to their incarcerated relatives. Third, in some cases it is not clear that the incarcerated witness was even aware that his relative(s) had received witness fees from the government, undermining the notion of an indirect inducement through payment to a nominee voucher recipient. *See, e.g.*, Tr. 906-07. Finally, many of the payments long post-dated the witness' testimony and even the conclusion of the trial and thus more easily fit Respondent's explanation that these individuals had ongoing informational value.

To be sure, an inference could be drawn from the overall pattern and quantum of payments that the intention and effect were to provide financial inducements to the government's witnesses. As Bar Counsel contended at the hearing, "Respondent provided unauthorized vouchers to friends or relatives of every major civilian witness in the Newton Street Crew Case and to witnesses in the Card case." Tr. 20. Nevertheless, we do not find a *quid pro quo* or financial inducement from the overall pattern of payments, given (i) the closely-knit communities involved in these cases, (ii) the undisputed access of relatives and other close associates to information about crimes and threats, and (iii) the likelihood that the pattern of cooperation merely reflects the government's inroads to the community through its incarcerated cooperators. The *Card/Moore* and *Newton Street Crew* cases involved friends and

relatives testifying against each other. The relatives and friends of prosecution witnesses who lived in the communities were privy to information about crimes committed by the gangs, threats against witnesses, and dissention within the families whose members were involved in the criminal organizations. These relatives were the most likely source of such information for the government, because the welfare of their incarcerated relatives gave them a reason to undertake the serious risks associated with cooperation. There is thus a plausible and innocent explanation for the pattern of payments: these were the people in the relevant communities who were known to and willing to talk with the government. And in at least a few cases, they were also the people most able to persuade the witnesses to continue their cooperation.

Nor will we infer a *quid pro quo* or other improper inducement from the quantum of the payments. The evidence presented to the Committee clearly depicts a "war room" type clearinghouse run by Respondent and his colleagues that processed crime and threat information on a massive scale over a period of years, served as a nucleus of activity for literally dozens of federal agents and local police detectives (as well as law enforcement officials in other cities beset by the same or related gangs), and regularly received and debriefed an array of informants, checking and re-checking any new information with multiple cooperators to ensure its veracity. Tr. 862-64, 886, 1008. Moreover, as noted, many of the payments to witnesses and their relatives came after the testimony and even the trial as a whole was completed, sometimes years later, reflecting that some of the murder cases had been severed from related drug conspiracy cases and that uncharged crimes were also being investigated through the same process. We therefore consider that the quantum of the payments is not highly probative of an intent to provide financial inducements to witnesses, even in conjunction with the large proportion of payments directed to government witnesses

and their relatives. Respondent has presented a credible and corroborated account of the investigative methodologies that led to these payments, and Bar Counsel has not presented a single instance showing either a *quid pro quo* or even an absence of information provided to the USAO, other than the cases set out above, which appear to have involved morale-bolstering rather than inducements to witnesses.

Finally, in support of the financial inducement theory, Bar Counsel adduced comments made by Judge Jackson, who tried the *Newton Street Crew* cases, in post-conviction proceedings in 1999:

> Let me tell you, quite frankly, [there] are some witnesses whose testimony I believe the government would not have had the benefit of had not extraordinary measures been taken to secure that witness' cooperation. They simply would not have testified but for the fact that a very sympathetic prosecutor went out of his way and tried to make life comfortable for their friends and relatives. And I can think of several witnesses right now. . . . So, I would not necessarily be prepared to accept that witness' assurance, "Oh sure, I knew that they were doing things for my grandmother, but that wouldn't influence me."

BX 107 at 8. When he testified before the Hearing Committee, Judge Jackson was unable to recall having made these comments. Tr. 982-83. When asked what the basis for his comments might have been, his response focused on the morale-boosting aspect of the payments rather than financial inducement:

> Q Judge, I don't know if it would be helpful if you wanted to look at the transcript or I can just ask you to explain why you made the statement that Ms. Herman read to you that the government might not have had the benefit of certain testimony?
>
> A Well, several examples of the expenditures I remember vividly. Two of the critical witnesses in that case for the government were two of the principal figures in the Newton Street conspiracy. One of them was a man by the name of Benjamin Forgy who was the – he was the killer for the organization. The other one was Sheldon Brooks Seldon who was the mastermind of the organization. Both of them, as I recall, were very much influenced by a grandmother who stayed in constant contact with these two guys and convinced, I'm sure not with their great reluctance, to continue to cooperate with the government and testify.

> Do the right thing.  There were payments made to this grandmother, which, in effect, represented the cost of her transportation to the District of Columbia and her continued contact with these two defendants.  If she had not used the influence that she had, I'm not at all sure that either of them would have testified for the government.

Tr. 985-86.  Given that Judge Jackson's earlier comments were conclusory and that their evidentiary basis is unknown, we do not find them sufficiently probative to support a finding under the clear and convincing evidence standard, particularly in view of the weight of evidence, including Judge Jackson's recent testimony, in favor of the morale-boosting explanation of the improper payments.

We also consider whether Respondent was reckless as to the creation of such inducements through payments to government witnesses and/or their relatives.  *Cf. Romansky*, 938 A.2d at 741-42 (recklessness as minimum culpability for dishonesty).  Although we might be prepared to find recklessness as to the creation of a financial inducement—Respondent must have perceived a risk that thousands of dollars paid to relatives would create a financial inducement to the government's witnesses—we do not find recklessness as to whether those inducements were *improper* for the reasons set out in section 1 above.  Moreover, absent individualized proof that a particular government witness was even *aware* of the payments being made to his relative(s), we would not be in a position to find recklessness as to the creation of an improper financial inducement as to that witness.

In sum, we believe the evidence supports the view that Respondent issued numerous witness vouchers to relatives of incarcerated witnesses to compensate them, not for attending at the USAO to provide information in all instances, but rather for visiting incarcerated government witnesses to maintain their resolve to testify for the government.  Because it involved false certifications of eligibility for payment on the District Court's witness voucher,

we find that this conduct violated Rules 3.3(a) (false statement to tribunal), 3.4(c) (knowingly

violating rule of tribunal), 8.4(a) (violation of Rules through acts of another), 8.4(c)

(dishonesty and misrepresentation), and 8.4(d) (serious interference with the administration of

justice).   We do not find sufficient support in the record to find by clear and convincing

evidence that witnesses or relatives of witnesses were issued witness vouchers as a *quid pro*

*quo* or financial inducement to testify, although Respondent's actions may well have had that

effect, and certainly risked creating that appearance.   However, these payments and the

appearance created by them bear on the charges relating to failure to provide potentially

exculpatory information to the criminal defendants in the *Card/Moore* and *Newton Street Crew*

cases.

### 3.    Issuance of Vouchers from Incorrect Court and with Incorrect Case Captions

It is undisputed that Respondent authorized payments to witnesses, relatives or

associates of witnesses, and others on federal court voucher forms under the *Hoyle* (*Newton*

*Street Crew*) caption even though the payments authorized pertained to the *Card/Moore* matter

in the D.C. Superior Court. *See, e.g.,* Response at 95-96.   The parties agree that this was

wrong and that *Card/Moore* witnesses should have been paid via Superior Court forms,

through the Superior Court's administrative offices, and under the correct, Superior Court case

caption.   Respondent explains that this was simply an expedient means of dealing with the

large volume of cooperating individuals, at least some of whom had information potentially

pertinent to both the *Card/Moore* and *Newton Street Crew* cases.   He thus contends that these

were technical violations.   Bar Counsel disagrees, noting that, among other things, this practice

prevented defense counsel from obtaining records of witness payments through subpoenas

issued to the Superior Court's offices, because the research would be keyed to the case caption,

and the responsive records would not be with that office in any event, but rather with the United States Marshals Service's (USMS) office in the District Court.

The Committee does not believe that the record establishes a premeditated scheme to thwart discovery efforts, and we credit Respondent's explanation that the use of federal vouchers in the *Card/Moore* matter began as a time and effort saving shortcut, albeit an improper one.  At some point, however, the Committee believes that Respondent became aware that the issuance of witness vouchers out of the wrong court and under the wrong case caption was frustrating defense discovery efforts and chose to continue to conceal the issue, further frustrating those efforts.  Respondent clearly knew, for example, that his opposing counsel in the *Card/Moore* matter were attempting to subpoena information concerning payments to government witness Theresa Bryant/Greene from the Superior Court Finance Office, *see*, *e.g.*, BX 23 at 317; Tr. 453-55, 481, 519-20, yet he made no effort to notify counsel that these and other vouchers had been issued improperly out of the federal court under an entirely different case caption.[7]

The Committee believes that Respondent's overall conduct in relation to the Bryant/Greene vouchers leaves little doubt that he deliberately concealed these payments in order to thwart defendants' legitimate discovery efforts.  During a colloquy before the Superior Court on December 8, 1993, defense counsel, Ms. Holt, stated on the record that she was "asking Mr. Howes for each copy of each and every witness voucher" issued to Ms. Bryant/Greene, to which Respondent replied that Ms. Bryant Greene had worn a wire on May 6, but had not been "opened as an informant." BX 22 at 305. Ms. Holt persisted: "That's not what I asked for. I asked for the witness vouchers." *Id.* at 306. Respondent replied that "[s]he

---

[7]       In fact, Ms. Holt also made Respondent aware that she had sought the Bryant/Greene vouchers in the District Court. BX 23 at 316-17. Those efforts were also unsuccessful, presumably because the vouchers had been issued not only out of the federal court but also under the *Hoyle/Newton Street Crew* case caption.

received no witness voucher on that day." *Id.* Ms. Holt demanded, "[d]id she receive witness vouchers on other days?" *Id.* Respondent replied that she had received witness vouchers for the three days she came to the Grand Jury. *Id.* Ms. Holt urged the court to allow her to review the Grand Jury vouchers, to which Respondent replied "Theresa Bryant/Greene was not an informant past the time she came to the Grand Jury. She got a standard witness fee as everybody else does when they testify before the Grand Jury. She didn't go to work, quote/unquote, for the government until the following day. And that's all she did. She didn't receive anything for it, nothing was given to her. It didn't work out. I don't intend to elicit any of that." *Id.* at 306-07. By that date, however, Ms. Bryant/Greene had received two witness vouchers for eight additional, non-Grand Jury appearances, totaling $320, and one of those vouchers had been provided to her only *twelve days prior* to Respondent's contrary representations in court. *See* BX 33. Judge Dixon took defense counsel's request for the witness vouchers under advisement, but he did so under the mistaken impression, left by Respondent, that there were only three Grand Jury witness vouchers at issue. *See* BX 22 at 306-07. At trial the following month, on January 11, 1994, Respondent elicited the following testimony from Ms. Bryant/Greene before the jury:

> Q:  Ma'am for that wearing a wire did you ever receive any money?
>
> A  None other than the witness fees.
>
> Q  Were you ever compensated other than your witness fee for the Grand Jury appearances? Did you ever receive any other benefits other than in terms of being a confidential informant or a special employee?
>
> A  No.

BX 24 at 331. As of the date of this testimony, January 11, 1994, Ms. Bryant/Greene had in fact received a total $480 in witness voucher payments other than for her Grand Jury appearances.[8] *See* BX 33.

---

[8]    Respondent maintains that this testimony was "absolutely accurate" because the question and response

As discussed in more detail below, Respondent has openly acknowledged concealing witness voucher payments that he should have turned over to the defense or at least brought to the attention of the court *in camera*, and he has explained that he did so in an effort to protect nonwitnesses' identities. Although Ms. Bryant/Greene was a witness and her identity was known, *see* BX 40 at 387, turning over her witness vouchers would have created significant complications for Respondent, by potentially revealing (i) the systematic miscaptioning of witness vouchers used in connection with the *Card/Moore* matter, (ii) other undisclosed payments to *Card/Moore* witnesses out of the federal court, and possibly (iii) improper payment activity under the *Hoyle* (*Newton Street Crew*) caption, because defense counsel could be expected to try to subpoena all vouchers under that caption once the pattern of improper voucher issuance was revealed. Respondent's evasiveness in responding to Ms. Holt's questions clearly suggests to the Committee, in any event, that his intention was to mislead and distract an inquiry that was venturing close to a problematic subject. This conclusion is consistent not only with the misleading testimony Respondent elicited from Ms. Bryant/Greene, but also with his similarly evasive and misleading conduct in stating, under inquiry from opposing counsel, that government witness Kalvin Bears had not received any witness vouchers, but failing to mention that Mr. Bears' girlfriend had by that time received several hundred dollars' worth of vouchers. Tr. 457-58; BX 25 at 333-34; BX 35; *cf.* BX 45 at 421-22, BX 46, BX 79 (eliciting testimony from incarcerated *Newton Street Crew* witness Forgy to the effect that he had received no benefits from the government during incarceration, where relatives had received substantial payments by time of testimony including almost

---

must be understood as limited to compensation of Ms. Bryant/Greene as an informant. Tr. 1193-95. We find this interpretation implausible and reject it.

$4,000 to his grandmother and more than $2,100 to his sister)[9]; BX 55, 71, 72, 73, 79 (eliciting similar misleading direct testimony from *Newton Street Crew* witness Frank Lynch, Jr. appearing to catalog even minor benefits from the government, but omitting thousands of dollars paid to close relatives).

Although the Committee does not find clear and convincing evidence that Respondent devised the miscaptioning scheme to thwart discovery, it is clear that Respondent became aware after the miscaptioning had begun that it impeded discovery, and knowingly and intentionally persisted in concealing it, in violation of Rules 3.3(a) (false statement to tribunal), 3.4(c) (knowingly violating rule of tribunal), 3.8(e) (failure to disclose exculpatory evidence), 8.4(a) (violation of Rules through acts of another), 8.4(c) (dishonesty and misrepresentation), and 8.4(d) (serious interference with the administration of justice).

### 4.    Payments to Retired Police Officers for Services as "Case Agents"

Respondent admits that he used witness vouchers to employ two retired police officers (who had worked with him before their retirement) as unofficial, part-time "case agents." The facts in this regard are not materially in dispute. Although Respondent quibbled somewhat with the "case agent" terminology, *see* Tr. 1170-71, he stipulated that the officers were used as case agents, and in the end he does not contest that federal witness voucher funds were used to

---

[9]    As part of his direct examination of Mr. Forgy concerning benefits received, Respondent elicited testimony to the effect that Mr. Forgy had been moved from the Lorton Prison to the Alexandria Detention Center in Virginia, that he received lunch during meetings with prosecutors, that he was allowed one telephone call after such lunches, and that he had been permitted to visit with his grandmother "a couple times." BX 45 at 421-22. Respondent left the impression that the prosecution had provided through its witness a conscientious recital of all benefits, even relatively trivial ones, the witness received from the government.

Even crediting, *arguendo*, Respondent's contention that Mr. Forgy was unaware of the approximately $4,000 paid by the government to his grandmother by this point in time, this testimony was misleading and improper because (i) the defense should have had the opportunity to inquire into the circumstances of the payments and to probe the veracity of the contention that he was unaware of them, and (ii) there has been no contention that Mr. Forgy was unaware of the more than $2,000 paid by the government to his sister.

compensate these retired officers to assist him with his work, just as they had prior to retirement, and he admits that there was no valid legal basis for issuing these vouchers. *See* Tr. 1172-73; BX 1, ¶¶ 18, 23; Joint Corrections to Stipulations, ¶¶ 18, 23. We agree.

Detective Fluck testified for one day in the *Card/Moore* case but received *68* days' worth of witness voucher payments for appearances and expenses, totaling $4,929.50. BX 1, ¶ 18; Joint Corrections to Stipulations, ¶ 18; BX 36. Detective Belisle testified for 3 days in the *Newton Street Crew* matter but received *167* days' worth of witness voucher payments for appearances and expenses, totaling $9,835.00. BX 1, ¶ 23; BX 3 at 34-36. This reflects a serious abuse of the witness voucher system and a flagrant disregard for the proper disposition of the public funds accessed through the witness voucher system. As noted, witness vouchers are intended to provide a modest compensation to witnesses for their time and trouble in coming to the court to testify. Even crediting Respondent's position that payment of a non-testifying cooperator under a witness voucher was considered permissible, there was no credible basis for an AUSA, in effect, to hire a small staff of part-time "case agents" for his own professional convenience through the use of United States District Court witness vouchers.[10] We consider that this conduct violated Rules 3.3(a) (false statement to tribunal), 3.4(c) (knowingly violating rule of tribunal), 8.4(a) (violation of Rules through acts of another), 8.4(c) (dishonesty and misrepresentation), and 8.4(d) (serious interference with the administration of justice). We also conclude below that these actions violated Rule 8.4(b) (criminal act reflecting adversely on lawyer's honesty).

---

[10]    We do not doubt Respondent's contention that the officers provided assistance after their retirement "out of loyalty to [him]," and it may well be that $40 per day was not viewed as full compensation for the extensive assistance apparently provided. Tr. 1031. But these facts do not make the payments proper. Moreover, they reflect that Respondent apparently viewed the voucher system as almost a private payroll.

5.     **Witness Vouchers Issued to Prisoners**

Respondent also abused the witness voucher system by using vouchers to compensate cooperators for alleged "appearances" on days when they were incarcerated. Such payments are clearly prohibited: "[a]ny witness who is incarcerated at the time that his or her testimony is given [subject to an exception not applicable here] may not receive fees or allowances under this section, regardless of whether such a witness is incarcerated at the time he or she makes a claim for fees or allowances under this section." 28 U.S.C. § 1821(d); *see also* 28 C.F.R. § 21.4(d) ("A witness in custody [subject to an exception not applicable here] is ineligible to receive the attendance and subsistence fees provided by this section.").

Respondent knew that incarcerated witnesses were not entitled to vouchers. Tr. 1283 ("I just know that I knew incarcerated witnesses shouldn't receive witness vouchers and I made a conscious choice in that situation for just moral reasons."); *see also See* BX 1, ¶¶ 9, 17, 22; Tr. 1130-31, 1282-83. Respondent nevertheless issued witness vouchers to five prisoners who testified for the government:

- Kalvin Bears, a witness in the *Card/Moore* trial, received vouchers totaling $504, including $160 for days on which he was incarcerated. BX 1, ¶ 17(d); Joint Corrections to Stipulations, ¶ 17(d).

- Lazaro Santa Cruz, Robert Smith, William Woodfork, and Frank Lynch, all witnesses in the *Newton Street Crew* trial, each received $160 worth of federal vouchers in whole or in part for "appearance" dates during which they were incarcerated. BX 1, ¶ 22.

Respondent has acknowledged and stipulated that he authorized these payments, even though he knew that such payments were not permitted. He explains his decision to issue the vouchers as follows:

> I had protected them all along. I had invested hours and hours trying to get
> them ready to go back so that they wouldn't revert and they wouldn't get—they
> wouldn't get killed and I made a choice. There was no federal money there.
> They showed up in my office where there should have been Safe Streets Money.
> It wasn't available and there they stood. That's what I did.

Tr. 1283. Despite this laudatory motive, this is another example of Respondent treating the

witness vouchers as if they were available to provide compensation as he deemed appropriate.

He intentionally and falsely certified the eligibility of these five prisoners to receive witness

fees, thereby causing the USMS to disburse to these individuals public funds to which he knew

they were not entitled. We consider that this conduct violated Rules 3.3(a) (false statement to

tribunal), 3.4(c) (knowingly violating rule of tribunal), 8.4(a) (violation of Rules through acts

of another), 8.4(c) (dishonesty and misrepresentation), and 8.4(d) (serious interference with the

administration of justice). We also conclude below that these actions violated Rule 8.4(b)

(criminal act reflecting adversely on lawyer's honesty).

### 6.     Other Improper Witness Voucher Payments

The parties agree that Respondent improperly issued federal witness vouchers in

connection with an investigation relating to alleged sexual assault on a child. *See* BX 1, ¶¶ 29-

31. Certain members of the child's family, the "Jones family," attended interviews with

Respondent to provide support to her, *not* to provide information to Respondent. Respondent

issued vouchers under the *Newton Street Crew* case caption, even though no one in the Jones

family provided information relating to that case. Some of the vouchers, moreover, were

issued after Respondent's last day on duty with the federal government. Respondent cannot

explain the late vouchers but concedes that payments were made improperly to Jones family

members and that he knew them to be improper when he made them. Tr.1057-60. The parties

have specifically stipulated that:

29.   Respondent authorized federal vouchers to be paid to Ms. Marjorie Jones and her three grandchildren for 53 days of attendance between December 1, 1993 and June 13, 1995, totaling $3,603.20 for Ms. Jones (including meals and/or mileage) and $2,080.00 for each grandchild, for a total of $9,843.20 to the family. Respondent authorized federal vouchers to two of the Jones grandchildren although he knew that they were not attending as fact witnesses.

30.   Respondent provided and authorized federal vouchers to Ms. Jones and her three grandchildren as witnesses for the *Newton Street Crew* case although neither Ms. Jones nor her grandchildren attended court proceedings to address *Newton Street Crew* matters. Respondent provided and authorized federal vouchers to Ms. Jones and her three grandchildren although they were not entitled to them.

31.   Respondent signed federal vouchers dated June 13, 1995, for attendance on May 31, June 2, June 8 and June 13, 1995, to Ms. Jones and her three grandchildren. Respondent had terminated his employment with the United States Attorney's Office and had left that office by May 26, 1995. Respondent authorized these federal vouchers for Ms. Jones and her grandchildren although he knew they were not entitled to them.

BX 1 at 14, 15. Respondent also acknowledged improperly issuing vouchers to the Jones family in his testimony, although he hedged his position in places as an acceptance of legal responsibility as opposed to a factual admission (in particular, in respect of the late-issued vouchers and the *Newton Street Crew* case captioning). *See* Tr. 1055-61, 1163-66. We find that the stipulated violations relating to these improperly issued vouchers are supported by clear and convincing evidence. *See* BX 1 at 14, 15; BX 93, 94; Tr. 93-97, 158-62, 385-88, 1055-61, 1163-66.

Respondent also issued witness vouchers improperly to Philadelphia Police Detective Jack Szymczak. Respondent stipulated specifically that

Detective Szymczak testified one day in *Card/Moore*, and then he returned to Philadelphia. Respondent authorized a federal voucher to Detective Szymczak which covered three days of attendance ($120) and meals and/or lodging ($173), although the Detective arrived from Philadelphia on the day of his testimony and completed his testimony on the same day in the *Card/Moore* case. Respondent falsely certified attendance and entitlement on the voucher provided to Detective Szymczak.

BX 1 at 7, ¶ 17(g); *see also* BX 34; Tr. 401-04, 1304-07 (claiming he did not, as a factual matter, recall being aware of improper issuance of vouchers because he was busy with trial responsibilities).  In view of the stipulations, testimony, and documentary evidence, we find Bar Counsel's charge to be supported by clear and convincing evidence as to these voucher payments as well.

We find that the conduct relating to the Jones family and to Detective Szymczak violated Rules 3.3(a) (false statement to tribunal), 3.4(c) (knowingly violating rule of tribunal), 8.4(a) (violation of Rules through acts of another), 8.4(c) (dishonesty and misrepresentation), and 8.4(d) (serious interference with the administration of justice).  We also conclude below that these actions violated Rule 8.4(b) (criminal act reflecting adversely on lawyer's honesty).

### 7.    Failure to Disclose Exculpatory Evidence

Rule 3.8 (e) provides that

> The prosecutor in a criminal case shall not . . . Intentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense . . .

Respondent has admitted to violating Rule 3.8(e) in both the *Card/Moore* case and the *Newton Street Crew* case:

> 8.    In both the *Card/Moore* and the *Newton Street Crew* cases, the government relied chiefly on the testimony of cooperating incarcerated witnesses who themselves had been participants and/or conspirators in the criminal conduct charged against the defendants. The veracity of their testimony was disputed and hotly contested throughout the two trials by the defense. Benefits provided directly or indirectly to cooperating government witnesses by the government could have been relevant to the jurors' duty to determine credibility and weigh bias.  Prosecutors are required by law to inform defendants of all benefits, including derivative benefits, provided by the government to government witnesses at a time when use by the defense would be reasonably feasible. *See Giglio v. United States,* 405 U.S. 150 (1972); *Brady v. Maryland,* 373 U.S. 83 (1963).

50

9.     Respondent intentionally failed to fully disclose, or failed to disclose at all, to attorneys representing the defendants he prosecuted the fact that he provided, was providing and/or intended to provide unauthorized federal vouchers to family and friends of government witnesses, incarcerated government witnesses and former police officers associated with the *Card/Moore* and *Newton Street Crew* cases.   Respondent was aware that incarcerated witnesses were not entitled to receive vouchers, yet he authorized vouchers for incarcerated witnesses.   Respondent also provided vouchers to the family and friends of government witnesses for unauthorized purposes and to cooperating witnesses who were not incarcerated but who were not entitled to such vouchers.

* * *

32.     Based upon the above-stated facts, Bar Counsel and Respondent agree that Respondent's conduct constitutes violations of the following District of Columbia Rules of Professional Conduct for each of the three Counts: . . . (c) Rule 3.8, in that Respondent, in a criminal case, intentionally failed to disclose to the defense, upon request and at a time when use by the defense was reasonably feasible, evidence o[r] information that he knew or reasonably should have known tended to negate the guilt of the accused.

BX 1 at 3, 15; *see also* BX 1, ¶ 16 ("Respondent repeatedly and falsely assured the court and

defense counsel that he had provided all *Brady* and *Giglio* information to the defense . . . .");

BX 1, ¶ 16 ("Respondent did not fully disclose the benefits provided to the government

witnesses although the defense requested such information . . . ."); BX 1, ¶ 24 ("Respondent

failed to disclose, or fully disclose, these payments to defense counsel who were entitled to

know of these benefits to government witnesses."); *see also* BX 1, ¶ 8 ("Benefits provided

directly or indirectly to cooperating government witnesses by the government could have been

relevant to the jurors' duty to determine credibility and weigh bias.   Prosecutors are required

by law to inform defendants of all benefits, including derivative benefits . . . ."); BX 1, ¶ 9

(failed to disclose unauthorized vouchers); Response at 17-18.

We quote some of these Stipulations in full because Respondent devotes several pages

of his Response to arguing that he did not violate Rule 3.8(e).   *See* Response at 21-25, 92-95.

Respondent suggests that:

> [i]n order to establish a violation of Rule 3.8(e) in this matter and all future charged Rule 3.8(e) cases, Bar Counsel should be required to establish by clear and convincing evidence that there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the underlying trial would have been different.  Bar Counsel should also be required to prove the additional factor that a defendant made a specific request for the undisclosed evidence in question.

Response at 25.  He then argues that:

> [t]he fact of the matter is that Bar Counsel has failed to meet its burden of showing *Brady* materiality in the [*Newton Street Crew* case]. *Absent such a materiality determination, it is impossible to determine whether an ethical violation occurred.*

Response at 95 (emphasis added).  We find that an ethical violation occurred because *Respondent stipulated to it in a document he and his counsel signed.*  BX 1 at 17.  Indeed, Respondent acknowledges at page 92 of his Response that he "has stipulated that he violated" Rule 3.8(e), yet he incongruously argues at page 95 that absent "a materiality determination, it is impossible to determine whether an ethical violation occurred."

We cannot reconcile these arguments with the above-quoted Stipulations, and therefore we rejected Respondent's arguments.  Bar Counsel presented his case in light of Respondent's pre-hearing stipulations, which relieved Bar Counsel of the obligation to "offer[] independent evidence of the stipulated facts." *Madison Hotel v. District of Columbia Dep't of Employment Servs.*, 512 A.2d 303, 307 (D.C. 1986).  Respondent has stipulated to violating Rule 3.8(e), as is his prerogative. *See e.g., In re Mendoza,* 885 A.2d 317, 318 n.1 (D.C. 2005); *In re Steinberg,* 761 A.2d 279, 283 (D.C. 2000) ("Before the Hearing Committee, Respondent conceded the violations and admitted responsibility when he stipulated to both the underlying facts and the charged violations. *This made for a very brief proceeding before the Hearing Committee.*") (emphasis added).  After stipulating to the violation, Respondent cannot now

argue that Bar Counsel's hearing evidence did not prove that very violation.  If Respondent thought that he did not violate Rule 3.8(e), he should not have stipulated to it.  In the circumstances, we review Respondent's contentions only to determine whether the charge is facially inapplicable.  Finding ample evidence in the record to support the charge by clear and convincing evidence, we find that Respondent violated Rule 3.8(e).

The Supreme Court in *Brady*, 373 U.S. at 87; held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  In *Giglio*, 405 U.S. at 153-54, the Court held exculpatory evidence includes information that could be used to impeach the reliability of witnesses whose testimony may determine guilt or innocence.  Respondent stipulated that "[b]enefits provided directly or indirectly to cooperating government witnesses by the government could have been relevant to the jurors' duty to determine credibility and weigh bias."  BX 1, ¶ 8.  We find that substantial cash payments to government witnesses or their close relatives through witness vouchers should have been disclosed.  Respondent has admitted as much in the Stipulations above, in his testimony, and in his post-hearing brief.  *See* Tr. 1260-63; *see also* Tr.1296-1300; Response at 16-18.

Respondent testified that he decided not to disclose information about the vouchers to the criminal defendants he was prosecuting.

> HEARING CHAIR GLASSMAN: I'm in the middle of paragraph 8 [of the Stipulations].  It says: "Benefits provided directly or indirectly to government witnesses by the government could have been relevant to the jurors['] duty to determine credibility and w[eigh] bias.  Prosecutors are required by law to inform defendants of all benefits, including derivative benefits, provided by the government to government witnesses at a time when use by the defense would be reasonably feasible."

And I take it from the fact that you've stipulated to this that you agree with that statement.

THE WITNESS: I agree with that statement.

HEARING CHAIR GLASSMAN: So benefits provided, even to a relative, could fit into that statement comfortably that that could be something that might be relevant to the jurors['] duty to w[eigh] bias, et cetera?

THE WITNESS: It could. Not in every case, but at the time of my conduct, I weighed disclos[ur]e to Judge Jackson of relatives and friends against protecting them and if I did disclose them I would necessarily put a target on them when I might not use them even in rebuttal. I weighed that against the obligation[s] as you have read them. I came down on the side of protecting my folks and it was based on the fact that no one asked me to disclose statutory witness fees and at the time I did not have any idea how much anybody, any particular person, had gotten. Counting up days and counting amounts on a day-to-day basis during the trial was something I never even thought about. I was far, far busier.

* * * *

In objective, dispassionate view, I know I should have gone to Judge Jackson and said here is the situation. Tell me whether I need to disclose it and I would have done what the Court required.

HEARING CHAIR GLASSMAN: You've anticipated my next question. I mean the weighing analysis you've just describe[d], potentially exculpatory material, potential impeachment evidence, the need to disclose it on the one hand, the need to protect witnesses or cooperators on the other, seems quintessentially to be a balancing test that a court does, not counsel. Correct?

THE WITNESS: Yes, sir.

HEARING CHAIR GLASSMAN: Okay. Normally, in practice, even at that time, it would have been perfectly natural to make that type of submission to the Court. Correct?

THE WITNESS: At that time, and I weighed it in my own mind. I can only tell you that having lost one informant and almost a second, I was terribly mindful of protecting them, and I made the wrong choice at the time.

HEARING CHAIR GLASSMAN: You were worried that if the Court made the decision that you needed to disclose that material, then those witnesses['] names would be out.

THE WITNESS: Yes.

> *HEARING CHAIR GLASSMAN: So you made a conscious decision to take the locus of that decision-making away from the Court?*
>
> *THE WITNESS: I made a conscious decision at the time.*

Tr. 1260-63 (emphasis added); *see also* Tr.1296-1300 (acknowledging that, although he did not believe that vouchers should normally be disclosed, the amount of witness vouchers was sufficient here to trigger disclosure obligations, and describing his conscious "calculus" not to disclose); Response at 17 ("It is the large amount of money that at least raised the spectre of possible *Brady*."). In view of Respondent's stipulation, this testimony and the rest of the record, the Committee finds that Respondent made a conscious decision to withhold *Brady* and *Giglio* information from criminal defendants during the *Newton Street Crew* prosecution.

Respondent contends he did not violate Rule 3.8(e) because that Rule requires that the prosecutor "intentionally fail to disclose [exculpatory information] to the defense, *upon request*," and the *Card/Moore* and *Newton Street Crew* defendants did not make appropriate requests. The record does not support Respondent's argument. The *Newton Street Crew* defendants filed motions specifically seeking information about witness voucher payments and other benefits provided to government witnesses and their relatives. *See* BX 87, 97. In response to a 1992 motion seeking "vouchers, or any other evidence of payment by [the] government" to any person supplying inculpatory information (BX 97 at 31, ¶ 8), the government represented to the court that opposing counsel "will be advised of [any] and all pecuniary benefits that the witness received as a result of involvement in this case." BX 98 at 40, ¶ 13.[11] Because a payment to an incarcerated witness's close relative could be considered a

---

[11]     *But see* Response at 93 ("In the *Hoyle* trial there were no requests for witness vouchers for any witness in the case . . . .").

benefit received by the witness, this response was at best highly misleading.[12] A later motion directly and specifically sought evidence of "witness fees" and fees paid to "the witnesses' family, girlfriends, close friends, and others who would benefit from the witness' cooperation."[13] BX 87. The Committee views these facts as more than sufficient to establish a specific "request" triggering the ethical obligation to disclose exculpatory evidence to the defendants, even assuming, *arguendo*, that such a specific request is necessary to establish a violation of Rule 3.8(e).

We believe that the *Card/Moore* record requires the same finding. First, it is clear that there were general demands for *Brady* and *Giglio* information and extensive discussion of the government's compliance with its obligations to provide material relating to benefits paid to government witnesses. *See* BX 5 (pre-opening statements, *Giglio* demands); BX 6 at 116-23 (same); BX 7 at 126-28 (*Giglio* demands re: records of payments to potential government witnesses); BX 8 at 131-32; BX 9 at 138, 140-41, 145-47; BX 10 at 149-55; BX 12 at 167-77; BX 13 at 191 (stating to court that all *Giglio* information regarding a certain witness, Mr. Crallie, had been turned over); BX 26 at 351-53 (further *Giglio* demands for witness fees); Tr. 1296. Indeed, there was intense debate about the government's compliance with its disclosure obligations, numerous hearings before Judge Dixon, and sanctions against the government. *See Card v. United States*, 776 A.2d 581, 597 (D.C. 2002) ("On more than several occasions, the trial court held hearings to determine the extent of any violations, and whether or not any sanctions would follow. On two occasions, the trial court sanctioned the prosecutor for

---

[12]     In responding to such motions, Mr. Ragsdale confirmed with Respondent that no benefits had been provided to the incarcerated witnesses, and AUSA Leibovitz also reported to Mr. Ragsdale having a discussion with Respondent concerning the propriety of making witness payments to the family members of such witnesses. *See* Tr. 217-18.

[13]     In January 1994, defendants in the *Newton Street Crew* case specifically requested information concerning contributions to the prison "canteen funds" of incarcerated government witnesses. *See* Tr. 217. This request should have made it clear that the defendants were seeking and expected broad discovery with respect to financial benefits provided to government witnesses.

discovery violations. . . .") (affirming convictions).[14]  Second, *Card/Moore* defendants made

specific requests for witness voucher payments as to at least some witnesses.[15]  Defense

counsel contended throughout the case that *Giglio* required the production of agreements,

receipts, and records of approximately $16,000 in payments made to government informant

and potential witness William Stewart.[16]  *See* BX 6 at 119-20; BX 9 at 146-47; *see also* BX 11

at 164; BX 26 at 351-52 (demanding pursuant to *Giglio* "the sum total of all funds he has

received as witness fees").  Similar requests were made in respect of Ms. Bryant/Greene as

discussed above in section 3.  Respondent made misleading statements concerning benefits

received by witnesses' relatives, representing, for example, under inquiry from opposing

counsel, that government witness Kalvin Bears had not received any witness voucher

payments, but failing to mention that Mr. Bears' girlfriend had received several hundred

dollars' worth of vouchers.[17]  Tr. 457-58; BX 25 at 333-34; BX 35; *see also* BX 1, ¶ 16

(stipulation that "Respondent repeatedly and falsely assured the court and defense counsel that

he had provided all *Brady* and *Giglio* information to the defense . . . .").  As with the *Newton*

*Street Crew* matter, the record does not support Respondent's contention that there was no

---

[14]    Ms. Holt stated that "[t]he Supreme Court I understand has said that information that the person has financial[ly] or otherwise benefitted from the Government is of critical dimension when talking about a witness," BX 12 at 171, and Mr. Ponds contended that the defendants were entitled to records of any payments or other "favorable treatment," broadly construed, *see, e.g.*, BX 9 at 146-47; BX 11 at 164; BX 12 at 175-76. Respondent acknowledged that he was obligated to provide information relating to favored treatment and to update that information continuously. BX 12 at 175-76; Response at 54-55.

[15]    Respondent argues that such requests were by only one defense attorney, Response at 35, but there was an agreement in the *Card/Moore* case that a request by one defense lawyer was considered a request by all. Tr. 453-54 (defense attorney Levy).

[16]    Payments to informants are an important reference point, because these payments, often totaling thousands of dollars, were considered disclosable under *Giglio* as indicated in the colloquy concerning Mr. Stewart. Respondent has contended that witness voucher payments, which in ordinary cases total much less than thousands of dollars, were not routinely disclosed. Here, of course, the quantum of Respondent's witness voucher payments to witnesses was on the order of magnitude normally seen with informants. Respondent has, as discussed above, acknowledged that at some point he realized that the quantum of the witness voucher payments was such that they should have been disclosed pursuant to *Giglio*.

[17]    In responding to the court's inquiry about *Giglio* compliance in respect of another witness, James Crallie, Respondent replied that he had attempted to determine "if he was ever provided money, money provided to his family." BX 14 at 193-94; *see also* BX 12 at 174-75 (Respondent offers to make search in agency data systems for witnesses' "receiving any sort of funds or favored treatment"). This belies any possible notion that payments to family members of witnesses were not understood to be potential *Giglio* material.

"request" triggering *Giglio* obligations in the *Card/Moore* matter. We find ample evidence to support the stipulated violation of Rule 3.8(e)—again, even assuming *arguendo* that a specific request is necessary under the Rule.

Respondent also contends that he should not be considered to have violated Rule 3.8(e) because Bar Counsel did not establish that the nondisclosures were material. *See* Response at 21-25, 92-95. Respondent argues that, "[i]n order to establish a violation of Rule 3.8(e) in this matter and all future charged Rule 3.8(e) cases, Bar Counsel should be required to establish by clear and convincing evidence that there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the underlying trial would have been different*." Id.* at 25. He further contends that the requisite materiality "can only be determined in light of the entire record of the [*Newton Street Crew* case]" and that "[i]t is necessary to analyze *every bit of testimony of every witness in the trial as to every count in the indictment*." *Id.* at 94 (emphasis supplied); *see also id.* at 18-20. He then argues that "Bar Counsel has failed to meet its burden of showing *Brady* materiality in the [*Newton Street Crew* case]" and that "[a]bsent such a materiality determination, it is impossible to determine whether an ethical violation occurred." *Id.* at 95.

We disagree. We consider that this entire line of argument is foreclosed by Respondent's stipulation that he failed to disclose information whose disclosure was required under *Brady* and *Giglio*. If Bar Counsel ever had a burden to prove materiality in view of the language of Rule 3.8(e), he was surely relieved of that burden when Respondent stipulated to a violation of that Rule. As with the "upon request" issue raised by Respondent, we review the materiality issue only to determine if the Rule is facially inapplicable. Finding no facial inapplicability, we sustain Bar Counsel's charge under Rule 3.8(e).

Rule 3.8(e) is violated when a prosecutor fails to turn over material "that the prosecutor

knows or reasonably should know *tends to negate the guilt of the accused*." D.C. R. Prof.

Cond. 3.8(e) (emphasis supplied). We have no difficulty concluding, particularly in view of

the Stipulation, that the withheld material in question on its face meets the standard set out in

the Rule. Respondent contends that the withheld information could not have been used (or at

least used effectively) in cross-examination, because (i) given the life-or-death stakes for

cooperators, even substantial witness voucher payments would not be viewed as highly

motivating for a witness (as opposed to, for example, a plea deal likely to reduce a sentence by

many years), and (ii) such cross-examination would have opened the door to testimony

concerning additional, uncharged criminal conduct by the defendants that had occasioned the

investigative interviews leading to the witness payments. This argument ignores the plain

language of Respondent's stipulation that evidence regarding the vouchers could have been

relevant to witness credibility:

> In both the *Card/Moore* and the *Newton Street Crew* cases, the
> government relied chiefly on the testimony of cooperating incarcerated witnesses
> who themselves had been participants and/or conspirators in the criminal conduct
> charged against the defendants. *The veracity of their testimony was disputed and
> hotly contested throughout the two trials by the defense. Benefits provided
> directly or indirectly to cooperating government witnesses by the government
> could have been relevant to the jurors' duty to determine credibility and weigh
> bias.*

BX 1, ¶ 8 (emphasis added).

Stipulation aside, had the entire pattern been disclosed as it should have been, it is by

no means clear, in our view, that defense counsel would have ignored the witness vouchers in

cross-examination or otherwise. *See, e.g.*, Tr. 449-64, 529, 566. Respondent had dispensed

tens of thousands of dollars in witness vouchers, many of them in a manner contrary to law,

and concentrated these payments heavily on witnesses and their close relatives and associates.

Moreover, Respondent was not entitled to deprive defense counsel of that decision. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 439-440 (1995) (full disclosure "will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations"); *Committee on Professional Ethics & Conduct v. Ramey,* 512 N.W.2d 569, 572 (Iowa 1994) ("The duty to disclose exculpatory evidence cannot be ignored because of a prosecutor's private belief that it is beside the point."). In view of the stipulation and the facial violation of the Rule, the Committee concludes that Respondent's violation of Rule 3.8(e) has been established by clear and convincing evidence.

## II.    Rules Violated

Respondent has stipulated to violating Rules 3.3(a), 3.4(c), 3.8(e), and 8.4(a), (c), and (d) in respect of the *Card/Moore*, *Newton Street Crew*, and *Jones* matters.  We accept these stipulations as to the *Card/Moore and Newton Street Crew* cases.  As for the *Jones* matter, the Committee accepts that the Rule 8.4(a), (c), and (d) violations are supported by clear and convincing evidence, but we do not accept that the stipulated violation of Rule 3.8(e), which applies to failures to provide required information to criminal defendants, is supported by the record, because the *Jones* matter did not proceed beyond the investigative stage.  As for Rules 3.3(a) and 3.4(c), there is a possible argument that issuing or tendering a witness voucher form with false information to the U.S. Marshals Service office in the District Court does not constitute a false statement to the *court* (but rather to an Executive Branch agency) or a violation of court rules as opposed to federal statutes and regulations more generally.  *Cf. Cleaver-Bascombe*, 892 A.2d at 403-04 (identifying but finding no need to decide similar issue relating to Superior Court Financial Operations Division because CJA voucher approval vests ultimately with judge).  Respondent has not made these arguments, however, but rather

has stipulated to violations of these rules, and there is a sufficiently close relationship between the role played by the USMS as regards witness vouchers and the business of the court that we do not find the application of these rules to the issuance of witness vouchers facially implausible.[18] We therefore sustain these charges as to all three matters.

The only questions remaining for the Hearing Committee regarding the charged violations are whether Respondent violated (i) Rule 3.4(b), by offering a prohibited inducement to a witness; or (ii) Rule 8.4(b), by committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness. We have already discussed the charge that Respondent offered a prohibited inducement to a witness. We concluded that the charge is not supported by clear and convincing evidence, because the only instances in which witness payments were provided other than for the receipt of information (and hence the only clearly "prohibited" payments in view of the USAO's practice at the time) involved vouchers issued to relatives of witnesses for visits they made to the USAO to provide moral support. Although we have found these payments to have been "prohibited" in that they were not an authorized use of witness vouchers, we do not believe that they constitute "inducements" to the witnesses in the sense intended by the Rule.

Rule 8.4(b) provides that "it is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." We find that Respondent has violated Rule 8.4(b) by committing criminal acts bearing directly on his honesty and trustworthiness—*i.e.*, false statements and certifications—when he used witness vouchers (i) to compensate incarcerated witnesses; (ii) to

---

[18] Respondent does argue, Response at 90-92, that, despite his stipulation, a Rule 3.4(c) violation should not be found unless a Rule 3.8(e) violation is also found. Because we have found a violation of Rule 3.8(e), we need not address this argument, which in any event is technical and would not affect our sanction recommendation.

compensate retired detectives Fluck and Belisle for services they provided to him as "case agents"; and (iii) to compensate Jones family members who were not witnesses and did not provide information, including through vouchers issued after his resignation from the USAO.

The above conduct clearly constitutes false statements and certifications in violation of 18 U.S.C. §§ 1001 and 1018.[19] *See, e.g., In re Goffe,* 641 A.2d 458, 465 n.8 (D.C. 1994) ("Knowingly using a false writing or document in any matter with the United States or its agency is also a felony. 18 U.S.C. § 1001 (1989)."). Indeed, Respondent has admitted that "Bar Counsel has established a violation of either 18 U.S.C. § 1001 or § 1018" for his authorization of vouchers for (i) incarcerated witnesses; and (ii) members of the Jones family for purported attendance on dates *after* Respondent left the USAO. Response at 97-98. We see no reason to question the validity of this stipulation. We also find no basis to doubt that the other payments, under *Newton Street Crew* case captions, to the Jones family members who accompanied their sister but were not witnesses or informants also violated these provisions. Nor do we see any reason to doubt that such violations arose from Respondent's payment of retired MPD police officers to serve him as "case agents."[20] We therefore find by clear and

---

[19]    18 U.S.C. § 1001 provides in relevant part that

whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--
(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
(2) makes any materially false, fictitious, or fraudulent statement or representation; or
(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
shall be fined under this title, imprisoned not more than 5 years . . .

18 U.S.C. § 1018 provides that

Whoever, being a public officer or other person authorized by any law of the United States to make or give a certificate or other writing, knowingly makes and delivers as true such a certificate or writing, containing any statement which he knows to be false, in a case where the punishment thereof is not elsewhere expressly provided by law, shall be fined under this title or imprisoned not more than one year, or both.

[20]    The same can be said of the excessive witness voucher payment authorized for Detective Szymczak.

convincing evidence that Respondent violated 18 U.S.C. § 1001 and 1018 in issuing these witness vouchers.

Although Bar Counsel has not charged violations under Rule 8.4(b) by reference to property crimes such as theft and embezzlement, the Committee believes that the record clearly establishes such violations. Federal law provides, for example, that

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or any department or agency thereof
>
> * * * *
>
> [s]hall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under the title or imprisoned not more than one year, or both.

18 U.S.C. § 641; *In re Patterson,* 833 A.2d 493, 493 (D.C. 2003) (disbarment following guilty plea for stealing more than $1,000 of U.S. government property in violation of § 641). There is no doubt that Respondent conveyed or disposed of federal witness vouchers—and the public monies accessed by them—without authority and converted public funds to the use of third parties for his own, improper purposes. Although there is arguably sufficient notice to Respondent to find Rule 8.4(b) to have been violated on this additional basis, we will not rely on such a finding, which is in any event superfluous for present purposes in view of the stipulated violations.

The Committee believes that Respondent's multiple and deliberate false statements and certifications in violation of 18 U.S.C. § 1001 and 1018 plainly reflect adversely on his honesty and trustworthiness. Rule 8.4(b) by its terms requires nothing more. In contrast to the ensuing phrase "or fitness as a lawyer in other respects," the phrase "reflects adversely on his honesty

[or] trustworthiness" can be satisfied without a broader inquiry into fitness, so long as the

criminal act reflects dishonesty. The comment to the Rule reinforces this conclusion:

> Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offenses carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. *Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category.* A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

D.C. R. Prof. Cond. 8.4 cmt. [1] (emphasis added). We conclude that Respondent's false

statements and certifications violate the Rule where, as here, they reflect deliberate and

repeated dishonest conduct. The various "moral" rationales adduced by Respondent in

explanation of his actions do not alter this conclusion.

## SANCTION

Bar Counsel seeks "at least" a two-year suspension with a fitness requirement. Bar

Counsel's Opening Br. at 97. Respondent argues that the sanction should be a non-suspensory

public censure or a 30-day suspension, at most. Response at 111. The imposition of sanctions

in bar disciplinary matters "is not an exact science but may depend on the facts and

circumstances of each particular proceeding." *Goffe*, 641 A.2d at 463. The facts and

circumstances generally considered include: (1) the nature and seriousness of the misconduct;

(2) the prejudice, if any, to the client that resulted from the misconduct; (3) whether the

conduct involved dishonesty or misrepresentation; (4) the presence or absence of violations of

other ethical rules; (5) whether the lawyer has had prior discipline; (6) whether the lawyer

acknowledges his wrongful conduct; and, (7) any circumstances in mitigation of the misconduct. *In re Pelkey,* 962 A.2d 268, 281 (D.C. 2008). We treat these factors below. In doing so, we are cognizant that the discipline we recommend "should serve not only to maintain the integrity of the profession and to protect the public and the courts, but also to deter other attorneys from engaging in similar misconduct." *In re Reback,* 513 A.2d 226, 231 (D.C. 1986) (en banc).

The Court of Appeals has cautioned that, although it "is not precluded from imposing a more severe sanction than that proposed by the prosecuting authority, that is and surely should be the exception, not the norm, in a jurisdiction, like ours, in which Bar Counsel conscientiously and vigorously enforces the Rules of Professional Conduct." *Cleaver-Bascombe,* 892 A.2d at 412 n.14; *In re Ukwu,* 926 A.2d 1106, 1119 (D.C. 2007) ("our disciplinary system is adversarial, and the imposition of a sanction harsher than that proposed by Bar Counsel should be the exception rather than the norm."); *In re Christenson,* 940 A.2d 84, 85 n.3 (D.C. 2007) (same); *In re Powell,* 898 A.2d 365, 366 n.1 (D.C. 2006) (same); *In re DeMaio,* 893 A.2d 583, 585 n.1 (D.C. 2006) (same). Although Bar Counsel's recommendation could be understood as a *minimum* recommended discipline—*i.e.,* "at least" two years' suspension with fitness—Bar Counsel appears to have considered and rejected disbarment:

> Normally Bar Counsel would recommend disbarment for misconduct as serious and extensive as that of Respondent. However, because the mitigating factors discussed herein [(Respondent's stipulations and cooperation with Bar Counsel, and the delay between the charged misconduct and the institution of disciplinary proceedings)], we believe that a substantial suspension of at least two years, with a fitness requirement, would be adequate to protect the courts, the public, and the integrity and standing of the Bar.

Bar Counsel's Opening Br. at 97; *see also* Bar Counsel's Reply to Respondent's Proposed Findings of Fact, Conclusions of Law, and Recommendation as to Sanction at 6 ("in determining what sanction to recommend, Bar Counsel took into consideration the length of

time that has elapsed since the underlying misconduct, and as a result, *is recommending a sanction less than disbarment.*") (emphasis added).

Mr. Phalen, the attorney member of the Hearing Committee, would have recommended Respondent's disbarment, but believes it is appropriate under *Cleaver-Bascombe* to follow Bar Counsel's recommendation of a lesser sanction of at least a two-year suspension with a fitness requirement. Mr. Phalen defers to the Board on Professional Responsibility and the Court of Appeals to decide whether a more severe sanction than sought by Bar Counsel should be imposed. The public member, Mr. Barker, recommends disbarment, notwithstanding Bar Counsel's position, on the grounds that the misconduct in this case is so grave that it presents the "exception" under *Cleaver-Bascombe* that warrants a departure from Bar Counsel's recommendation. Our analysis below marshals the findings and principles that support disbarment for Respondent's serious misconduct.

A.    **Seriousness, Multiple Violations, and Dishonesty**

It would be difficult to overstate the seriousness of Respondent's misconduct. He has admitted to violating six District of Columbia Rules of Professional Conduct—3.3(a) (false statement of fact or law to a tribunal), 3.4(c) (disobeying an obligation under the rules of a tribunal), 3.8(e) (failing to timely disclose evidence that tended to negate the guilt of the accused), 8.4(a) (violating the Rules of Professional Conduct), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation; and 8.4(d) (engaging in conduct that seriously interfered with the administration of justice)—in each of three separate cases (*Card/Moore*, *Newton Street Crew*, and the *Jones* matter).[21]  In addition, we have found that

---

[21]    Notwithstanding the Stipulation, the Committee above found Rule 3.8(e) inapplicable to Respondent's conduct in relation to the Jones investigation.

Respondent violated Rule 8.4(b) (committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness) through deliberate and repeated false sworn statements and certifications to the government that resulted in the misuse of public funds.

The Committee has found Respondent to have violated the Rules in the following specific ways: (i) by making improper payments to relatives of two key witnesses for their assistance in visiting the witnesses in prison to encourage them to continue to cooperate with, and eventually testify on behalf of, the government; (ii) by intentionally concealing his issuance of witness vouchers out of the wrong court and under the wrong case caption even after he was on notice that this practice was thwarting defense discovery efforts; (iii) by intentionally and improperly issuing witness vouchers to two retired police officers as a means of compensating them for their service to him as "case agents"; (iv) by intentionally and improperly issuing witness vouchers to prisoners covering days when they were incarcerated; (v) by intentionally and improperly issuing witness vouchers to family members who accompanied a child who was cooperating with an investigation during interviews; (vi) by improperly issuing witness vouchers to a police officer from Philadelphia purporting to compensate him for days he did not actually attend; and (vii) by intentionally failing to disclose exculpatory and/or potential impeachment information to criminal defendants whom he was prosecuting as required by law.  These violations have resulted not only in substantial expenditures of investigative, administrative, and judicial resources, but also in profound detrimental impacts on the *Card/Moore* and *Newton Street Crew* prosecutions.

Broadly speaking, the record reflects two core types of misconduct, misapplication of public funds and failure to disclose information required to be provided to criminal defendants. The Committee finds that the seriousness of the misconduct overwhelms any mitigating

factors, including the delay in this case which has been substantial, and supports the sanction of disbarment.

### 1.   Misapplication of Funds

An important initial question in evaluating the seriousness of Respondent's misconduct for purposes of recommending a sanction is whether and how the Court of Appeals' jurisprudence concerning misappropriation should be applied to this case.[22]  Reckless or intentional misappropriation presumptively results in disbarment. *See In re Addams*, 579 A.2d 190, 191 (D.C. 1990) (en banc).  Misappropriation is defined as "any unauthorized use of client's funds entrusted to [a lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [he] derives any personal gain or benefit therefrom."  *In re Mitrano*, 952 A.2d 901, 925 (D.C. 2008) (citations omitted). Respondent's misconduct falls *prima facie* within this definition—*if* the definition applies to government attorneys and the term "client's funds" applies to public funds entrusted to those attorneys.  As the law presently stands, however, it is not at all clear that cases such as this one involving defalcations from public funds should be analyzed as misappropriations.  The majority in *Cleaver-Bascombe*, 892 A.2d at 411-13, for example, declined to treat a Criminal Justice Act voucher improperly submitted by a court-appointed criminal defense attorney as a misappropriation.  Judge Glickman, dissenting, would have disbarred the respondent rather than remand, and he relied at least by analogy on the *Addams* line of cases to support his

---

[22]     Bar Counsel did not charge misappropriation and the matter was not litigated on that footing.  On the other hand, there is no doubt that the gravamen of the charges was Respondent's misuse of public funds, and the Court of Appeals has not taken a formalistic approach to questions of notice in attorney discipline cases, particularly in regard to sanctions. *See, e.g., Ukwu*, 926 A.2d 1106 at 1113-1114, n.17; *In re Austin*, 858 A.2d 969, 975-976 (D.C. 2004); *In re Hager*, 812 A.2d 904, 917 n.14 (D.C. 2002); *In re Slattery*, 767 A.2d 203, 208-209 (D.C. 2001); *In re Haar*, 698 A.2d 412, 417 (D.C. 1997); *In re Smith*, 403 A.2d 296, 300 (D.C. 1979).

position. *Id.* at 413-14. But neither the majority nor the dissent contended that *Addams* bound the Court outright to order disbarment. And the Board on remand recommended a two-year suspension rather than disbarment pursuant to *Addams*.

Respondent's misconduct here seems no less culpable than many misappropriations, frauds, and thefts that have resulted in disbarment in this jurisdiction. *See, e.g., Patterson,* 833 A.2d at 493 (conviction for theft of more than $1,000 from U.S. government); *In re Ayeni*, 822 A.2d 420 (D.C. 2002) (misappropriation in multiple cases and CJA voucher fraud); *In re Caplan*, 691 A.2d 1152, 1152 (D.C. 1997) ("Criminal offenses involving theft and fraud inherently involve moral turpitude.") (disbarment); *In re Bond*, 519 A.2d 165 (D.C. 1986) (disbarment for wire fraud).

*Patterson* is instructive. The respondent in that case plead guilty to theft in violation of 18 U.S.C. § 641, which, as noted above, makes it a felony to "embezzle[ ], steal[ ], purloin[ ], or knowingly convert[ ] to his use or the use of another, or without authority, sell[ ], convey[ ] or dispose[ ] of any record, voucher, money, or thing of value of the United States or any department or agency thereof" in excess of $1,000. *Patterson,* 833 A.2d at 493. Based on the guilty plea, the Court found that Patterson had been convicted of a crime of moral turpitude *per se* and ordered him disbarred pursuant to D.C. Code § 11-2503(a) (disbarment on the basis of conviction for crime involving moral turpitude). *Id.* Although we do not find that disbarment *per se* is appropriate in this case in the absence of a criminal conviction, on the equities we see no compelling reason why Respondent, who "paid" Detectives Belisle and Fluck alone with nearly $15,000 of improper witness vouchers, should receive qualitatively different treatment from Patterson. *See also In re Tillerson*, 878 A.2d 1186, 1186 (D.C. 2005) (citing *Patterson* and finding disbarment *per se* appropriate for felony theft conviction under D.C. law).

The Court of Appeals has confronted cases in which the *Addams* rule either did not apply or did not clearly apply, but the misconduct so resembled misappropriation or other disbarment offenses as to require the same result. In *In re Slattery*, 767 A.2d 203 (D.C. 2001), for example, the respondent held funds as a trustee rather than through an attorney-client relationship, and in that capacity he diverted the funds (about $10,000) to his own use. *Id.* at 206. The Court found violations of Rule 8.4(b) and (c) and ordered the respondent disbarred. *Id.* at 213-14, 219. The Court observed that "there is a structural similarity between the attorney-client fiduciary relationship sought to be protected in *Addams* and the trustee relationship of Slattery . . . . At the very least, the near-automatic rule of disbarment of *Addams* signals the seriousness with which the disciplinary system should deal with an attorney's deliberate taking of fiduciary funds to convert them to a personal use."[23] *Slattery*, 767 A.2d at 216. We think the same can be said here. A government lawyer's misapplication of public funds entrusted to his control implicates many of the same regulatory interests as misappropriation of funds or outright theft from a private client. Certainly, it is no less dishonest. The Court has emphasized that the misappropriated funds need not benefit the lawyer as opposed to a third party, and we see nothing that would suggest a narrower rule in this context. *Cf.* 18 U.S.C. § 641 (crime occurs when defendant "converts [government funds] to his use or the use of another").

*In re Gil*, 656 A.2d 303 (D.C. 1995), is to similar effect. In that case, the respondent agreed to assist a friend of 15 years by seeing to the transfer of some of her assets, and then stole the assets, forging various signatures in the process. *See Gil*, 656 A.2d at 304. The Court

---

[23]     "Nor are we persuaded that Slattery's violation of a fiduciary relationship and dishonesty during his deposition are completely unrelated to the practice of law or the administration of justice." *Slattery*, 767 A.2d at 218.

concluded that Gil had committed larceny, found violations of Rule 8.4(b) and (c), and ordered

him disbarred, observing that "'[m]isappropriation . . . of a client's (or other) funds . . .

demonstrates absence of the basic qualities for membership in the legal profession. . . .'" *Id.* at

306 (quoting *In re Minninberg*, 485 A.2d 149, 151 (D.C. 1984)). Because the Court "agree[d]

with the Board that respondent violated Rules 8.4(b) and (c) and that his misconduct was grave

enough to require disbarment," it did "not decide whether respondent acted in the course of an

attorney-client relationship or whether the existence of that relationship is a pre-condition to a

violation of Rule 1.15." *Id.* at 304. As in *Slattery* and *Gil,* we see no persuasive reason why

the technical inapplicability of the *Addams* rule (or a statute mandating disbarment) should

require a lesser sanction than disbarment.

We find some helpful guidance in *In re Pennington*, 921 A.2d 135 (D.C. 2007). The

respondent in that case was disbarred in Maryland for lying to her clients about the source of a

$10,000 payment made to them in connection with a lawsuit that Pennington was handling for

them. *Id.* at 137-39. There had been a problem with the filing of the clients' complaint in the

personal injury matter, allowing the statute of limitations to run. *Id.* at 137. Because the

clients had previously authorized a settlement offer of $10,000, Pennington paid them that

amount from her own funds, without revealing the problem that had occurred with the

complaint, and provided them with a false "Statement of Settlement" that led them to believe

that the $10,000 had been paid by the defendant's insurer. *Id.* at 138-39. The D.C. Court of

Appeals declined to follow the Maryland Court's disbarment, concluding that a two-year

suspension with a fitness requirement was the appropriate sanction in this jurisdiction. *Id.* at

142-45. Like Pennington, Respondent here did not pocket the proceeds of any of his wrongful

acts. However, unlike Pennington, Respondent's "client," or in any event the public, suffered

direct financial harm when he used public funds for his own purposes. And unlike Pennington, who spent her own funds to effectuate the scheme, Respondent chose to misapply public monies. Particularly in view of the widespread, repeated, deliberate, and dishonest character of Respondent's actions, we find his misconduct to be considerably more serious than that addressed in *Pennington*.

Finally, we consider disbarment to be consistent with the outcome in *Cleaver-Bascombe*. The Court in that case emphasized that attorneys who accept CJA funds "are expected to be scrupulously honest and to exercise a high degree of care in completing their vouchers, which are paid out of taxpayer funds, and which are submitted to the court under penalty of perjury." 892 A.2d at 398. The same can be said of witness vouchers. Indeed, Judge Glickman emphasized that, in order to provide adequate general deterrence, "the severity of a sanction should take into account the difficulty of detecting and proving the misconduct at issue" and argued that disbarment without remand was warranted "because inflated vouchers are difficult to detect and prove." *Id.* at 414. This is even more true in the case of witness vouchers, which are not scrutinized by the court like CJA vouchers but rather paid by the USMS without any review other than to determine that the AUSA has endorsed the voucher form. Although we have not found that Respondent has provided perjured testimony to this Hearing Committee as Cleaver-Bascombe was found to have done, he did engage in substantial dishonest conduct before two courts in the course of the underlying conduct as set out in detail above. Cleaver-Bascombe's conduct was also relatively isolated, pertaining to billing entries in a single case and on a single voucher, and the overall amount of CJA compensation questioned was only $725. *Id.* at 400. By contrast, Respondent used scores of false submissions to improperly procure tens of thousands of dollars.

72

Because we consider Respondent's misconduct to be substantially more egregious than Cleaver-Bascombe's, we believe that disbarment in this matter is consistent with the two-year suspension and fitness requirement recommended by the Board upon remand in that case. *In re Cleaver-Bascombe,* Bar Docket Number 183-02 at 9 (BPR July 21, 2006). In reaching that recommendation, the Board observed that if Ms. Cleaver-Bascombe had prepared the CJA voucher accurately "she could have billed something close to (and perhaps more than) the $725 amount that she actually billed." *Id.* at 4. No such argument is available here: it is undisputed that Respondent claimed many thousands of dollars without any legal justification. Moreover, the Board observed at the end of its Supplemental Report and Recommendation that "this appears to be a case of first impression" and that "[i]t may be that the Court will decide that Respondent's violations are so strikingly similar to misappropriation that disbarment is the presumptive sanction." *Id.* at 9.

Disbarment could thus be amply justified on this record solely on the basis of Respondent's misapplications of public funds through the issuance of false witness vouchers. But those misapplications are not, in the Committee's view, the most serious aspect of his misconduct: Respondent's intentional and repeated violations of his obligations to disclose exculpatory and bias-related information to the criminal defendants whom he was prosecuting.

2.   **Failure to provide *Brady* and/or *Giglio* information.**

The Supreme Court stated in *Brady* in 1967 that "[s]ociety wins not only when the guilty are convicted, but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady*, 373 U.S. at 87 ("The United States wins its point whenever justice is done its citizens in the courts."). The commentary to Rule 3.8 echoes *Brady's* axiom that a prosecutor owes a duty to society beyond obtaining

convictions: "The prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." D.C. R. Prof. Cond. 3.8 cmt. [1]. Respondent's Stipulations relating to *Brady* and *Giglio* and his extraordinary admission of this misconduct are set out in the discussion above of the Rule 3.8(e) charge. We will not repeat the Stipulations or the full colloquy here. In sum, Respondent admitted, *inter alia*, having performed a mental "calculus" in which he unilaterally balanced the rights of the criminal defendants to *Brady* and/or *Giglio* information against his own assessment of the likelihood that harm might come to his cooperators if their identities were divulged to the defendants. Respondent has stipulated and testified that he was required to turn this information over to the defense, and he concedes that he had the ability to put the question before the judge in the case but decided on his own not to do so. It is also apparent that Respondent made dishonest and improper efforts to conceal his activities in respect of witness payments, making false or misleading statements to the court and to opposing counsel on the record, and adducing false or misleading testimony from witnesses about their receipt of benefits from the government.

The Committee has concluded that at some point Respondent became aware that his practice of issuing of vouchers out of the wrong court and under the wrong caption was frustrating defense discovery efforts, yet he chose to continue to conceal the practice, further frustrating those efforts. Respondent knew that his opposing counsel in the *Card/Moore* matter were attempting to subpoena information concerning payments to a witnesses from the Superior Court, *see, e.g.,* BX 23 at 317; Tr. 453-55, 481, 519-20, yet he made no effort to notify counsel that these and other withheld vouchers had been issued improperly out of the

74

federal court. Respondent was at that point clearly on notice that his practice of systematically issuing witness vouchers out of the wrong court was thwarting defense discovery efforts in one instance and potentially in many others. He also knew that the practice was needlessly and substantially wasteful of his opposing counsels' and the court's limited time and resources. *See* BX 23 at 316-17. Yet he took no action to correct his conduct.

In multiple instances, Respondent compounded his discovery violations by making false and/or misleading statements to the court and adducing false or misleading testimony from witnesses before the jury. *See* BX 1, ¶ 16 (stipulation that Respondent "repeatedly and falsely assured the court and defense counsel that he had provided all *Brady* and *Giglio* information to the defense" in *Card/Moore* matter). We have already discussed the testimony of Theresa Bryant/Greene, adduced by Respondent, to the effect that she had only received witness vouchers for three Grand Jury appearances when in fact Respondent had recently given her twelve vouchers, totaling $480, that were not related to those appearances. We have also discussed Respondent's evasive and misleading conduct in stating, under inquiry from opposing counsel, that government witness Kalvin Bears had not received any witness vouchers, omitting to mention that Mr. Bears' girlfriend had by that time received several hundred dollars' worth of vouchers. Tr. 457-58; BX 25 at 333-34; BX 35. Other examples are evident in the record. For example, Respondent's direct examination of Frank Lynch in the *Newton Street Crew* case appeared to provide a catalog of the benefits he received from the government, including not only his plea and cooperation agreements but also items such as receiving lunch during visits with prosecutors, permission to use the telephone, and family visits. BX 55; *cf.* BX 56 at 504-05 (similar testimony on cross-examination). But the examination omitted any mention of payments to Michelle Washington, Lynch's girlfriend and

the mother of his child, amounting to $7,392, to his sister Karen Lynch amounting to $1,008, to his mother Helen Lynch amounting to $126, and to his father Frank Lynch, Sr. amounting to $546, as of the date of the testimony. *See* BX 55, 71, 72, 73, 79.

Although there are no original D.C. disciplinary cases involving a prosecutor's failure to provide discovery in violation of Rule 3.8(e), the Court did address an analogous violation in a recent reciprocal discipline case, *In re Stuart,* 942 A.2d 1118 (D.C. 2008). The respondent in that matter, an Assistant District Attorney in Queens County, New York, failed to produce to the defense a police report concerning a witness believed to have exculpatory information in a homicide case, falsely represented to the court that he did not know the witness's whereabouts, and failed to correct the misrepresentations during the trial, causing the matter to have to be retried. *Id.* at 1119. The New York Court suspended the respondent for three years for violating New York Disciplinary Rule 1-102(a)(4), (5), (7). *Matter of Stuart,* 803 N.Y.S.2d 577, 577-78 (App. Div. 2d Dep't 2005). Given the strong presumption of identical reciprocal discipline, the Court imposed a three-year suspension with a requirement to prove fitness. *Stuart,* 942 A.2d at 1120-21. The Court of Appeals acknowledged that the respondent's misconduct could have merited disbarment in this jurisdiction if considered as an original disciplinary matter. *Id.* at 1120. Judge Nebeker dissented, stating that the three-year suspension with fitness "does not go far enough" and that he would remand to the Board "for proceedings leading to possible disbarment." *Id.* at 1122. Judge Kramer wrote separately to express agreement with Judge Nebeker that a prosecutor who makes misrepresentations to the court, withholding possibly exculpatory evidence from the defense, "deserves more than a three-year sanction and serious consideration of disbarment," but ultimately concluded that the deference required in reciprocal cases militated in favor of the three-year suspension with

fitness. *Id.* at 1121. The Court's analysis in *Stuart*, in which there was a single misrepresentation to the court and a single instance of failure to disclose information, strongly supports disbarment in this case, which involves far more extensive dishonesty and prosecutorial misconduct. *Id.* at 1121.

A number of cases not involving Rule 3.8(e) or failure to disclose *Brady* or *Giglio* information also offer some guidance, particularly as regards misrepresentations to the Court and opposing counsel. In *In re Corizzi*, 803 A.2d 438 (D.C. 2002), for example, the respondent urged two clients to lie under oath in their depositions so that they would not reveal that the respondent had a reciprocal referral relationship with a chiropractor who was acting as an expert in their cases. *Id.* at 440. Corizzi had also failed to report settlement offers to a client, lied to opposing counsel and the court about the timing of his engagement as counsel, and lied to Bar Counsel. *Id.* The Court disbarred Corizzi, stating that "[d]ishonesty is at the heart of the respondent's violations, and honesty continues to be an 'indispensable component of our judicial system.'" *Id.* at 442 (quoting *In re Mason*, 736 A.2d 1019, 1024 (D.C. 1999)). The Court observed that Corizzi's instruction to his clients to lie virtually destroyed their prospects of recovery in their personal injury actions and exposed them to potential prosecution for perjury. *Id.* at 440. Similarly, in this case, Respondent's abuse of the witness voucher system and concealment of his witness voucher payments (which included eliciting false and misleading testimony from witnesses concerning benefits provided to them by the government) resulted in extensive litigation and, ultimately, substantially reduced sentences for the *Card/Moore* and *Newton Street Crew* defendants. Although the analogy is not perfect, we find some guidance in *Corizzi*.

We also find some basis for comparison of Respondent's misconduct to that found in *In re Parshall*, 878 A.2d 1253 (D.C. 2005), a reciprocal discipline case in which a Department of Justice attorney submitted a false status report, along with fabricated supporting documents, to a federal district court. *Id.* at 1254. The attorney resigned from the Justice Department and was reprimanded by the Maryland Court of Appeals. *Id.* The D.C. Court of Appeals adopted the Board's recommendation to depart from the Maryland sanction and imposed an 18-month suspension. *Id.* at 1255. As with *Cleaver-Bascombe* and this case, the submission of false information to a court was a very serious matter. Parshall's misconduct was isolated, however, consisting of a single false submission. His misconduct also did not involve the misuse of client or public funds. And he had never been subject to discipline in twenty years of law practice. *Id.* at 1254 n.4. Respondent in the present matter, by contrast, engaged in widespread dishonest conduct and misapplied many thousands of dollars of public funds. We find these distinguishing factors to be more than sufficient to account for the difference between the 18-month suspension imposed in *Parshall* and the more severe sanction of disbarment recommended here. *Compare id. with Goffe*, 641 A.2d at 465 (disbarment where "repeated fabrication and falsification of documents and related lying created the prospect of injustice and unfair advantage with respect to a range of government institutions as well as to private individuals") (sanction covered additional areas of misconduct).

Similarly, we find the misconduct reflected in this record to be qualitatively more serious than that addressed in *Powell*, 898 A.2d 365. Powell had been convicted of a misdemeanor in Virginia and had been suspended from practice on an interim basis in the District of Columbia, yet he failed to disclose his D.C. bar membership or his interim suspension in an application for admission to the bar of the United States District Court for the

District of Colorado. *Id.* at 365-66. The Court issued an order to show cause why Powell should not be disbarred. *Id.* at 366. The Board recommended, and the Court adopted, a suspension of one year with a requirement to prove fitness as a condition of reinstatement. *Id.* Unlike Powell, who made one false submission to a court, Respondent in this case has made numerous false submissions, has made multiple false or misleading statements to courts on the record, and has adduced false or misleading testimony in multiple cases. These distinctions are more than sufficient to justify the difference between the one-year suspension with fitness imposed in *Powell* and the sanction of disbarment.

In sum, the misconduct reflected in this record appears capable of supporting disbarment either on the basis of the Respondent's defalcations from public funds entrusted to his control or on the basis of his prosecutorial misconduct relating to *Brady* and *Giglio* violations. Taken together, and particularly in consideration of the extensive dishonesty involved, the Committee believes that the record in this matter amply supports the sanction of disbarment.

**B.    Prejudice to the Client**

Respondent's extensive misconduct resulted not only in a substantial expenditure of investigative time and effort by the Department of Justice's Office of Professional Responsibility and the Office of Bar Counsel, but also in an extensive motions practice, and the renegotiation and substantial reduction of sentences for a number of extremely serious criminals. In the wake of Respondent's misconduct, the United States Attorney agreed to the following sentence reductions, which were approved by the presiding courts:

Mark Hoyle

original sentence: 8 life terms, plus 25 years
amended sentence: 28 years

John McCollough

> original sentence: 9 life terms, plus 85 years
> amended sentence: 28 years

Anthony Goldston

> original sentence: 4 life terms, plus 5 years
> amended sentence: 18 years, concurrent with Superior Court sentences

Mario Harris

> original sentence: 5 life terms, plus 25 years
> amended sentence: 18 years

Antoine Rice

> original sentence: 40 years-life with a mandatory minimum of 25 years;
> amended sentence: 5 to 15 years.

Javier Card

> original sentence: 69 years to life;
> amended sentence: 23 years to life, with the execution of all but 23 years
> suspended.

Jerome Edwards

> original sentence: 61 years to life, mandatory minimum of 30 years;
> amended sentence: 23 years to life, with the execution of all but 23 years
> suspended.

Donnie Strothers

> original sentence: 30 years
> amended judgment: 14 ½ years

William Hoyle

> original sentence: 30 years
> amended sentence: 14 ½ years

Respondent has indeed acknowledged that the government perceived a "substantial risk that

the [*Newton Street Crew*] convictions could be set aside, that the collateral attack hearings

80

could be embarrassing, and [that] they could be facing a complicated re-trial ten years after the original complicated trial." Response at 20. *But cf. id.* at 20 n.20 (asserting that concerns were exaggerated based on OPR report).

In addition, prosecutorial misconduct on this scale is, in the Committee's estimation, extremely serious. The prosecutorial obligations set out in *Brady* and its progeny rest on a foundation of trust: the defense and the court must be able to rely on a prosecutor's word that he or she has provided the requisite disclosures. Respondent's conduct breached that trust, thwarted the criminal discovery process and undermined the integrity of our system of justice.

### C.    Prior Discipline

Respondent has been the subject of prior discipline in New Mexico. *See In re Howes,* 123 N.M. 311 (1997) (BX 101). In that case, the New Mexico Supreme Court publically censured Respondent, finding that he

> had inappropriate contacts with [a represented] defendant directly on at least six
> (6) separate occasions and on numerous other occasions through an
> intermediary ([a] detective). Although defendant initiated the contacts,
> respondent's repeated willingness to accept defendant's calls and his statement
> in open court (after defendant's attorney had objected to contacts between
> defendant and the detective outside of her presence) to the effect that "If he
> [defendant] wants to call us, we will take his call" indicate that he encouraged
> and perpetuated the communications and that his actions were intentional rather
> than the result of negligence or ignorance.

*Id.* at 322. The violation occurred in late 1988, in the early stages of what became a dispute between the Justice Department and state bar associations about the applicability of local bar rules to federal prosecutors in general and the permissibility of prosecutors' contact with certain represented persons in particular. Respondent had obtained the backing of his superiors within the USAO before taking the actions for which he was charged with ethical violations,

and the Department supported Respondent in the New Mexico disciplinary proceeding and

issued letters affirming its approval of his conduct. *See* Tr. 1002-03; RX 13, 14.[24]

> The New Mexico Supreme Court concluded that Respondent

> refuses to this day to accept or even recognize the wrongful nature of his conduct. (ABA Standard 9.22[g]). When asked at one point whether, if put in the same position again he would do the same thing, respondent replied in the negative. His answer, however, appears to have been based more upon his annoyance at having become the subject of disciplinary charges than upon any remorse for his actions, as he went on to say:

>> I would never put myself in a position again to be a guinea pig, a test case, whether or not [the chief of the felony section] gave me the right directions, whether or not the Attorney General or the Thornburgh Memorandum, whether or not the District of Columbia Court of Appeals two years later said what happened was—if it was constitutional, it was proper. I would never again put myself in a position where so many authorities would second-guess what I thought I had done reasonably and within the bounds of my professional responsibilities.

> Respondent then proceeded to remove any remaining doubt about whether or not he acknowledges that his actions were improper:

>> When you asked me if I would ever do this again, my answer was not to say that what I did then was wrong. I believe I was ethical and proper under those circumstances. And I would, given the same circumstances today, without any other changes, if this happened again, I would do the same thing. I wouldn't change.

> We believe respondent's comments indicate a lack of appreciation for the importance of the duty at issue. We are not persuaded that he "was simply caught in a dispute."

*Howes,* 123 N.M. at 322. Before the Hearing Committee, Respondent reiterated his position

that the New Mexico disciplinary proceedings represented a "national test case." Tr. 1002,

---

[24]    Indeed, the Department of Justice filed a federal suit challenging the New Mexico Supreme Court's jurisdiction to conduct disciplinary proceedings against Respondent. The federal court found that the New Mexico Supreme Court had jurisdiction to discipline Respondent for his conduct while a federal prosecutor. *See Howes,* 123 N.M. at 315 (citing *In re Doe,* 801 F. Supp. 478 (D.N.M. 1992) and *United States v. Ferrara,* 847 F. Supp. 964 (D.D.C. 1993), *aff'd,* 54 F.3d 825 (1995)).

1230.

The Committee has considered the matter and, although the New Mexico Court's statements concededly cause us some concern, we are not inclined to rely on the New Mexico public censure, which relates to conduct that occurred more than twenty years ago, as an aggravating factor. There was debate concerning the federal government's power to preempt state ethics regulations in general, and federal prosecutors' ability to have contact with represented persons in particular. Attorney General Richard Thornburgh sanctioning the practice in 1989, (see Doe, 801 F. Supp. at 486 (BX 114)), the Department of Justice issued a confirming federal regulation under Attorney General Janet Reno in 1994,[25] the so-called McDade Amendment reversing the position in 1998,[26] and numerous efforts to repeal the amendment since then. Prior to 1998, there was a good deal of heated criticism of the Department's policy by local bar associations and courts, of which the judicial decisions leading to Respondent's discipline were prominent examples. Indeed, the decisions make little effort to conceal that their principal target is a policy of the Justice Department.[27] In any event, in view of the passage of more than twenty years since the conduct in question and the indisputably unusual context in which the conduct arose, we are not inclined to consider this prior discipline as an aggravating factor.

---

[25]     28 C.F.R. Part 77 (1995).

[26]     Citizens Protection Act, Pub. L. No. 105-277, div. A, Sec. 101(b), § 801(a), 112 Stat. 2681 (1998) (codified in pertinent part at 28 U.S.C. § 530B (West 1998)).

[27]     See, e.g., Doe, 801 F. Supp. at 487 ("It is understandable that an AUSA would construe the Thornburgh Memorandum to permit or even mandate unethical behavior.  But it is 'alarming' that the principal law enforcement officer of this country would issue a memorandum purporting to authorize unethical behavior. . . ."); id. at 488 ("Before issuing his memorandum, Attorney General Thornburgh would have done well to have taken a few steps from his office to contemplate the inscription on the rotunda wall . . . ."); see also Howes, 123 N.M. at 316 (New Mexico Supreme Court's holding that USAO's authorization of Respondent's conduct does not absolve him of ethical violation because "there was no 'arguable question of professional duty' requiring resolution").

### D.    Acknowledgement of Wrongdoing

Respondent's acceptance of responsibility in this matter is partial and conflicted. Although Respondent is to be credited for stipulating to many relevant facts and numerous rule violations, we cannot find that Respondent has acknowledged that his conduct was wrongful. While Respondent can point to instances in which he testified that his actions were wrong, and he is responsible for his actions, his testimony suggests that he is not convinced that his conduct was, in fact, wrongful.  For instance, when asked if the attestation on a certain witness voucher was true or accurate, Respondent answered, "I know now that, *if* I have to comply under the C.F.R. and the U.S.C. regs that have been stipulated to, it was wrong *if that is the law.*" Tr. 1041 (emphasis added).  When specifically pressed as to whether he was taking responsibility for his misconduct, Respondent testified that he is responsible for this actions, and if those actions were wrong, then he was wrong.  This is a far cry from accepting responsibility:

Q    You stipulated that you knowingly made a false statement of material fact or law to a tribunal.

A    And that would be, as far as I saw, the miscaptioning of vouchers and paying of witnesses under the C.F.R. and U.S.C. provisions and *if they were the law,* then I was wrong.

Q    You keep saying "if they were the law" and you didn't see them at that time, so how can you knowingly make a false statement of material fact if you didn't even know that you were suppose[d] to do a voucher a certain way?

A    Well, I think that I am a lawyer and ignorance of the law is no defense.

Q    Yes, that is for sure.

A    *If that is the law, then I'm wrong.*

Q    But there is a big difference between saying, if that's the law, then I'm wrong and saying when I made this material, this false statement of material fact I made it knowingly, knowing it was false.

A    I signed vouchers and as you've heard me testify about my conduct.  I can only tell you, as I have since yesterday, the common custom and

> practice of the office and *if that custom and practice was in violation of statutes and regulations,* then I knowingly broke the law because I signed the vouchers.

Q   That's what you think Rule 3.3(a) means.

A   Probably among other things.

Q   That *if that's the law, if I did it contrary to law,* then I violated that rule.

A   I guess.

Q   You think that's taking responsibility for doing something knowingly?

A   As I've said, Ms. Herman, I take responsibility for my actions in this case. You know, I signed my name. However it happened, *if it was wrong,* it is my responsibility.

Tr. 1252-54 (emphases added).

Respondent argues at page 3 that this and similar testimony reflect merely an observation that his use of vouchers may have been allowed under certain statutes:

> Bar Counsel claims [Respondent's] use of "if" shows a lack of acceptance of responsibility. In fact, Respondent is just stating the obvious. He has readily admitted that a large percentage of the vouchers he signed or authorized cannot be justified by 28 U.S.C. § 1821. But since Bar Counsel has not established that § 1821 is the sole and exclusive authority for issuing vouchers, and in fact the evidence plainly shows that vouchers can be issued under other provisions including 28 U.S.C. § 524, then Mr. Howes statement is perfectly logical. It hardly shows a limited acceptance of responsibility; it simply reflects Bar Counsel's inadequate case.

Response at 3. Having witnessed Respondent's cross-examination, we cannot agree with him that his use of "if" in the testimony quoted above reflected simply an acknowledgement that some statutes might allow his behavior. He and Bar Counsel were not engaged in a debate over the statutes applicable to his conduct. He was trying to explain how he was accepting responsibility for his conduct. Indeed, as made clear in the above-quoted testimony, Respondent argued repeatedly that he did not think that he had done anything wrong because he complied with standard practice within the USAO: "I can only tell you, as I have since yesterday, the common custom and practice of the office and *if that custom and practice was in*

*violation of statutes and regulations,* then I knowingly broke the law because I signed the vouchers." Tr. 1253 (emphasis added).

As was the case in New Mexico ten years ago, Respondent appears to believe that he has been singled out in this disciplinary proceeding, when he was simply doing what all other prosecutors were doing:

> I handed these kinds of vouchers to hundreds of witnesses in [the] course of my almost 12 years in the office, 11 plus years in the office, as was the custom and practice in the office across the street [(the USAO)] throughout the that time. If we are held, from [Bar Counsel's] standpoint, to it had to be a proceeding and that [witnesses] were compelled to appear, then I was wrong and every Assistant U.S. Attorney that handed one of these for something that wasn't in trial at the moment or in the Superior Court Grand Jury, they were wrong.

Tr. 1127; *see also* Tr. 1289 ("You've heard my bosses say, and *if you are to adhere to what those certifications say and what those regulations say, then we were wrong all along.*") (emphasis added).   Indeed, echoing the "national test case" theme from the New Mexico proceeding, Respondent testified that he was the "poster boy for this matter." Tr.1121.

Perhaps most troublingly, Respondent suggested twice that if this Committee found that he committed ethics violations through his misuse of witness vouchers—which is required given his stipulations—we would impair the ability of current AUSAs to investigate and prosecute crimes:

> And if the state of the law is those regulations applied, then we were absolutely wrong, had been wrong since long before this case.
>
> HEARING CHAIR GLASSMAN: Let me stop you there.  You've said that several times now, "if that is the state of the law." Do you have a doubt that the 28 U.S.C. and C.F.R. provisions are the law?
>
> THE WITNESS:       Well, I understand them to be the law.  What I am saying is, given the custom and practice of the U.S. Attorney's Office, me included, having never considered that that was the limitations [sic] and what I believe, sir, that if you were to decide in my case is that [(compliance with

applicable regulations)] is the only way you can provide these witness vouchers, *you will shut down for every D.C. prosecutor and any member of the D.C. bar the ability to do grand jury originals and a variety of other investigations that have been the life's blood of that office for years.* That's my only statement about those regulations.

Tr. 1288-89 (emphasis added).

I can't think of anybody that I worked with in 11 years that would have known the two regulations [applicable to witness vouchers] and the limitations and would have applied them. I learned how to do drug cases and then learned how to do murder cases and in many ways what you've heard about this case was unique, *sui generis* and as you heard Mr. Shertler say, it became sort of the exemplar for how these related homicide cases were done. But I didn't know the limitations and that was my only context, sir. That's my reference about the law. I should have known. I'm charged with knowing the law. But my only point was, *if that is—indeed, it is the law, then that office across the street [(the United States Attorneys' Office)] is going to not need as many people to work because there won't be a whole host of things being done, given the limitations of the law.*

Tr.1292-93 (emphasis added).   Respondent's testimony demonstrates that Respondent still does not understand the seriousness of his misconduct, and most disturbingly, suggests that he believes that the law may be ignored where compliance with the law would limit an otherwise laudatory goal.

### E.   Circumstances in Mitigation

The Committee has considered several factors in mitigation of Respondent's misconduct.   These include (i) his record of law practice before, during, and after the violations, (ii) numerous testimonials in the record to his good character, and (iii) delay.[28] With regard to Respondent's record of law practice, we accept that he was an exceptionally tenacious and talented prosecutor with a strong work ethic, and that he handled some of the

---

[28]     We do not consider the absence of personal financial gain as a separate factor, because it has already been factored into our analysis above of the seriousness of the misconduct.

office's most complex and challenging matters.[29] Tr. 645-46; RX 1(a). On the other hand, we find that this record was marred by serious wrongdoing, and we are not inclined to consider it as a significant mitigating factor in these circumstances. It does appear that Respondent's post-violation law practice has been free of disciplinary incident, and he has adduced an impressive array of testaments to his honesty, integrity, and good character. Against the backdrop of the extremely serious misconduct reflected in this record, however, we find that these considerations have only some, but not significant, mitigating force.

The Court of Appeals has said that, for delay to be considered as a mitigating factor in determining an appropriate sanction, the circumstances must be "unique and compelling." *In re Fowler,* 642 A.2d 1327, 1331 (D.C. 1994) ("While we do not venture to opine under what circumstances time delay may properly mitigate an otherwise appropriate sanction, we do express the view that the circumstances of the individual case must be sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest."). A 2005 decision further suggests that delay-based mitigation is only appropriate when there are other significant mitigating factors. *See In re Ponds,* 888 A.2d 234, 240-44 (D.C. 2005). These statements may foreclose the possibility of mitigation in this case: we have found that there are no other significant mitigating factors.

We will nevertheless assume *arguendo* that mitigation on the basis of delay is *not* foreclosed categorically by *Ponds* or otherwise in this case. The delay in this case has been, by any measure, extraordinary. The misconduct in issue occurred principally in 1993-1995, *i.e.,*

---

[29] Judge Thomas Penfield Jackson, who presided over the *Newton Street Crew* trial, testified that Respondent was "absolutely instrumental to" the prosecution of the *Newton Street Crew* defendants, whom he described as "brutal, vicious people." Tr. 975. Judge Jackson testified that he considered Respondent "to be an exceptional[] lawyer," who epitomized the "honorable lawyer's conduct . . . in all respects." Tr. 972-73.

in the range of fifteen years ago. We are aware of no other case even approaching this length of time from conduct to disposition, and the Board's and Court's actions still lie ahead. Even assuming, however, that delay-based mitigation is a concept fully operative in this case and that the delay is substantially mitigating, disbarment would still be appropriate. As we see it, the seriousness of Respondent's misconduct is such that even mitigating factors on this order of substantiality should not alter the recommended sanction. Respondent has argued that the pendency of this matter has inhibited his ability to practice, in particular by requiring him to play a non-speaking role in the *Enron* class action in which he has been lead counsel. It might also be said, however, that but for the delay complained of Respondent would not have had the opportunity to participate in the litigation.

## Conclusion

For the foregoing reasons, the Committee finds that Respondent committed multiple violations of Rules 3.3(a), 3.4(c), 3.8(e), 8.4(a), 8.4(b), 8.4(c), and 8.4(d).  Mr. Phalen recommends that Respondent be suspended for at least two years, and that he demonstrate his fitness to practice before being readmitted to the bar.  This recommendation is based entirely on Bar Counsel's recommended sanction.  Were it not for the fact that Bar Counsel considered, and rejected, disbarment as a sanction, Mr. Phalen would have recommended disbarment.  Mr. Barker concludes that the gravity of the misconduct in this matter compels disbarment, notwithstanding Bar Counsel's recommendation of a lesser sanction.  Respondent's attention should be drawn to the requirements of D.C. Bar R. XI § 14, and their effect on eligibility for reinstatement.  *See id.* § 16(c).

HEARING COMMITTEE NO. ONE

_____
John F. Barker

_____
James T. Phalen, Esq.

Date:    AUG 1 9 2009

90

# EXHIBIT 6

CR 01-396-1                 UNITED STATES OF AMERICA  vs.  ABDUR MAHDI

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       .  Docket No. CR 01-396-01
                                .
          Government,           .  Washington, D.C.
                                .  December 4, 2003
     vs.                        .  12:10 p.m.
                                .
ABDUR R. MAHDI,                 .
                                .
          Defendant.            .
                                .
. . . . . . . . . . . . . . .
             TRANSCRIPT OF SENTENCE
     BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
          UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:           STEPHEN PFLEGER, AUSA
                              RODERICK L. THOMAS, AUSA
                              U.S. Attorney's Office
                              555 Fourth Street, N.W.
                              Washington, D.C.  20001


For the Defendant             BERNARD S. GRIMM, ESQ.
Abdur R. Mahdi:               MARY M. PETRAS, ESQ.
                              307 G Street, N.W.
                              Suite 300
                              Washington, D.C.  20001


Court Reporter:               BEVERLY J. BYRNE
                              Official Court Reporter
                              Room 6810 U.S. Courthouse
                              Washington, D.C.  20001


Proceedings reported by stenomask, transcript produced from
dictation.

                    BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

396-1                    UNITED STATES OF AMERICA  vs.  ABDUR MAHDI

Page 22

1  mother whose son was taken.
2      I'll never get to have a grandchild, so I just hope
3  that the Court will do justice here today.
4      THE COURT: Thank you, Ms. Dawkins.
5      Mr. Grimm and Mr. Mahdi, you're welcome to address
6  the court.
7      MR. GRIMM: Very briefly, Your Honor. Bernard Grimm
8  on behalf of Mr. Mahdi. If the Court had any leeway one way
9  or another, I would obviously be up here allocuting on Mr.
10 Mahdi's behalf to give him the low end of whatever base
11 offense level he's at, but statutorily the Court can't do
12 anything at all.
13     Curiously, why the government sought to regive a
14 closing argument at this juncture is beyond me. Perhaps it's
15 the benefit of the victims which maybe I can understand. But
16 the Court has no choice whether Mr. Pfleger sat there and said
17 I have nothing to say or if he advocated on behalf of Mr.
18 Mahdi, the Court couldn't do anything.
19     But the tremendous irony in this case is -- and
20 obviously I'm not speaking to Mr. Hattley's family who has
21 every right to come up here and speak to the Court for as long
22 as it likes concerning its loss, whoever was responsible for
23 Mr. Hattley's death, but the tremendous irony and hypocrisy of
24 this system, which none of us are a part of but all of us are
25 a part of by nature of the law is society will forever be

Page 23

1  protected from Mr. Mahdi.
2      He will no longer be a threat to allegedly deal
3  drugs, to hit people over the head with sticks, to engage in
4  unmitigated violence in alleyways with unintended victims
5  walking through there. The question I have is who protects
6  society in three years, four years, eight years, ten years
7  from the likes of Mr. Joseph Hooker, Kevin Evans, Darrell
8  McKinley, Mr. Tabron, and Mr. Hamilton?
9      I've represented people like this before, and the
10 Court knows -- I hope they all turn the corner, but I
11 guarantee you none of them will. They will be back in this
12 courthouse standing on the other side of United States versus
13 Joseph Hooker, Kevin Evans, Darrell McKinley. This has
14 nothing to do with Mr. Mahdi's guilt.
15     The jury found him guilty. But in our system the
16 irony just can't be over-emphasized. Mr. Hooker is going to
17 find himself back dealing drugs, wielding guns. Mr. McKinley
18 the same thing. Mr. Tabron, Mr. Hamilton the same thing.
19 They're all going to be rewarded, which is the way the system
20 is set up for what they testified to.
21     So it's curious that the government gets up here and
22 allocutes, but says nothing about the culpability of someone
23 like Mr. Hooker who for all intents and purposes someday and I
24 believe the Court will give him a firm and just sentence, but
25 someday will see the light of day. They all admitted it.

Page 24

1  Frankly, every single one of them to a cooperator agreed that
2  they were all virtually looking at life in jail and were
3  trying to go home.
4      I want to come to those sentencings in 10 years, in
5  15 years when those people are back in court and say that
6  victims and see what the government has to say about that.
7  Thank you, Your Honor.
8      THE COURT: Mr. Mahdi, do you wish to be heard?
9  Did you wish to be heard, Ms. Petras?
10     MS. PETRAS: No, I'm just standing for --
11     THE DEFENDANT: I come in here today I didn't
12 really -- I didn't have nothing to write down or nothing to
13 say written down or practice anything like that. When I come
14 in, I see the prosecutor and the police and with, you know,
15 disgruntled and upset looks on their face. You know, they mad
16 about something.
17     As though they sat here for three months and was
18 lied on consecutively over and over, as though they facing
19 life in prison, as though their defense attorneys was hindered
20 to the point of ineffectiveness on several occasions.
21     I mean, when I saw that, I realized what is at the
22 core of this whole situation. And they're upset because even
23 though they got a conviction, they're not satisfied, because
24 they expected to see me come from the back of the courtroom
25 with my hair falling out from stress and fragile looking.

Page 25

1      They wanted my family to come in the courtroom and
2  my loved ones to come in the courtroom with dismay on their
3  face and tears in their eyes. But, I mean, look at me and
4  look at them.
5      Ms. Dawkins, you know I feel sorry -- I mean, my
6  heart goes out to her, but she really needs to get to the
7  essence of this or the truth of the situation and all of the
8  circumstances that surround it. Mr. Pfleger here spoke of
9  people crossing paths and pain being brought and innocent
10 lives being destroyed.
11     This was something that was perpetrated by his
12 office on a daily basis. I have a letter here that we
13 received shortly after the verdict came back, and I'll read a
14 portion of it. It says, I'm writing to inform you that I have
15 been informed that Kevin Evans has admitted that he did not
16 provide truthful testimony during the trial of U.S. versus
17 Abdur Mahdi, 01-396-1, with regard to being shot.
18     It goes on to say, I have been informed that Mr.
19 Evans now claims that he shot himself. Sincerely, Stephen
20 Pfleger.
21     This letter is true that he did not provide truthful
22 testimony. It was written because it was eventually going to
23 come out in the trial that he spoke of that was going on
24 across the street. But what is not true is the fact that he
25 says I am writing to inform you that I have been informed.

7 (Pages 22 to 25)

CR 01-396-1        UNITED STATES OF AMERICA  vs.  ABDUR  MAHDI

Page 26

1    He was not informed that this man admitted to
2  providing untruthful testimony. He knew he was going to
3  provide untruthful testimony when he got on the stand. He
4  orchestrated the testimony, and then he perpetrated the
5  testimony as he did with all the other cooperators, and what
6  they're mad about is they cannot break me, have not and will
7  not, and they will never be able to use me as a poster boy for
8  cooperating or lying snitches on behalf of the government.
9    This is something that -- a goal that they would
10 never be able to reach. I'm going to be just fine.
11 Regardless of the sentence that is handed down on me, he had
12 the audacity to speak of my character. He's a savage in a
13 gentleman's veneer.
14    I mean, he talk about what I earned myself. We'll
15 soon see what he has earned himself, and I would be a fool to
16 get on the bandwagon with all of the other buffoons who got up
17 here on this stand and just told lies after lies because this
18 piece of paper is just something he feel as though he wanted
19 to do or had to do because it was going to eventually come
20 out.
21    More will come out in the future, but, you know,
22 we'll deal with that then. But to get on the bandwagon with
23 not just this man here but the office of the United States,
24 Attorney's Office as a whole, I mean, would be so foolish,
25 because to get on a wagon when I know where it's going is just

Page 27

1  crazy.
2    I mean, so I'm very happy today. I want again for
3  the police officers, prosecutor to look at me very fine and
4  very good, because I look well. My family looks well. I
5  mean, you know, we're strong, and, you know, the goal that you
6  set out to try to accomplish is unaccomplishable. There's
7  nobody in America, let alone in this courtroom, that has the
8  power to break me or my spirit or make me bow down.
9    You know, I've not been a slave and will not be made
10 one. You will deal with me as a man and with respect. I have
11 no concern. I have not lost sleep over what you think about
12 me, not one bit, and will not lose none in the future.
13    So with that said, I'm done.
14    THE COURT: Mr. Mahdi, if you would remain standing,
15 I've never made it part of the file. I will include it in the
16 file. I note that the testimony that Mr. Evans is talking
17 about did not have to do with the specifics of the event of
18 June 6, correct, Mr. Pfleger?
19    MR. PFLEGER: That's correct, Your Honor.
20    THE COURT: Let this be filed in the court jacket so
21 there is no question of what Mr. Mahdi was referring to
22 Well, Mr. Mahdi, I've now for the first time had the
23 opportunity to hear from you.
24    I have listened to four months of testimony or
25 thereabouts regarding your activities, and I've watched the

Page 28

1  tapes. I've listened to the audios. I've listened to the
2  victims. I've heard Ms. Dawkins this morning, and it is
3  amazing to me that you can demonstrate the cavalier attitude
4  to human life that you have demonstrated here today and
5  previously.
6    To say that the prosecutors are mad is I think a
7  misunderstanding. We are saddened by your conduct beyond
8  belief. We are unbelievably saddened for your parents, for
9  the victims, innocent people who you fed their drug addiction,
10 members of the African-American community, middle-aged people,
11 that you lined your pockets with selling drugs to people that
12 some of whom had led perfectly respectable lives until you and
13 others helped them.
14    You're going to listen, Mr. Mahdi.
15    THE DEFENDANT: I'm listening, Judge Huvelle, and I
16 mean no disrespect, but you don't have any concern about the
17 black community, and please --
18    THE COURT: That's fine, sir.
19    THE DEFENDANT: -- don't express any sadness towards
20 my family because we need no sadness and we need no sympathy.
21 I'm not before you asking for any mercy.
22    THE COURT: Fine. I'm going to finish here.
23    THE DEFENDANT: You don't have ability to give me
24 any.
25    THE COURT: I'm not giving you mercy. I have no

Page 29

1  choice about the sentence here. This is not a question of
2  mercy, but you've spoken, and I'm going to speak now.
3    And I believe sincerely that your conduct which was
4  proven by an abundance of evidence, there may have been people
5  who testified here who are not the highest respectability.
6  The people who worked with you out there in the streets, I
7  have no doubt are not angels. I have no doubt that someday
8  some of them may get in trouble again.
9    And if they do, it will be my job to sentence them.
10 I have no doubt about that. These kinds of cases don't come
11 about because everybody comes in here having been in the
12 ministry. I'm not naive. Although Mr. Grimm's point may be
13 taken, that doesn't for one moment excuse anything that you've
14 done.
15    You exercised your right, which you had the right
16 to do, to go to trial, and the members of this community found
17 you guilty on 48 counts. Unanimously they returned verdicts.
18 Your conduct was callous, despicable, and you in every sense
19 of the word deserve the sentence that you got.
20    The evidence here was overwhelming. Those shots,
21 those videos couldn't have been clearer. There is no way that
22 a person deserves to be hit over the head with a two by four.
23 Or innocent victims like Sonia Hamilton who have to live with
24 bullet holes because you and others shot at her and weren't
25 even intending to shoot her.

8 (Pages 26 to 29)

APPEAL, CAT B

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:01-cr-00396-ESH-1

Case title: USA v. MAHDI, et al

Date Filed: 11/08/2001
Date Terminated: 12/04/2003

Assigned to: Judge Ellen S. Huvelle

Appeals court case number: 03-3154

### Defendant (1)

**ABDUR R. MAHDI**
*TERMINATED: 12/22/2003*
*also known as*
CHIEF
*TERMINATED: 12/22/2003*
*also known as*
BIG CHIEF
*TERMINATED: 12/22/2003*

represented by **Bernard S. Grimm**
COZEN O'CONNOR
The Army and Navy Club Building
1627 I Street NW
Suite 1100
Washington, DC 20006
(202) 912-4800
Fax: (877) 260-9435
Email: bgrimm@cozen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Gregory Bruce English**
ENGLISH & SMITH
526 King Street
Suite 213
Alexandria, VA 22314
(703) 548-8911
Fax: (703) 548-8935
Email: genglish@englishandsmith.com
*TERMINATED: 06/24/2002*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Marie Elise Haldane**
303 E Street, NE
Washington, DC 20002
(202) 659-8700
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| | | |
|---|---|---|
| | | Life on Count 47rrr, 5 years supervised release, $100.00 special assessment. Sentenced to 40 years incarceration on Count 48rrr, 3 years supervised release, $100.00 special assessment; Count 4rrr: dismissed; Count 6rrr: sentenced to 20 years incarceration, 3 years supervised release, $100.00 special assessment. Sentences on all counts are to run concurrently except where noted. All supervised release terms are to run concurrently. Special assessments in the amount of $100.00 shall be payable to Clerk of the Court for the U.S. District Court, District of Columbia. Special assessments in the amount of $500.00 shall be payable to the Criminal Finance Office, Room 4203, D.C. Superior Court, 500 Indiana Avenue, N.W., Washington, D.C. Restitution in the amount of $3,171.00 shall be payable to the Victim Crime Compensation Fund, D.C. Superior Court. Defendant committed/commitment issued. (Court Reporter Beverly Byrne.) (zmlp) (Entered: 12/18/2003) |
| 12/04/2003 | 536 | LETTER (copy) by UNITED STATES OF AMERICA to counsel for DEFT. 1, dated 8/9/03. "Let this be filed, 12/4/03." Huvelle, J. (fiat) (zmlp) (Entered: 12/18/2003) |
| 12/08/2003 | 535 | NOTICE OF APPEAL by DEFT. 1 from sentence imposed on 12/4/03 and entered on 12/18/03. Copies mailed to counsel. No filing fees paid - CJA. Docketing statement submitted. (zmlp) (Entered: 12/18/2003) |
| 12/18/2003 | | Transmission of Notice of Appeal and Docket Sheet as to DEFT. 1 to US Court of Appeals re 535 Notice of Appeal. (zmlp) (Entered: 12/18/2003) |
| 12/22/2003 | 541 | USCA Case Number as to DEFT. 1 03-3154 for 535 Notice of Appeal - Final Judgment filed by DEFT. 1. (zmlp) (Entered: 12/23/2003) |
| 12/22/2003 | 580 | JUDGMENT as to DEFT. 1 (1), Counts 10rrr, 16rrr, 23rrr, 25rrr, 8rrr, Sentenced to 15 years to Life, $100.00 special assessment.; Count(s) 118r, 120r, 121r, 67r, 70r-71r, Counts closed for statistical purposes. Counts deleted from retyped indictment filed 4/4/03.; Count(s) 11rrr, 15rrr, 24rrr, 9rrr, Sentenced to 10 years incarceration, 3 years supervised release, $100.00 special assessment.; Count(s) 122r, 168r, 170r, 62r, Count closed for statistical purposes. Count deleted from retyped indictment filed 4/4/03.; Count(s) 12rrr, Sentenced to 30 years to Life, $100.00 special assessment.; Count(s) 13rrr, 40rrr, 43rrr, 46rrr, 49rrr, 7rrr, Sentenced to Life, 5 years supervised release, $100.00 special assessment.; Count(s) 14rrr, Sentenced to 10 to 30 years incarceration, $100.00 special assessment.; Count(s) 176r, 177r, 178r-179r, 180r-183r, 187r-188r, 189r, Counts closed for statistical purposes. Counts deleted from retyped indictment filed 4/4/03.; Count(s) 17rrr, Sentenced to 10 years incarceration, 3 years supervised release, $100.00 special assessment.; Count(s) 18rrr, 3rrr, Sentenced to 20 to 60 months incarceration, $100.00 special assessment.; Count(s) 19rrr, 21rrr, 5rrr, Sentenced to 40 to 120 months incarceration, $100.00 special assessment.; Count(s) 1rrr, 2rrr, Sentenced to Life, 5 years supervised release, special assessment of $100.00.; Count(s) 20rrr, 33rrr, 34rrr, 35rrr, 36rrr, 37rrr, Sentenced to 5 to 15 years incarceration, $100.00 special assessment.; Count(s) 22rrr, Sentenced to 20 years incarceration, 3 years supervised released, $100.00 special assessment.; Count(s) 26rrr, Sentenced 10 years incarceration, 3 years supervised release, $100.00 special assessment.; Count(s) 27rr, 33rr, 36rr-37rr, 38rr, 44rr, 47rr, 52rr, 55rr, Deleted from the Third Retyped Indictment filed in open court by the government.; Count(s) 27rrr, Sentenced to 7 years incarceration, to run |