# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES, | ) |
| | ) |
| v. | ) Criminal No. 01-396-01 (ESH) |
| | ) |
| ABDUR MAHDI, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Defendant Abdur Mahdi has filed a *pro se* motion to vacate, set aside, or correct his criminal conviction and sentence pursuant to 28 U.S.C. § 2255. (Def.'s Mot. to Vacate, Set Aside, or Correct Sentence, Oct. 17, 2011 ("Def. Mot.").) For the reasons set forth herein, the motion is denied as to all claims except the ineffective assistance of counsel claim, which requires an evidentiary hearing.

## BACKGROUND

In 2003, Mahdi was tried by a jury and convicted on 48 counts of a 49-count indictment. Six counts were vacated on appeal, *see United States v. Mahdi*, 598 F.3d 883, 898 (D.C. Cir. 2010) ("*Mahdi Direct Appeal*"), so he presently stands convicted of 42 counts, including 24 federal counts[1] and 18 counts under District of Columbia law.[2] For these offenses, Mahdi is

---

[1] Mahdi was convicted on one count of conspiracy to distribute and possession with intent to distribute cocaine, cocaine base and marijuana in violation of 21 U.S.C. § 846 ("Narcotics Conspiracy Conviction"); one count of conspiracy to participate in racketeer influenced corrupt organization in violation of 18 U.S.C. § 1962(d) ("RICO Conspiracy Conviction"); ten counts of violent crimes in aid of racketeering activity in violation of 18 U.S.C. § 1959(a) ("VICAR Convictions")); six counts of use of a firearm during a drug trafficking crime or crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) & (C)(i) ("Federal Firearm Convictions");

serving multiple concurrent life sentences (and lesser terms of incarceration), followed by one 7–year and five 25–year consecutive sentences for the six Federal Firearm Convictions. (Judgment of Conviction, Dec. 22, 2003.)

Following the Supreme Court's denial of his petition for certiorari, *see Mahdi v. United States*, 131 S. Ct. 484 (2010), Mahdi timely filed the pending motion. After examining the motion, and the affidavits Mahdi subsequently filed in support thereof (*see* Notice of Filing, Def.'s Supplemental Filing in Support of Section 2255 Mot., Dec. 9, 2011 ("Def. Supp. Filing"), the Court ordered the government to file a response.[3] (Order, Dec. 16, 2011.) The government opposed the motion (Gov't's Opp'n to Def.'s Pro Se Mot. to Vacate Conviction and Sentence

---

and six counts of unlawful distribution or possession with intent to distribute controlled substances within 1000 feet of a school in violation of 21 U.S.C. § 860 ("Federal Drug Convictions").

[2] Mahdi was convicted of one count of first degree murder while armed in violation of 22 D.C. Code § 2101 ("Hattley Murder Conviction"); two counts of assault with a dangerous weapon in violation of 22 D.C. Code § 402 and six counts of assault with intent to murder while armed in violation of 22 D.C. Code § 403 ("DC Assault Convictions"); two counts of carrying a pistol without a license and five counts of possession of a firearm during a crime of violence in violation of 22 D.C. Code § 4504(b) ("DC Firearm Convictions"); one count of perjury in violation of 22 D.C. Code § 2402 (one count) ("DC Perjury Conviction"); and one count of obstruction of justice in violation of 22 D.C. Code § 722(a)(6) ("DC Obstruction of Justice Conviction").

[3] Rule 4(b) of the Rules Governing Section 2255 Proceedings provides:

> If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. If the motion is not dismissed, the judgment must order the United States attorney to file an answer, motion or other response within a fixed time, or to take other action the judge may order.

*See also* 28 U.S.C. § 2255(b) ("Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney . . . .")

Pursuant to 28 U.S.C. § 2255, Feb. 15, 2013 ("Gov't Resp.")), and Mahdi filed a reply. (Movant's Reply in Answer to the Gov't's Opp'n to Movant's Mot. to Vacate Pursuant to 28 U.S.C. § 2255, Apr. 1, 2013 ("Def. Reply").)

## ANALYSIS

Mahdi's § 2255 motion makes the following claims: (1) that his counsel's failure to call as a witness an individual whose testimony would have exonerated Mahdi of the Hattley murder and related charges deprived him of his Sixth Amendment right to the effective assistance of trial counsel; (2) that the prosecution's failure to turn over impeachment evidence deprived him of his Fifth Amendment right to due process; (3) that the Narcotics Conspiracy Conviction and five of the six Federal Firearm Convictions violate the Fifth Amendment's Double Jeopardy Clause; and (4) that the prosecution's decision to charge him in a single indictment with both federal and state law offenses violated the Assimilative Crimes Act, 18 U.S.C. § 13, and deprived him of his Fifth Amendment right to equal protection.[4]

**I.    LEGAL STANDARD**

Section 2255(a) of the United States Code provides that "[a] prisoner in custody under sentence of a [federal] court . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Where the motion is not dismissed prior to service upon the United States Attorney, the court will "determine the issues and make findings of fact and conclusions of law with respect

---

[4] "Equal protection applies to the District of Columbia as part of the fifth amendment's guarantee of due process of law." *Family Div. Trial Lawyers of Superior Court-D.C., Inc. v. Moultrie*, 725 F.2d 695, 697 n.1 (D.C. Cir. 1984) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)).

thereto." *Id*. § 2255(b). "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Id*.

If an evidentiary hearing is sought, the prisoner bears a "fairly high burden of demonstrating a need for such a hearing," *United States v. Geraldo*, 523 F. Supp. 2d 14, 17 (D.D.C. 2007), and the decision whether to grant an evidentiary hearing "is committed to the district court's discretion." *United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992); *see also United States v. Morrison*, 98 F.3d 619, 625 (D.C. Cir. 1996) ("[A] district judge's decision not to hold an evidentiary hearing before denying a § 2255 motion is generally respected as a sound exercise of discretion when the judge denying the § 2255 motion also presided over the trial in which the [defendant] claims to have been prejudiced."). The § 2255 motion must "raise[] 'detailed and specific' factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection.'" *Pollard*, 959 F.2d at 1031 (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). In addition, "[e]ven if the files and records of the case do not clearly rebut the allegations of the prisoner, no hearing is required where [defendant's] claims are 'vague, conclusory, or palpably incredible.'" *Pollard*, 959 F.2d at 1031 (quoting *Machibroda*, 368 U.S. at 495).

## II.   SIXTH AMENDMENT INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Mahdi's first claim is that he was deprived of his Sixth Amendment right to the effective assistance of counsel due to his trial counsel's failure to call a witness, Jacob Vonderpool, to

testify at trial.[5]

To prevail on a claim for ineffective assistance of counsel, a defendant must be able to show both "deficient performance" and "prejudice." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A counsel's performance is deficient if it falls below "an objective standard of reasonableness" defined by "prevailing professional norms." *Id*. at 688. Prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id*. at 700.

According to Mahdi, Vonderpool, an eyewitness to the shooting death of Curtis Hattley, would have testified that Mahdi was not the shooter, and trial counsel was made aware prior to the trial of Vonderpool's existence and his willingness to provide potentially exonerating testimony at trial, yet counsel failed to further investigate or call Vonderpool to testify. (Def. Mot. at 2 (counsel "committed an egregious error in abandoning Vonderpool as a defense witness").) As for prejudice, Mahdi contends that had Vonderpool testified, there is a reasonable probability that he would not have been convicted of the Hattley murder or any related counts.[6]

Mahdi's allegations are primarily supported by an affidavit from Vonderpool, who states

---

[5] While, in general, "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice," "an ineffective assistance of counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003).

[6] Four counts of conviction were directly based on the Hattley shooting: the Hattley Murder Conviction, one of the VICAR Convictions, one of the Federal Firearm Convictions, and one of the DC Firearm Convictions. *See supra* nn. 1-2.

as follows:

    1. On the evening of November 17, 1999, I was visiting a friend in the 1300 block of Taylor Street, N.W., Washington, D.C. Then my friend Marcus and I began heading towards the corner store at 14th and Shepherd streets, N.W. We walked north up Taylor St. to an alley on the left hand side of the street, near the end of the block. We entered the alley to travel in a short cut across to Shepherd Street, which the next street over and where the corner store sat up on the corner. While in the alley we say a blue car with tinted windows pull into the alley from off Shepherd Street and a guy got out that I recognized as someone that I seen in the area named Joe. Joe had a gun in his hand and went out the alley and turned right.

    2. Marcus and I exited the alley and turned right on Shepherd Street, headed up toward the corner store and a small bluish car drove up headed up toward the corner store with two people inside. Up ahead I saw a guy named Musa and Radar in the street and a guy name Joe. Radar had a gun and Joe had a gun, as the car reached the corner Radar start shooting into the car. I did not see Musa shoot nor did I see Joe shoot. It was Radar that was the only one shooting and I heard him yell to one of the people in the car, "I told you stay the fuck away from my woman," right before he fired his gun. Me and Marcus then turned around and headed back through the alley.

    3. Then in or about the fall of 2002, I met and spoke with an investigator for the case of Abdur Mahdi. Her name was Rebecca O'Brien and she asked me did I know anything about Abdur Mahdi and whether he was a big time drug dealer in the area or had shot anyone. I told her I had heard he was no bigger than the average seller and that I never seen or heard that he shot anyone. I also told her that I had read about the case against Mahdi in the newspaper and when I tried to discuss the charges with Mahdi, he always referred me to his attorney with anything that I knew which was helpful to his defense. Ms. O'Brien then gave me Abdur's attorney's number and told me to give him the information about the shooting on Shepherd Street.

    4. Then in or about February of 2003, I called Mr. Grimm, Abdur Madhi's attorney, and who Ms. O'Brien had referred me to. I told Mr. Grimm everything I saw on Shepherd Street, just as I told Ms. O'Brien. Mr. Grimm then took down all my contact information and told me that he would need to interview me further and that he would probably be calling me to trial on behalf of Abdur Mahdi. He also asked me did I discuss the Shepherd Street shooting that I had witness with Abdur, I told him no, which I hadn't, because Abdur would not discuss his case with me and referred me to him (Mr. Grimm) with any information that was helpful to the defense.

    5. After my initial conversation with Mr. Grimm, in or about February, 2003, I

6

> was never contacted again by him nor called to any trial for Abdur Mahdi. Then, in a conversation just prior to Christmas, in December of 2010, I discussed for the first time with Abdur Mahdi, via e-mail messaging, while he was at USP-Canaan, that I had witnessed the Shepherd Street shooting and that I had previously told Mr. Grimm about everything I saw and that he (Abdur) was not involved. Abdur then told me that he knew nothing about my prior revelation to Mr. Grimm and whether I could provide him with an affidavit detailing this fact. I agreed and here now is my affidavit.

(Def. Supp. Filing, Ex. 1 ("Vonderpool Aff.").) In addition, Vonderpool's version of events is corroborated by an affidavit from Musa Mahdi, Mahdi's brother and co-defendant[7]:

> [O]n November 17, 1999 I was standing at the alley adjacent to Shepherd Street N.W. with Radar aka (Clarence) and Lil Joe (Joseph Hooker) was also out there. I saw Radar pull out a gun and shoot inside a little blue car that was coming up the street [from the direction of 13th street]. I also saw Lil Joe pull out a gun but he didn't shoot. I didn't have a gun. Abdur Rahim Mahdi was not outside that night and I did not say anything to him about it until February 2011.

(Def.'s Supp. Filing, Ex. 2 ("Musa Mahdi Aff.").) Finally, Mahdi's own affidavit states that: (1) he did not shoot and kill Hattley; (2) he did not know until December 2010 that Vonderpool had been in contact with defense counsel in February 2003 or that Vonderpool had told defense counsel at that time that Radar, not Mahdi, was the shooter; and (3) he learned for the first time in February 2011 of Musa Mahdi's presence at and observations of the Hattley murder scene. (Def.'s Mot., Ex. 3, at 1 ("Def. Aff.").)

The government argues that Mahdi's allegations are insufficient to show either deficient performance or prejudice or even to entitle him to an evidentiary hearing. While it may be argued that Mahdi's own affidavit is hardly sufficient, the affidavits from Vonderpool and Musa Mahdi are enough to raise factual issues that require an evidentiary hearing.

---

[7] On February 21, 2003, Musa pled guilty to Conspiracy to Participate in a Racketeer Influenced Corrupt Organization (RICO), in violation of 18 U.S.C. § 1962(d), acknowledging participation in eight racketeering acts, including "acts of violence to advance the goals of the organization." Musa Mahdi did not admit to any facts relating to the Hattley shooting.

On the issue of deficient performance, Mahdi's contentions are uncontroverted. The government was unable to obtain any information from trial counsel. (*See* Gov't Resp. at 30 n.21 ("Mr. Grimm has declined to speak with the attorneys in the Special Proceedings Division of the United States Attorney's Office, despite the Court's Order issued on December 27, 2012, permitting discussion on defendant's instant allegation based on a Waiver of the Attorney-Client Privilege.").) It speculates that trial counsel might have had good reasons for failing to follow up with Vonderpool or to call him as a witness (Gov't Resp. at 30-41), but speculation is not enough to counter Mahdi's affidavits. Nor can the Court ignore Mahdi's specific allegations based solely on the government's assertion that trial counsel "zealously represented" Mahdi at trial. (Gov't Resp. at 20-28.)

On the issue of prejudice, the Court must assume that Mahdi will be able to prove, as alleged in his affidavits, that trial counsel knew about Vonderpool and his potentially exonerating testimony prior to the trial and that if counsel had called Vonderpool as a witness, Vonderpool would have testified as set forth in his affidavit. Although there was certainly sufficient evidence at trial to support the jury's verdict on the Hattley murder and related charges, that evidence consisted primarily of the testimony of two cooperating co-defendants (Zakki Abdul-Rahim and Lil' Joe Hooker) and a bystander who claimed to recognize Mahdi. (Gov't Resp. at 30-32 (summarizing evidence).) Is there a "reasonable possibility" that the contrary testimony of Vonderpool, who was neither a cooperator nor a co-defendant, would have affected the jury's verdict on the Hattley murder charge and related counts? At least at this stage, the Court cannot rule out that possibility based on the existing record.[8]

---

[8] The Court, however, does reject Mahdi's contention that "the jury could have decided, based on

As the existing record does not establish the absence of either deficient performance or prejudice, Mahdi is entitled to an evidentiary hearing on his ineffective assistance of counsel claim.

## III.   DUE PROCESS: *BRADY/GIGLIO* CLAIM

Mahdi next claims that he was deprived of his Fifth Amendment right to due process, as established by the Supreme Court's decisions in *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), by the prosecution's failure to turn over impeachment evidence. (Def. Mot. at 2.)

Under *Brady* and *Giglio*, the prosecution violates a defendant's right to due process if it fails to disclose to the defense material evidence that is "favorable to an accused," including impeachment information, and "material either to guilt or punishment." *Brady* at 87; *Giglio* at 154. "There are three components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

In this case, Mahdi claims that the prosecution failed to disclose that several cooperating witnesses had received "special privileges, promises, payments or gifts in exchange for their

---

Vonderpool's exoneration of [defendant] for the Hattley murder, that defendant then was not guilty of the government's overall omnibus conspiracy charged in the indictment." (Def. Mot. at 2.)

testimony." (Def. Mot. at 2.)  Mahdi claims that the "government knew (or should have known) about sexual favors and relations, unmonitored telephone calls and or the use of personal (unrestricted) cellular telephones, and possession of contraband such as cigarettes, marijuana, and or cocaine and heroin by the cooperating witnesses but did not disclose[] these facts to [him] in time for effective use at trial nor at any time thereafter." (Def. Mot. at 2.)  The government responds that Mahdi "has fallen far short of demonstrating either that the government suppressed evidence of any special treatment for cooperating witnesses, or that any such suppression was material under *Brady/Giglio*." (Gov't Resp. at 13.)  The Court agrees.

The sole evidentiary support for Madhi's *Brady/Giglio* claim is an affidavit from Antoine Tabron, a co-defendant who pled guilty and cooperated, but did not testify at Mahdi's trial.[9] (Tabron Aff. at 1).  Although Tabron's affidavit claims that the prosecution provided him and other cooperating witnesses with special treatment in exchange for testimony against Mahdi (Tabron Aff. at 1-3), it fails to persuade the Court that an evidentiary hearing is warranted.

First, Tabron's affidavit describes in some detail the privileges *he* purportedly received. (Tabron Aff. at 1-2.)[10]  However, even if these allegations could be proven by a preponderance

---

[9] Mahdi's own affidavit adds only that he first learned of the privileges Tabron received in July 2011. (Mahdi Aff. at 1).  Nor will the Court take "judicial notice," as Mahdi suggests, of the misconduct of a different prosecutor in unrelated cases that were prosecuted many years before Mahdi's case, where it turned out that the prosecutor had improperly provided cooperating witnesses, along with their friends and relatives, with federal payment vouchers.  (*See* Def. Reply at 9 & Ex. 5.)

[10] Specifically, Tabron claims that in the "early months of 2002," after he entered his plea, an Assistant United States Attorney arranged for him to meet privately with his girlfriend in a conference room in the federal courthouse; that during the meeting he and his girlfriend "had sexual relations and [he] was given a cellular telephone" and that afterwards that he told the prosecutor that he "would testify to anything [the prosecutor] wanted me to say against A[b]dur and his family." (Tabron Aff. at 1.)  He also claims that in 2003 while he was detained in the Correctional Treatment Facility ("CTF") prior to trial, he "came to experience more privileges"

of the evidence (the government has submitted affidavits from the prosecutors strongly denying them), the failure to disclose this evidence would not have amounted to a *Brady/Giglio* violation. Under *Brady* and *Giglio*, the prosecution is only required to disclose "material evidence." As Tabron did not testify at Mahdi's trial, evidence that could have been used to impeach his testimony is not material. The same is true for evidence of special privileges received by the other non-testifying cooperators mentioned in Tabron's affidavit.

As for the favors allegedly received by the testifying cooperators, such evidence would be material, but the allegations in Tabron's affidavit fall short of the "detailed and specific factual allegations" that are required. *See Pollard*, 959 F.2d at 1031. For example, Tabron states in his affidavit that while he was in CTF in 2003, he was housed "with several other co-defendants who had pled guilty in the case," and that the privileges he received "were already being given to the other co-defendants prior to my arrival" and that "other co-defendants were receiving cigarettes, narcotics, sexual relations and unmonitored telephone calls/cellphones." (Tabron Aff. at 2). However, although Tabron's affidavit identifies the cooperating co-defendants he was housed with at CTF by name (*see* Tabron Aff. at 2), several of whom did testify, he does not describe any specific instances of special privileges being provided to any particular cooperator. Nor does he indicate from whom these testifying cooperators were "receiving" these privileges or provide any support for Mahdi's contention that the prosecutors were responsible for or even aware that such privileges were being provided. Indeed, it is not clear from Tabron's affidavit whether his allegations are based on actual knowledge or merely

---

such as "cigarettes, narcotics, sexual relations and unmonitored telephone calls/cellphones" and also that he "was allowed additional sexual relations while [there] and food items from outside restaurants." (Tabron Aff. at 2.)

something he heard about from other prisoners. Under these circumstances, no evidentiary hearing is required. *See, e.g.*, *Lynn v. U.S.*, 365 F.3d 1225, 1238-39 (11th Cir. 2004) (no evidentiary hearing required on claim of prosecutorial misconduct where "affidavits d[id] not name any government agents or investigators and d[id] not give details or a single example of what testimony or statements were tailored or conformed to be consistent or were based on information fed from government agents" and did not "identif[y] any statement that was made without the witnesses' personal knowledge"); *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) ("[I]n order to warrant an evidentiary hearing . . . , the application must contain assertions of fact that a petitioner is in a position to establish by competent evidence. . . . Airy generalities, conclusory assertions and hearsay statements will not suffice." (internal quotations omitted)).

Although Mahdi makes the point that he is handicapped in his ability to obtain competent evidence to support his claim while he is incarcerated, that does not overcome the deficiencies in the evidence he was able to procure. Accordingly, as the allegations in Tabron's affidavit do not persuade the Court that an evidentiary hearing on Mahdi's *Brady/Giglio* claim is warranted, that claim will be denied.

## IV. FIFTH AMENDMENT DOUBLE JEOPARDY CLAIMS

Mahdi next claims that his Narcotics Conspiracy Conviction and five of his six Federal Firearm Convictions run afoul of the Fifth Amendment's Double Jeopardy Clause.[11] Madhi makes two distinct claims: (1) that the Narcotics Conspiracy Conviction violates double jeopardy because it is a "lesser included offense" of either the RICO Conspiracy or the VICAR

---

[11] The Double Jeopardy Clause states that "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V

offenses[12]; and (2) that the six Federal Firearm Convictions violate double jeopardy because they are arose out of the same "global conspiracy."

The government does not address Mahdi's claims on the merits, maintaining that the Court of Appeals addressed and resolved the same issues in the direct appeal, thereby precluding Mahdi from reasserting these claims now. (Gov't Resp. at 9.) Mahdi does not dispute that as a general rule an issue raised and decided in a direct appeal may not be relitigated via a § 2255 motion. *See United States v. Greene*, 834 F.2d 1067, 1070 (D.C. Cir. 1987) ("It is well established in the federal circuits that a federal prisoner cannot raise collaterally any issue litigated and adjudicated on a direct appeal from his conviction absent an intervening change in the law."). He contends, however, that the arguments he is now raising are distinct from those previously addressed by the Court of Appeals. The Court agrees. Although the issues are similar, they are not identical. In his direct appeal, Mahdi "argued that the federal counts in the indictment were multiplicitous of the D.C. Code counts,"[13] whereas he is now claiming a double jeopardy problem within the federal counts. Nonetheless, Mahdi's double jeopardy claims are without merit and will be denied.

The Double Jeopardy Clause "'protects against multiple punishments for the same

---

[12] Mahdi's motion refers to "the VICAR conspiracy offenses," but although a VICAR offense can be based on a conspiracy, *see* 18 U.S.C. § 1959(a)(5) & (6), Mahdi's VICAR Convictions were not. (*See* Verdict Form at.)

[13] "When an indictment charges the same offense in more than one count, it creates a problem known as multiplicity." *Mahdi Direct Appeal* at 887. In the direct appeal, defendant challenged as multiplicitous the eight VICAR Offenses that were based on the same underlying conduct as a D.C. Code Offense; three of the "sub-conspiracies" in the RICO Conspiracy that were also charged as D.C. Code Offenses; and the five Federal Firearms Convictions that were based on the same underlying conduct as D.C. Code Offenses for possession of a firearm during a crime of violence (D.C. Code § 22–4504(b)). The Court of Appeals rejected all of Mahdi's arguments.

13

offense.'" *United States v. McLaughlin*, 164 F.3d 1, 8 (D.C. Cir. 1998) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).[14] As a general rule, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). "The *Blockburger* test, however, provides only a canon of construction, not a 'conclusive presumption of law.'" *Mahdi Direct Appeal* at 888 (quoting *Garrett v. United States*, 471 U.S. 773, 779 (1985)). "'[T]he *Blockburger* presumption must of course yield to a plainly expressed contrary view on the part of Congress.'" *Id.* (quoting *Garrett*, 471 U.S. at 779). "If the legislature intends two criminal provisions to apply simultaneously, applying them together does not offend the Double Jeopardy Clause, even if the two provisions would otherwise be considered as defining the same offense under the *Blockburger* test." *McLaughlin*, 164 F.3d at 8; *see Garrett*, 471 U.S. at 779 ("'There is nothing in the Constitution which prevents Congress from punishing separately each step leading to the consummation of a transaction which it has power to prohibit and *punishing also the completed transaction*.'"). Thus, "[e]ven if one crime is a lesser included offense of another, punishments may be imposed for both if Congress intended that they be imposed." *United States v. White*, 116 F.3d 903, 932 (D.C. Cir. 1997) (internal quotations omitted).

### A.   Narcotics Conspiracy Conviction

Mahdi claims that his Narcotics Conspiracy Conviction should be vacated because it is a

---

[14] The Double Jeopardy Clause also "protects against a second prosecution for the same offense after acquittal . . . [and] a second prosecution for the same offense after conviction." *North Carolina v. Pearce*, 395 U.S. at 717.

"lesser included offense" of either the RICO Conspiracy Conviction or the VICAR Convictions. Mahdi relies on the Supreme Court's decision in *Rutledge v. United States*, 517 U.S. 292 (1996). In *Rutledge*, the Court held, based on a straightforward application of *Blockburger*, that it violated double jeopardy to convict a defendant of both narcotics conspiracy in violation of 21 U.S.C. § 846 and a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848 because the charged narcotics conspiracy was a "lesser included offense" of the CCE. *Id*. at 300. However, the Court's decision in *Rutledge* did not alter the rule that Congressional intent may provide a basis for rejecting the *Blockburger* presumption.[15]  *See Rutledge*, 517 U.S. at 300 n.12.

With respect to the RICO Conspiracy Conviction, the Court of Appeals has concluded that Congress's intent in enacting RICO was to "supplement, rather than replace, existing criminal provisions" and, therefore, even if a charged narcotics conspiracy is a "lesser included offense" of a RICO conspiracy, "cumulative punishments are authorized." *United States v. White*, 116 F.3d at 932.

As for the VICAR Convictions, the Court of Appeals stated in the *Mahdi Direct Appeal*

---

[15] The Court in *Rutledge* explained the distinction between *Rutledge* and *Garrett* as follows:

> [In *Garrett*,] we affirmed the defendant's prosecution for a CCE violation even though he had previously pleaded guilty to a predicate crime of importing marijuana.  That holding, however, merely adhered to our understanding that legislatures have traditionally perceived a qualitative difference between conspiracy-like crimes and the substantive offenses upon which they are predicated. . . .  No such difference is present here.  In contrast to the crimes involved in *Garrett*, this case involves two conspiracy-like offenses directed at largely identical conduct.

*Rutledge*, 517 U.S. at n.12 (internal citations omitted).

that "[t]he VICAR statute's language supports the same sort of Congressional intent" as RICO."

*Mahdi Direct Appeal* at 889. Noting that VICAR

> sets out specific punishments for anyone who "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do" in return for "anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity"

*id*. (quoting 18 U.S.C. § 1959(a)), the Court of Appeals concluded that

> [t]he quoted language at least suggests that the Congress intended to impose for a VICAR violation a cumulative penalty separate from and in addition to what is authorized by a particular "law[ ] of a[ ] State or the United States," as it did in enacting RICO . . . , based upon the showing of an additional statutory element— in the case of VICAR, that the underlying violent offense bears a certain relationship to racketeering activity. At least this is a reasonable construction, particularly in light of the close relationship between VICAR and RICO, the latter of which, as already noted, we have held to authorize separate sentences for both RICO and a lesser included offense.

*Id.* (quoting 18 U.S.C. § 1959(a)). Although the Court of Appeals' review was limited to plain error, its analysis applies here.

Having concluded that Congress's intent in enacting both RICO and VICAR was to allow cumulative punishment, Mahdi's claim that his Narcotics Conspiracy Conviction violates the Double Jeopardy Clause fails.

      **B.**    **Federal Firearms Convictions**

Mahdi claims that the six Federal Firearm Convictions "should have merged into the first firearm offense of conviction" because "the firearm conduct charged was part and parcel of the overall sprawling and omnibus conspiracy the government charged in the indictment." (Def. Mot. at 3.) Mahdi is correct that only one § 924(c) violation may be charged in relation to one predicate crime, *United States v. Anderson*, 59 F.3d 1323, 1334 (D.C. Cir. 1995), but the Court

does not agree that the relevant predicate crime here is the overarching "conspiracy." Each § 924(c) conviction is based a distinct underlying crime. (*See* Verdict Form at 8-9, July 31, 2003.[16]) Under those circumstances, the six Federal Firearm Convictions do not violate the Double Jeopardy clause.

## V.  ASSIMILATIVE CRIMES ACT/EQUAL PROTECTION CLAIM

Mahdi's final claim is that the prosecution has violated the Assimilative Crimes Act and his right to equal protection under the law by including federal and D.C. Code offenses in a single indictment. He asserts that "the federal government violated the [Assimilative Crimes Act, 18 U.S.C. § 13] when it charged [defendant] in its federal indictment with the D.C. Code murder, narcotics, and firearm offenses while having the same and/or similar offenses listed in its federal code." (Def. Mot. at 3-4.) Mahdi's argument is premised on an apparent misunderstanding of the Assimilative Crimes Act. The Assimilative Crimes Act applies only to offenses committed on a "federal enclave." *See* 18 U.S.C. § 13(a). [17] It "adopts" state law as

---

[16] The predicate crimes for the § 924(c) convictions are six of the VICAR counts: (1) the armed kidnapping of Darrell McKinley in aid of racketeering activity on or about October 9, 1999; (2) the assault with intent to murder Russell Battle in aid of racketeering activity on or about October 20, 1999; (3) the assault with intent to murder of Monica Bowie in aid of racketeering activity on or about October 20, 1999; (4) the murder of Curtis Hattley in aid of racketeering activity on or about November 17, 1999; (5) the assault with intent to murder of Brion Arrington in aid of racketeering activity on or about May 26, 2000; and (6) the assault with intent to murder of Kevin Evans in aid of racketeering activity on or about June 6, 2000.

[17] The text of 18 U.S.C. § 13(a), under the heading "Laws of States adopted for areas within Federal jurisdiction," states

> Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, or on, above, or below any portion of the territorial sea of the United States not within the jurisdiction of any State, Commonwealth, territory, possession, or district is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory,

federal law for conduct that would not be an offense under federal law, but would constitute an offense under the surrounding state's criminal law. *See United States v. Cohen*, 733 F.2d 128, 140 (D.C. Cir. 1984) ("By passing the Assimilative Crimes Act Congress decreed that defendants in a federal court brought there by reason of crimes committed on a federal enclave would be treated the same as defendants accused of the same crime brought into the courts of the state in which the enclave is located."). It does not apply to defendants such as Mahdi who commit offenses within the District but not on a federal enclave. Nor does it authorize the federal government to charge a defendant who commits an offense on a federal enclave with both federal and state offenses. As the Assimilative Crimes Act has no application to Mahdi's case, he cannot use it to argue for the reversal of any of his convictions.

As for Mahdi's equal protection argument, it is true that a defendant in federal court in the District of Columbia is treated differently than defendants in other federal courts in that he can be prosecuted in a federal court indictment for both federal and D.C. Code offenses, *see* D.C. Code § 11-502(3),[18] whereas state offenses cannot be combined with federal offenses in a single prosecution. *See United States v. Jones*, 527 F.2d 817, 821 (D.C. Cir. 1975) ("a defendant whose

---

> Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13(a).

[18] Section 11-502(3) of the D.C. Code provides:

> In addition to its jurisdiction as a United States district court and any other jurisdiction conferred on it by law, the United States District Court for the District of Columbia has jurisdiction of . . . (3) Any offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense.

acts constitute violations of both statutory schemes can, under the statute, properly be the subject of a single trial in the District Court under a joint indictment") (citing *United States v. Shepard*, 515 F.2d 1324 (D.C. Cir. 1975)); *United States v. Sumler*, 136 F.3d 188, 190 (D.C. Cir. 1998) ("This provision places District defendants in the unique position of being tried under two statutory schemes at the same time.") The Court of Appeals has recognized that as "successive federal and state prosecutions are relatively rare, § 11-502's joinder provision means that District residents, as a practical matter, are much more likely to be prosecuted under separate statutory schemes for the same conduct, and hence, receive more severe punishments." *Sumler*, 136 F.3d at 191. Nonetheless, the Court of Appeals has "rejected the argument that this result violate[s] the equal protection clause." *See id.* at 191 (citing *United States v. Jones*, 527 F.2d at 822).[19]

## CONCLUSION

For the reasons stated above, Mahdi's due process, equal protection, and double jeopardy claims are denied while Mahdi's ineffective assistance of counsel claim requires an evidentiary hearing. A separate Order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: November 25, 2013

---

[19] On the other hand, in the District of Columbia there is no "separate sovereign" exception to the double jeopardy clause. *See Sumler*, 136 F.3d at 191 ("A person acquitted of a crime under District law may not be charged with that same crime under federal law in a successive prosecution, [but] . . . [a] defendant across the border in Virginia, however, who has been acquitted in a state proceeding, may be prosecuted again for the same conduct under an identical federal statute."); *see also United States v. Jones*, 527 F.2d at 821 ("Since successive prosecutions on identical or lesser included D.C. and federal offenses emanate from the same sovereignty, they are precluded by double jeopardy considerations.").